**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DEVON IT, INC.<br>1100 First Avenue<br>King of Prussia, PA 19406 | : | |
| | : | |
| | : | |
| and | : | Civil Action No. |
| | : | |
| DEVON AD TECH, INC.<br>1100 First Avenue<br>King of Prussia, PA 19406 | : | |
| | : | |
| | : | |
| | : | **JURY TRIAL DEMANDED** |
| and | : | |
| | : | |
| DEVON IT (EUROPE), LTD.<br>c/o John P Greely & Company<br>Mill House, Millbrook, Naas<br>County Kildare, Ireland | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| INTERNATIONAL BUSINESS<br>MACHINES CORPORATION<br>a/k/a IBM CORPORATION<br>1 New Orchard Road<br>Armonk, NY 10504 | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| and | : | |
| | : | |
| THOMAS M. S. BRADICICH<br>7506 Apex Barbecue Road<br>Apex, NC 27502 | : | |
| | : | |
| | : | |
| and | : | |
| | : | |
| BERNARD S. MEYERSON<br>80 Wellington Court<br>Yorktown Heights, NY 10698 | : | |
| | : | |
| and | : | |

|                                                           |     |
| --------------------------------------------------------- | --- |
|                                                           | :   |
|                                                           | :   |
| JAMES A. GARGAN                                           | :   |
| PO Box 12195                                              | :   |
| 3039 Cornwallis Rd.                                       | :   |
| Research Triangle Park, NC  27709                         | :   |
|                                                           | :   |
|              and                                          | :   |
|                                                           | :   |
| RODNEY C. ADKINS                                          | :   |
| 2932 Millwood Drive                                       | :   |
| Greenwich, CT 06831                                       |     |
|              Defendants.                                  | :   |
|                                                           | :   |

## COMPLAINT

Plaintiffs, Devon IT, Inc. ("Devon IT"), Devon AD Tech, Inc. ("Devon AD"), and Devon IT (Europe), Ltd. ("Devon Europe") (collectively "Devon") bring this Complaint against the Defendants, International Business Machines Corporation a/k/a IBM Corporation ("IBM"), Thomas M.S. Bradicich ("Bradicich"), Bernard S. Meyerson ("Meyerson"), James A. Gargan ("Gargan"), and Rodney C. Adkins ("Adkins") (Bradicich, Meyerson, Gargan and Adkins are referred to collectively as the "RICO Defendants"), and aver, upon information and belief, as follows:

## PRELIMINARY STATEMENT

1.      The RICO Defendants are responsible for orchestrating a wide-spread Ponzi scheme, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), over a period of nearly five years involving the direct solicitation of $12 million in investment money from Devon for two information technology projects that Devon agreed to fund based on the RICO Defendants' deceptive representations and revenue projections.  As part of their scheme, the RICO Defendants intentionally misrepresented the market potential of the products they

touted and continued to demand funding from Devon – an admittedly smaller company with less resources than IBM – even after the RICO Defendants secretly cancelled at least one of the subject development projects.  To entice Devon to continue its relationship with IBM, and to continue the flow of funds from Devon to IBM's hardware division ("STG" or the "Systems and Technology Group"), the RICO Defendants engaged in a pattern of deception successfully designed to mislead Devon into believing that its failing relationship with IBM would continue to expand.

2.     In reality, upon information and belief, instead of using the more than $12,000,000 invested by Devon for the projects that Devon agreed to fund, the RICO Defendants used a substantial portion of Devon's investment money to inflate the earnings of STG, to fund other projects with other business partners, or for some purpose other than for the benefit of the projects involving Devon.  While leading Devon down this road of deceit and as part of their scheme, the RICO Defendants improperly included the funding provided by Devon on the financial reports of STG, thereby exaggerating its performance.

3.     The practices described above are believed to be part of a pattern of deceptive practices pursuant to which the RICO Defendants enter into development agreements with serial investment partners with no real intention of completing the development of the projects.  Even though the RICO Defendants know that the development projects have no realistic prospect of completion, the RICO Defendants still require their development partners to continue to invest in those projects.  To keep the scheme alive, the RICO Defendants must continue bringing in new development partners so that money invested by the new partners can pay their obligations to prior development partners.

4.        Defendants engaged in the Ponzi scheme outlined above for their own personal benefit, to increase reported revenue in STG, in which the RICO Defendants work.  At relevant times during 2008 and until February 2009, these individuals were under the formal direction and control of former Senior Vice President, Robert Moffat ("Moffat").  Moffat served at Senior Vice President and Group Executive, Systems and Technology Group at IBM, during 2008 and early 2009.  Moffat was recently indicted and plead guilty to securities crimes in connection with his position as an officer at IBM, and as the head of the STG division.  Moffat has admitted to federal crimes of conspiracy to commit securities fraud (Count I) and securities fraud (Count II), and is scheduled to be sentenced in July 2010. *United States v. Robert Moffat, Jr.,* 10 Crim. 270 (S.D.N.Y.).   The SEC has also brought a proceeding against Moffat for his unlawful actions while the head of STG.  *Securities and Exchange Commission v. Danielle Chiesi, Mark Kurland and Robert Moffat,*  09-MJ 02307-UA-3 (S.D.N.Y.).  Before his arrest and guilty plea, Moffat was responsible for selling off IBM's hardware division to Lenovo and was well known for his brash and intimidating management style.

5.        STG is the least profitable division within IBM.  As press reports have documented, including a January 2010 New York Times article by Steve Lohr, IBM since the 1990's has steadily shifted its business model away from hardware and manufacturing and toward a focus on software and services sales.  Indeed, according to that article, services and software now account for more than 80% of IBM's business.  Moreover, since 2002, IBM has spent more than $25 billion on dozens of acquisitions, nearly all of which were software and services related companies.  Finally, this shift in IBM's attention away from hardware

4

development has been fueled by, *inter alia*, the introduction of smartphones, increased use in personal computers for work purposes and ever expanding corporate databases.

6.      Despite this radical change in its business model, upon information and belief, as part of the STG division, the RICO Defendants were still required to meet strict quarterly revenue targets within IBM to keep their jobs and to ensure the continued receipt of lucrative salaries, bonuses and/or distributions from IBM.  The RICO Defendants used STG as the enterprise through which they carried out their racketeering activities.  Over a five-year period through numerous meetings, telephone calls, emails and letters, the RICO Defendants promoted this enterprise to benefit themselves (and IBM) through illegally obtained funding and related investments that were procured by deception, artifice and fraud.  By fraudulently enticing Devon to enter into the one-sided contracts described in detail below, the RICO Defendants could guarantee that they would meet their division's aggressive profit requirements and then use those very agreements to mask and shield their liability for this racketeering enterprise.  Devon brings this Complaint to hold the RICO Defendants liable for their unlawful and disruptive actions, and to hold IBM liable for its contribution to the maintenance and success of the enterprise, all as detailed below.

## THE PARTIES

7.      Plaintiff, Devon IT, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and it maintains its principal place of business at 1100 First Avenue, King of Prussia, Pennsylvania 19406.

8.      Plaintiff, Devon AD, is a corporation organized and existing under the laws of the State of Delaware and it maintains a principal place of business at 1100 First Avenue, King of Prussia, Pennsylvania 19406.

9.      Plaintiff Devon Europe is a limited company organized and existing under the laws of Ireland and it maintains a principal place of business at Mill House, Millbrook, Naas, County Kildare, Ireland.

10.     Defendant, IBM, is a corporation organized and existing under the laws of the State of New York and it maintains a principal place of business at 1 New Orchard Road, Armonk, New York 10504.

11.     Defendant, Bradicich, is an individual with a residential address at 7506 Apex Barbecue Road, Apex, North Carolina.  At all times material hereto and continuing through the present, Bradicich has been employed by IBM as an IBM Fellow and Vice President, Systems Technology IBM Rack, Blade & x86 Servers.

12.     Defendant, Meyerson, is an individual with a residential address at 280 Wellington Court, Yorktown Heights, New York 10698.  At all times material hereto and continuing through the present, Meyerson has been employed by IBM as an IBM Fellow and Vice President, Strategic Alliances and Chief Technology Officer, IBM Systems and Technology Group.

13.     Defendant, Gargan, is an individual with a business address at PO Box 12195, 3039 Cornwallis Road, Research Triangle Park, North Carolina, 27789.  At all times material hereto, Gargan was employed by IBM as Vice President, Brand Executive System x and BladeCenter, and he was subsequently transferred to another position.

6

14. Defendant, Adkins, is an individual with a residential address at 2932 Millwood Drive, Greenwich, Connecticut 06831. At all times material hereto, Adkins was employed first as Senior Vice President, Development and Manufacturing, Systems and Technology Group, and then he was promoted in October, 2009 to Senior Vice President, Systems and Technology Group after Moffat was indicted.

## JURISDICTION AND VENUE

15. This Court also has jurisdiction over the subject matter and the Defendants pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1961 *et seq.*, specifically, 18 U.S.C. § 1864(c) and (d). Supplemental jurisdiction applies pursuant to 28 U.S.C. § 1367 because the state law claims are so factually related to the RICO claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

16. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a) because there is diversity of citizenship and the amount in controversy exceeds $75,000 exclusive of interest and costs.

17. This Court has personal jurisdiction over Defendants under 42 Pa.C.S. §§ 5301 *et seq.* and 5322 and the United States Constitution because the Defendants have transacted business within the Commonwealth of Pennsylvania and Eastern District of Pennsylvania and purposefully availed themselves of the Commonwealth of Pennsylvania and the Eastern District of Pennsylvania, and Defendants should have reasonably expected their actions to have consequences within the Commonwealth of Pennsylvania and the Eastern District of Pennsylvania.

18.     Venue in the Eastern District of Pennsylvania is proper under 28 U.S.C. §1391(a)(2) because it is where a substantial part of the events giving rise to this transaction occurred.

## FACTUAL ALLEGATIONS

### IBM's Initial Pitch to Devon – The Blade Project

19.     In or about September of 2005, high level IBM executives, including Bradicich, and Doug Balog ("Balog"), System x Division Head, approached Devon executives, John Bennett ("Bennett"), Devon IT's CEO and Chairman, and Joe Makoid ("Makoid"), Devon IT's President, regarding a potential investment by Devon in an IBM server project formally known as the "Aspen Project."  The initial meeting was held with Makoid in Raleigh, NC.  A second meeting was held with Bennett and Makoid in IBM's office in New York, NY.

20.     The project, later referred to as "Blade" or the "Blade Project," involved the development of a blade PC that would be housed in a blade center cabinet and would connect over local area networks and wide area networks to a small desktop appliance called a "terminal."

21.     At its most basic level, Blade was designed to be a server-based or server-hosted blade PC or Workstation.  It was designed to replace the typical stand-alone desktop PC.  Blade was not only intended to save space, but was also intended to significantly reduce energy expenditures, increase efficiency and speed, increase the security of a user's data by maintaining all data in the user's secured data center as opposed to individual desktop hard drives, and to provide business clients with flexible and tailored information technology solutions based on their individual needs.

22.     This project was attractive to Devon because it would allow Devon to enter the PC market with a server-based solution product that would mark the return of IBM to the PC market after the sale of its PC business to Lenovo.

23.     In September of 2005, a meeting was held amongst Bennett, Makoid and IBM executives, including Bradicich, at IBM's offices at 590 Madison Avenue, New York, New York, 10022.

24.     At the meeting in New York, NY, Bradicich gave an extensive presentation on the Blade Project.  During his presentation, Bradicich falsely represented to Bennett and Makoid that, among other things, Blade would be introduced into the market during the first quarter of 2006 and at a competitive price of approximately $1,500.00 per unit.

25.     Bradicich also falsely represented Blade's expected sale projections.  According to Bradicich, Devon IT could reasonably expect that 500,000 Blade units would be sold over the course of the first three years with 100,000 units sold in the first year alone.  On information and belief, Bradicich did not believe the sale projections to be accurate at the time that he provided them.

26.     Bradicich also represented that these forecasts were conservative and usually surpassed.  Indeed, Bradicich informed Bennett and Makoid that several prominent companies, including Merrill Lynch and Honda, were already interested in purchasing the Blade product from IBM once it went to market.  On information and belief, Bradicich did not believe these statements to be true at the time that he provided them.

27.     According to Bradicich and other IBM deal executives, once this product reached an IBM milestone called "commit exit," worldwide forecasts would be obtained and the product would be launched.

28.     By way of background, commit exit projections provided to Devon by the RICO Defendants for sales of the Blade were 100,000 units sold in year one, 158,000 in year two, and 250,000 in year three.  In addition to the royalties Devon would receive upon the sale of a Blade unit, Devon would also receive revenue for sales of the terminals and connection manager software associated with Blade.  Thus, according to the RICO Defendants, total revenue was projected to reach $33,800,000 in year one, $50,086,000 in year two and $79,250,000 in year three.  On information and belief, the RICO Defendants did not believe the sales projections to be accurate at the time they were provided.  For comparative purposes, by the time 2008 rolled around, the sales forecast dropped dramatically to 26,613 units in year one, 50,000 in year two, and 80,000 in year three.  This would yield projected revenue of $8,516,160 in year one, $16,000,000 in year two and $24,411,127 in year three.

29.     Importantly, at the September 2005 New York meeting, Bradicich and other IBM executives represented that any investment by Devon in the Blade Project would be put towards the design, development and marketing of the Blade Project.  On information and belief, Bradicich did not believe this to be true at the time that he stated it, because he expected that the funds would be diverted for other purposes.

30.     Following the September 2005 meeting in New York, on November 7, 2005, Devon IT entered into the IBM/Devon IT Blade Collaboration Agreement (the "Blade Agreement") with IBM, in reliance on Bradicich's September 2005 misrepresentations regarding

Blade's overwhelming market potential and the purpose of Devon's investment. A true and correct copy of the November 7, 2005 Blade Agreement (with an effective date of October 3, 2005) is attached hereto as Exhibit "A." Devon IT subsequently assigned the Blade Agreement to Devon Europe.

31. The Blade Agreement obligated Devon IT to make development payments to IBM in a total amount of $4,000,000 at the occurrence of three milestones. See Exhibit "A" at § 2.2.

32. In addition, Devon agreed to fund and develop the desktop terminal. Devon was interested in developing the desktop terminal because it would catapult Devon's name and product into major IT centers around the world in conjunction with IBM's return to the PC market. Devon proceeded to develop this product, called "CP 20," because the product would be marketed under IBM's valuable brand and would be sold in IBM's well-established sales channels.

33. Devon IT and Devon Europe made all three of the milestone payments under the Blade Agreement, using funds borrowed from Claret Capital Blade Limited ("Claret"). Claret acquired a 10% equity interest in Devon Europe as partial consideration for the loan.

34. Each of the three milestone payments was made to IBM by Devon IT and Devon Europe via electronic wire transfer to IBM's account at JP Morgan Chase, New York, New York as follows:

| Date | Amount |
|---|---|
| January 5, 2006 | $ 500,000 (Devon IT) |
| December 18, 2006 | 1,500,000 (Devon Europe) |

11

October 24, 2007                2,000,000 (Devon Europe)

See Exhibit "A" at §§ 2.2, 18.0.

35.     In return for Devon's $4,000,000 investment, the Blade Agreement obligated IBM to pay a certain royalty fee for each Blade shipped.  See Exhibit "A" at § 18.1 and Attachment A, appended thereto.

36.     It was the intention to repay the loan from Claret with the significant royalties that the IBM executives, including Bradicich, dishonestly had promised would be generated under the Blade Agreement.

### The iDataPlex and ClientPlex Projects

37.     Following the execution of the Blade Agreement, in February of 2007, IBM executives approached Devon IT executives Bennett, Makoid and James Kane ("Kane"), Devon IT's Senior Director of Business Development, to pitch a new investment project involving the design, development and marketing of a large-scale, data center server complex called iDataPlex (the "iDataPlex Project").

38.     According to IBM, iDataPlex was to be a state-of-the-art computer rack used to store servers, switches and other equipment.  iDataPlex was intended to provide tremendous density and would be very power efficient.  It was expected to alleviate the need for excessive processing and storage power.

39.     At one of the earliest meetings in February 2007 between Devon and IBM regarding iDataPlex, Bradicich and Balog advised Devon that IBM was seeking an investment partner for the rack server itself.

40.     At a subsequent meeting in March 2007, IBM executives, including Bradicich, Gargan and Jan Janick ("Janick"), IBM Vice President of Modular Development, represented that they were also looking for an investment partner for a ClientPlex node, a data center based remote PC.  According to Bradicich, Gargan and Janick, IBM's best engineers would be tasked with developing the ClientPlex node.  Importantly, these individuals also represented that the remote PC would be less expensive than a Dell PC and that it would dominate the market.

41.     At a meeting between Devon and IBM in March 2007, Adkins informed Devon that Devon would be featured at IBM's Partner World presentation in St. Louis, Missouri in May 2007.  At this meeting, Adkins advised that as an IBM partner, Defendants would make sure to give Devon "only good deals."

42.     Makoid was indeed introduced on stage at IBM's Partner World presentation in St. Louis, Missouri in early May 2007.  At a dinner meeting during the trip to St. Louis, Adkins advised Bennett and Makoid that Adkins, Bradicich and Meyerson were a team that worked together to ensure the IBM executives' future success.

43.     Another meeting occurred in April 2007 at Devon's offices in King of Prussia, Pennsylvania.  The meeting was attended by Gargan and Janick, on behalf of IBM, and Bennett, Makoid, Kane and Paul Mancini ("Mancini"), Devon IT's Vice President of Marketing, on behalf of Devon.  At this meeting Gargan described the complicated cooling technology embodied in the iDataPlex and ClientPlex systems called "Blue Ice."

44.     At this meeting, Gargan advised Bennett, Makoid, Kane and Mancini that IBM had obtained a market research report from International Data Corp. regarding iDataPlex.

13

According to Gargan, the research confirmed that this technology and the proposed products would dominate the middle of the market pyramid – a market that exceeded $4 billion.

45.      Gargan represented the iDataPlex project as a "lock" because of the low cost of the ClientPlex node and also because the expected inclusion of the TC5 product in the marketing agreement to be entered into between IBM and Devon following the execution of the iDataPlex Agreement would yield significant revenues for Devon.  The TC5 product is a high-end thin client terminal that would allow users to connect to terminal sessions on servers which would allow more robust connectivity to servers and open up a broader market space.

46.      Additionally, in response to a question from Kane about how much of the market IBM expected to garner with iDataPlex and ClientPlex, Gargan represented that "[i]t is IBM's God-given right to achieve 35% of any market it enters."

47.      Even before the initial "pitch meeting" in February 2007, in early 2007, Bradicich bragged that Devon IT would become a $1 billion company if it invested in the iDataPlex Project.  Indeed, after a dinner at the 21 Club in New York, Bradicich gave Makoid a book titled "IBM Journal of Research and Development." Bradicich signed the book and wrote the following message across the cover:  "Joe, From the 21 Club to a $1 B[illion] company!"

48.      Importantly, based on the numbers provided by Gargan and Bradicich, Devon could expect substantial gains by partnering with IBM on the iDataPlex Project even if the projections vehemently insisted on by Gargan and Bradicich were not fully met.  Specifically, on the basis of these representations, it became clear that Devon's involvement in these projects would propel Devon into a multi-hundred million-dollar business and even a billion dollar company.

49.     Specifically, initial sales projections for iDataPlex were at 85,000 client nodes sold in year one, 540,000 in year two, and 1,000,000 in year three.  Devon would receive approximately $500 per iDataPlex unit sold and revenue from the sales of the terminal and connection manager software.  On information and belief, the RICO Defendants did not believe the sale projections to be truthful and accurate at the time they were provided.  Subsequently, as with Blade, at the time of commit exit, sales forecasts dropped off dramatically to 25,562 in year one, 90,392 in year two, and 135,588 in year three.

50.     At the April 2007 meeting, the IBM executives advised Devon that if Devon decided to partner with IBM on the iDataPlex Project, Devon would be required to pay IBM $11,000,000 via a development agreement.  According to Gargan and Meyerson, the appearance of a fully funded "development agreement" was necessary to obtain the approval of IBM's accounting department for the contemplated deal.  Gargan represented that, because non-recurring engineering expenses would never reach $11,000,000, the real value in the deal would actually come from a subsequent "go to market" agreement entered into following the execution of the development agreement.  That subsequent agreement was the September 28, 2007 Marketing Agreement, a true and correct copy of which is attached hereto as Exhibit "B."  The Marketing Agreement set forth the joint marketing plan and strategy for selling iDataplex, including its component parts.

51.     Moreover, at this meeting, Gargan and Bradicich advised Bennett, Makoid, Kane and Mancini that Devon IT's investment money would be put towards the design, development and marketing of iDataPlex and ClientPlex.  Furthermore, they advised the Devon executives that Intel Corporation was investing $10,000,000 to secure that Intel's chips would be used in the

iDataPlex server.  On information and belief, the RICO Defendants did not believe those investment statements to be true at the time they were made.

52.     In reliance upon the fraudulent representations of Gargan and Bradicich regarding the lucrative nature of the proposed deal and the purpose of Devon's investment money, on June 7, 2007, IBM and Devon IT entered into the IBM/Devon IT Hosted Client Collaboration Agreement (the "iDataPlex Agreement") for the purpose of designing, developing and marketing iDataPlex.  A true and correct copy of the iDataPlex Agreement is attached hereto as Exhibit "C."

53.     Devon IT assigned the iDataPlex Agreement to Devon AD on July 30, 2007 by virtue of the First Amendment to the iDataPlex Agreement (the "First Amendment").  The iDataPlex Agreement obligated Devon AD to make substantial development payments to IBM in a total amount of $11,000,000 at the occurrence of five (5) dates.  See Exhibit "C" at § 16.1.

54.     Devon AD made four payments totaling $8,000,000 via electronic wire transfer to IBM's account at PNC Bank, 500 First Avenue, Pittsburgh, PA as follows:

| Date | Amount |
|---|---|
| June 11, 2007 | $ 500,000 |
| September 28, 2007 | 2,000,000 |
| December 20, 2007 | 2,500,000 |
| March 3, 2008 | 3,000,000 |

See Exhibit "C" at § 16.1.

55.     On October 3, 2007, Makoid sent an email to Meyerson to confirm that Intel indeed committed to provide $9,000,000 for the iDataPlex project.  Less than 90 minutes after

16

Makoid sent his email, Meyerson responded by email stating "I am sitting next to Jim Gargan, and he confirms that Intel renewed its funding commitment to the IDataPlex at our formal review last week.  The program is therefore fully funded and going.  I also spoke with Tom Bradicich and he agreed to take on the program management working with my team and Jim's.  We will work with him to get the products and terms defined and done.  Regards, Bernie."  Myerson copied Gargan, Bradicich on this email.

56.     Based on the representations about Intel's confirmed $9,000,000 funding and that the project was fully funded (which was represented to be $30 million), Devon wired $2,000,000 on October 24, 2007 and another $2,000,000 on December 20, 2007 to IBM.  These payments would not have been made to IBM in the absence of these assurances by the RICO Defendants.  Upon information and belief, the project was not fully funded as represented by IBM and the RICO Defendants.  The RICO Defendants knew the project was not and would not be fully funded at the time these representations were made, but the RICO Defendants concealed this information from Devon.  These misrepresentations about the project being "fully funded" not only deceived Devon, but the lack of this funding doomed this project – a result that had to be known by the RICO Defendants.

57.     Because of subsequent restructuring of the iDataPlex Agreement, discussed in more detail below, Devon was not obligated to make the final and fifth payment to IBM.

58.     To fund the project, Devon AD borrowed the required amounts from Claret Capital, Inc. ("Claret Capital").  As partial consideration for the loan, Claret Capital acquired a 33% equity interest in Devon AD.

17

59.     In return for its investment in the iDataPlex Project, Devon AD was to receive royalties from the sale of ClientPlex and TC5.

60.     In further reliance upon the fraudulent representations of Gargan and Bradicich regarding the lucrative nature of the proposed deal and the purpose of Devon's investment money, on September 28, 2007, IBM and Devon IT entered into the Marketing Agreement for the purpose of making Devon IT's thin client terminal, TC5, available to customers under an IBM part number at a price to be determined.

**The RICO Defendants' Scheme to Divert Devon's Funds to Other Projects**

61.     In February 2007, despite Bradicich's earlier representations that Blade would go to market during the first quarter of 2006 and the statement in the Blade Agreement that the Blade would be brought to market no later than the third quarter of 2006, Meyerson advised Devon that the product would not be released until August 27, 2007.  On September 18, 2007, Meyerson moved the release date once again to September 28, 2007.

62.     After numerous delays and the passage of the original deadline of the third quarter of 2006, discussions between Devon and IBM eventually contemplated that Blade would become generally available during the fourth quarter of 2007.  However, Meyerson ultimately changed the date of anticipated general availability again and advised Devon that it would be during the third quarter of 2007.  By advising Devon that the Blade would be available in the third quarter of 2007 – when Defendants knew that it would not be – Defendants induced Devon to make the $2,000,000 payment under the iDataplex Agreement, even though there remained agreements to be negotiated with regard to the associated Marketing Agreement and Blade had not yet been made generally available.

63.     Upon information and belief, Meyerson and the other RICO Defendants never intended to market the Blade in a way that would meet the lofty projections that the RICO Defendants had provided to Devon.  Rather, they intended to use Devon's money to advance other purposes within STG.  The moving of the general availability date was a mere diversionary tactic, designed to defraud and mislead Devon into believing that IBM was actively developing Blade and to ensure Devon's continued payment under the terms of the Blade Agreement and the iDataPlex Agreement.  Moreover, as a result of the RICO Defendants' strategic delays, the technology used in the Blade eventually became outdated, rendering the Blade essentially obsolete and ruining any chances Devon had to recoup its investment through the royalties the RICO Defendants had promised Devon it would receive if it partnered with IBM on the Blade Project.

64.     In June of 2007, Devon also learned that the go-to-market price for Blade was actually $4,500 and not $1,500, the competitive price that Bradicich had promised Devon prior to signing the Blade Agreement.

65.     Furthermore, during a February 2008 meeting in Ireland attended by Bennett, Meyerson and Claret, Claret representative Paul Kealy ("Kealy"), asked Meyerson why Blade sales were low.  Meyerson advised that low numbers were typical at the start of any project. However, as discussed in detail below, Meyerson concealed the real reason behind the Blade's dwindling sale numbers.  **Blade was not selling because, in actuality, the RICO Defendants had already terminated the Blade Project in early 2008 without advising Devon**.  The concealment of the cancellation of Blade by the RICO Defendants was intended to and did

motivate Devon to continue to invest money, resources, and attention in the Blade Project and the iDataPlex/CientPlex project.

66.     Ultimately, in April of 2008, IBM advised Devon that the Blade Project was at the "end of life" and would be cancelled shortly, and that the future of the iDataPlex/ClientPlex project was in question.  Meyerson was directly responsible for and involved in the discussions involving how these issues would be handled.

67.     The RICO Defendants solicited and accepted a wire transfer payment of $3,000,000 from Devon on March 1, 2008 under the iDataPlex Agreement **after** the Blade Project had been cancelled but **before** Devon was advised of the cancellation.  Upon information and belief, the RICO Defendants did not advise Devon of the cancellation of the Blade Project until April, 2008 to ensure that the RICO Defendants and STG would receive the $3,000,000 development payment in March, 2008.

68.     When it was finally disclosed to Devon that the Blade Project had been cancelled, negotiations began between IBM and Devon during which Devon IT proposed that it take over responsibility for the distribution of the Blade.  Two of the major points discussed during the negotiations were the current Blade inventory in the possession of FoxConn, the manufacturing company employed by IBM to produce the Blade, and whether FoxConn would continue to manufacture the Blade for Devon.

69.     During a conference call in June, 2008 involving representatives of IBM, Devon and FoxConn, Devon learned to its surprise that FoxConn had been told in early 2008 that IBM had unilaterally cancelled the Blade Project.  As a result, FoxConn had very little inventory to support Devon in the Blade project and no interest in continuing to manufacture the Blade.

70.     In the spring of 2008, Devon was also advised that IBM did not intend to continue with the iDataPlex/ClientPlex Project under the previously agreed terms and that it wanted to restructure the iDataPlex Agreement.  Despite Devon's investment of $8 million to fund the iDataPlex Project, the project never came to fruition.

71.     Upon information and belief, the RICO Defendants' false statements regarding the market potential of Blade and iDataPlex and the purpose of Devon's investment monies were made as part of the RICO Defendants' calculated scheme to improperly acquire money from Devon and either use the money to inflate the performance of STG, to divert it to other projects with other business partners, or for some other illegitimate purpose (that is, not for the benefit of the projects in which Devon invested).

72.     Devon's belief is based in part upon Meyerson's statements to Bennett that IBM needed Devon's payments to IBM to be independent of any contractual requirement on the part of IBM, but that all payments from IBM to Devon would have to be tied to some contractual requirement.  Upon information and belief, the RICO Defendants required this dichotomous payment arrangement with Devon so that STG could immediately recognize payments from Devon as revenue as opposed to having to spread them over the term of a contract.

73.     Specifically, Meyerson told Bennett that such an arrangement was necessary so that IBM's auditors would not object to the booking of the payments as fully recognized revenue upon receipt.  On the contrary, the payments from IBM to Devon had to be tied to a contractual payment requirement.  Further proof of this accounting scheme was Gargan's statements to Devon that it would not take $11,000,000 to develop iDataPlex despite the contractual requirement that Devon pay that amount in development costs.

21

74.     Upon information and belief, the RICO Defendants engaged in the Ponzi scheme outlined in paragraphs 1-6 in order to increase revenue in STG.  Upon information and belief, the RICO Defendants were required to meet strict quarterly revenue targets to keep their jobs and to ensure the continued receipt of lucrative salaries, bonuses and distributions from IBM.

75.     Had Devon known that its investment monies would be used to fund other projects or for reasons other than the two projects specified above, Devon would not have entered into the Blade or iDataPlex Agreements.

76.      In addition to the fabricated projections for the Blade Project, iDataPlex and ClientPlex Project, the RICO Defendants, particularly Meyerson, discussed partnering with Devon for additional projects including the potential spin-off from IBM of a foundry operation for the manufacture of semiconductors that would require a $1 billion investment, a green IT project in Iceland, a super computing operation in Connecticut, and a potential partnership at the Mayo Clinic.  Meyerson discussed spinning each of these projects off from IBM with the understanding that he would join Devon as its Chief Executive Officer.  Meyerson explained that when IBM executives left the company, they were permitted to take some projects with them. He explained that these projects are the types of projects that he could help Devon achieve, thereby making Devon a prominent company in the information technology sector.  Upon information and belief, at the time that Meyerson brought these opportunities to Devon, he knew that Devon would not ultimately be allowed to become involved in any of the opportunities.  The promise of these projects was merely a carrot to keep Devon involved with the RICO Defendants so that money would continue to flow from Devon to STG.

**Bradicich's Breach of His Fiduciary Duties as Member of the Advisory Board**

77.     In late February and early March of 2007 (after the execution of the Blade Agreement and before the execution of the iDataPlex Agreement), Bradicich asked Devon IT to appoint him to a position on Devon IT's Board of Directors.

78.     Bradicich advised Bennett and Makoid that, as a member of the Board of Directors, he could help Devon build its business because of his position within IBM and his many industry contacts.  He also advised Bennett and Makoid that he would make sure that all deals between IBM and Devon would be beneficial to Devon.

79.     However, after making the suggestion to Devon, Bradicich advised Bennett that his request for an appointment to Devon's Board of Directors was rejected by IBM's legal department because of an apparent conflict of interest, but that he was going to appeal to Adkins. Adkins then suggested that, to circumvent the conflict of interest issue, Devon IT create an Advisory Board so that Bradicich could serve on that board as opposed to a Board of Directors.

80.     Upon information and belief, Adkins approved Bradicich's appointment to the Advisory Board so that Bradicich could persuade Devon to invest in the iDataPlex Project for the benefit of IBM and the RICO Defendants and actively prevent Devon from discovering the RICO Defendants' improper redirection of Devon's investment monies.

81.     On March 8, 2007, Bradicich was appointed to Devon IT's Advisory Board ("Board").  See March 8, 2007 Advisory Board Retainer and Appointment Agreement, with an effective date of March 1, 2007, attached hereto as Exhibit "D."  Devon IT agreed to pay Bradicich $65,000 annually to serve on its Board.  See Exhibit "D".

23

82.     Devon IT agreed to increase Bradicich's salary to $175,000 annually and to change the Advisory Board position from Devon IT to Devon International Group ("DIG") (of which Devon IT is a part) at Bradicich's request, as is confirmed in the December 1, 2007 Advisory Board Retainer and Appointment Agreement, attached hereto as Exhibit "E."

83.     Adkins requested that Bennett and Makoid agree to pay Bradicich an annual amount of $175,000 because Bradicich had advised Adkins that he might leave IBM for a position with a competitor and Adkins was looking for a way to provide additional money to Bradicich.

84.     In connection with this request, Adkins advised Bennett and Makoid that he would make certain that only good deals were entered into by the RICO Defendants and Devon.

85.     Bradicich retained his position as the IBM Fellow and Vice President, Systems Technology IBM Rack, Blade & x86 Servers while serving as a member of the Advisory Boards of Devon IT and DIG.

86.     As a member of the Advisory Boards of Devon IT and DIG, Bradicich owed Devon IT fiduciary duties, including the duty of loyalty.

87.     Pursuant to the terms of both the Advisory Board Retainer and Appointment Agreements, in exchange for compensation of $65,000 and $175,000 respectively, Bradicich agreed to provide strategic advice regarding both technical and business issues, represented that his role on the Board would not create a conflict of interest, and acknowledged that he had duties to Devon including a duty of confidentiality.

88.     The clear understanding of the parties was that, as a member of the Boards, Bradicich would provide Devon with sound technical and business advice and would work to

24

increase Devon's presence in the information technology industry.  However, rather than provide Devon with the promised support, Bradicich participated in a campaign to divert Devon's funding to other IBM projects and for purposes that were not part of the two projects in which Devon had invested, deceitfully using the powers bestowed on him as a member of the Advisory Board to his own advantage, to the advantage of the other RICO Defendants, and to the advantage of IBM.

89.     During his tenure on the Boards, Bradicich repeatedly assured Devon that the Blade Project was a successful project and that it would prove an immense source of revenue for Devon.  In reality, however, the RICO Defendants unilaterally discontinued the Blade Project in January of 2008 without advising Devon.  Bradicich knew the status of this project at all times and failed to advise Devon that the Blade Project had been cancelled.

90.     Moreover, while serving on the Boards, Bradicich continually encouraged Devon IT to invest in the iDataPlex Project, assuring Devon IT that it would recoup significant monetary gains from its investment.

91.     Devon IT reasonably relied on Bradicich's advice and entered into the iDataPlex Agreement because Bradicich, as an executive of IBM, had knowledge regarding the marketability of the proposed project.

92.     Upon information and belief, at all relevant times, Bradicich was aware that the market projections given to Devon IT regarding Blade and iDataPlex were grossly overstated. Upon information and belief, rather than advise Devon of Blade and iDataPlex's various shortcomings as required by Bradicich's fiduciary duties, Bradicich used his position as a member of the Boards to conceal all accurate information from Devon regarding the Blade

Project and iDataPlex Project in clear breach of his fiduciary duties.  Upon information and belief, Bradicich concealed such information to guarantee Devon's continued investment in the STG division's projects.

93.     Upon information and belief, Bradicich failed to advise Devon that its investment in the Blade iDataPlex Projects was used to fund other projects and for purposes unrelated to the Blade or iDataPlex Project.

94.     In addition to advising Devon IT to invest in the iDataPlex and Blade Projects, Bradicich also used his position on the Boards to solicit and obtain funding and marketing resources for his son's (Jason Bradicich) company GeeVee, Inc., a web video game company. Importantly, Bradicich was the Chairman of the Board of GeeVee, Inc.  Bradicich went so far as to have Devon IT provide marketing advice and resources for GeeVee, Inc. for no compensation or benefit other than to accommodate Bradicich.

95.     Bradicich pressured Devon's executives, including Bennett and Makoid, as well as Claret executives to invest in GeeVee, Inc. by implying that their investment in GeeVee, Inc. would secure IBM's continued support and partnership in other lucrative projects.  These representations were false and resulted in certain Devon IT personnel/executives investing in GeeVee, Inc. and in Devon IT providing marketing support for no purpose other than to accommodate Bradicich.

96.     Bradicich resigned from the DIG Advisory Board on June 1, 2008, shortly after Devon became aware that the Blade Project had been discontinued without its knowledge and that the iDataPlex Project was facing a similar fate.

**IBM's Breach of the Restructured Blade and the iDataPlex Agreements**

97.     When it was determined in June 2008 that the RICO Defendants had concealed from Devon their decision to cancel the Blade Project and information making it unlikely that Devon would be able to continue with the distribution of the Blade, the RICO Defendants began discussions with the Devon to restructure the Blade and iDataplex Agreements.  Meyerson, with the advice, consent and direction of Adkins, was responsible for negotiating a restructuring of the Blade Agreement and the iDataPlex Agreement.

98.     The restructured agreements were negotiated together.  Each was made expressly dependent on an agreement being reached with the other.  The two restructured agreements were signed at the same time in July 2008.  True and correct copies of the July 10, 2008 Blade Enablement Agreement (the "Restructured Blade Agreement") and the Hosted Client Solution Enablement Agreement (the "Restructured iDataplex Agreement") (collectively, the "Restructured Agreements") are attached hereto as Exhibits "F" and "G" respectively.

99.     Pursuant to the Restructured Agreements, IBM agreed to make a lump sum payment to Devon IT and to award Devon the right to use up to 60 part numbers (30 per Restructured Agreement) under IBM's modified vendor logo for hardware program.  See Exhibit "F" at §§ 3.5.1, 19.0; Exhibit "G" at § 3.6.1.  An IBM part number is a unique identification number given to a particular product.  By acquiring an IBM part number, a product will enjoy immediate name recognition by virtue of its association with IBM.

100.    Moreover, in addition to assigning Devon's products valuable IBM part numbers, the negotiations concerning the restructuring of the iDataPlex Agreement focused on Devon AD

receiving a particular royalty stream for the sale of each specified planar product. A planar is an individual server node that is installed into the iDataPlex rack.

101.   During the negotiations, Bennett proposed a royalty of eight to ten dollars per planar without a cap. Meyerson rejected this proposal because, as he explained, the royalties Devon AD would receive under Bennett's proposal would be too high. According to Meyerson, expected sales would be at least 100,000 planars per quarter with a likelihood of more than 500,000 planar sales per quarter. Additionally, Meyerson represented that the part numbers would be readily available world-wide.

102.   Ultimately, Meyerson agreed that IBM would pay Devon AD $100 per planar sold through the second quarter of 2010, and $10 per planar thereafter until 2013 with certain specified caps that would set the total royalty at $9,100,000 through the second quarter of 2010 and at $14,700,000 through the fourth quarter of 2013. See Exhibit "G" at § 19.1.

103.   Meyerson explained that the royalty stream of $100 per planar through the second quarter of 2010 was intended to return to Devon the $8 million that had been invested in the iDataPlex Project, plus reasonable interest. Meyerson characterized the revenue stream from the proposed restructuring of the iDataPlex Agreement as an "underhand pitch." Upon information and belief, Meyerson agreed that IBM would return the $8 million owed to Devon with the restructuring of the iDataPlex Agreement as part of the unlawful accounting scheme identified and described in Paragraphs 1 - 6, 69 - 72.

104.   On information and belief, Meyerson knew at the time of the negotiation of the Restructured Agreements that Devon would not receive the IBM part numbers he had promised, that the information and estimates he provided regarding future royalties were inaccurate, and

that Devon would not have agreed to the Restructured Agreements if he had truthfully disclosed the situation.

105.    Following the execution of the Restructured Agreements, on February 23, 2009, Devon and IBM entered into addenda to the Restructured Agreements adding and/or modifying certain terms in the Restructured Agreements.  True and correct copies of the February 23, 2009 Addendum 1 to the Restructured Blade Agreement ("Blade Addendum") and the Addendum 1 to the Restructured iDataplex Agreement ("iDataplex Addendum") (collectively, the "Addenda") are attached hereto as Exhibits "H" and "I" respectively.

106.    Importantly, pursuant to the Addenda, STG, IBM's hardware division, is expressly prohibited until December 31, 2010 from, among other things, proactively enabling thin client hardware products which are "similar or reasonably equivalent in function to Devon's TC-5 and/or TC-2 product…"  See Exhibit "H" at § 2.0; Exhibit "I" at § 2.0.

107.    Following the execution of the Addenda, upon information and belief, STG began proactively enabling a very similar thin client hardware product developed by Wyse Technology ("Wyse") in clear breach of STG's obligations under the Addenda.  STG's breach and improper marketing of Wyse's thin client terminal has undermined the competitive edge the Addenda were intended to give Devon's TC5 and TC2 products.

108.    On information and belief, the RICO Defendants and IBM had no intention at the time of the execution of the Addenda of complying with the thin client hardware prohibition and knew that Devon would not have agreed to the Addenda absent that prohibition.

109.    Upon information and belief, IBM strongly promoted and marketed Wyse's thin clients more aggressively and actively than it promoted and marketed Devon's thin clients.  IBM

failed to cooperate and work with Devon on a reasonable basis to make the Devon products that had been assigned IBM part numbers successful in the market, thereby deliberately undermining sales of Devon products.

110.     In February 2009, Hector Guevarez ("Guevarez"), an IBM employee within the STG division, who was assigned to be Devon's primary contact within IBM for implementation of the vendor logo for hardware ("vlh") part number program, advised Devon that the part numbers that had been assigned to Devon's products were in fact "fake" part numbers.  When Devon IT objected to this description, Guevarez claimed that IBM would work with Devon and meets its obligations to assure the success of the vlh part number program.

111.     In fact, from the inception of the vlh part number program through the present, IBM has failed to meet its obligations and instead has not cooperated with Devon and has imposed hurdles preventing the success of the vlh part number program for Devon.  IBM has demonstrated a lack of effort and interest in properly promoting and marketing the products with the vlh part numbers.  All of this has confirmed Guevarez' statement that IBM considers the vlh part numbers assigned to Devon products to be "fake" part numbers.

112.     As further evidence of the depth of the IBM's betrayal, in late August and early September of 2009, Guevarez attended the VMWorld conference at the Moscone Center in San Francisco, California to promote Devon's thin-client product.  Devon incurred all the costs for Guevarez to attend this event on its behalf.  However, instead of promoting Devon's interests and products at the conference, Guevarez secretly created a marketing video with Maryam Alexandrian-Adams ("Adams"), Senior Vice President Worldwide Sales and Channels for Wyse, actively promoting Wyse's partnership with the STG division and, more importantly, marketing

and proactively enabling Wyse's thin-client product, all in breach of IBM's contracts with

Devon.  The video is posted at http://www.youtube.com/watch?v=HYCwr27pko4.

113.     In addition to breaching the Restructured Agreements and the Addenda as

outlined above, the planar sales under the Restructured iDataplex Agreement did not even come

close to Meyerson's representations.  Indeed, the actual planar sales and royalty payments under

the Restructured iDataplex Agreement have been as follows:

| Quarter | Units Sold | Cap | Actual Royalty |
|---------|-----------|-----|----------------|
| 3Q08 | 755 | $ 400,000 | $ 75,500 |
| 4Q08 | 5,626 | 750,000 | 562,600 |
| 1Q09 | 2,687 | 1,325,000 | 268,700 |
| 2Q09 | 7,431 | 1,325,000 | 743,100 |
| 3Q09 | 3,964 | 1,325,000 | 396,400 |
| 4Q09 | 9,623 | 1,325,000 | 962,300 |
| 1Q10 | 3,484 | 1,325,000 | 348,400 |

114.     Moreover, contrary to Meyerson's representations that the part numbers would be

available in all geographies across the world, the part numbers are not available in Japan, Brazil,

Russia or China.  Upon information and belief, Meyerson knew that actual sales would never

approach the projections that he provided and that the part numbers would not be available in all

promised countries.

31

**The RICO Defendants Induce Devon to Market TC5 Under Less Lucrative Vlh Program**

115.    Although Devon IT's thin client terminal, TC5, was designed for use with the iDataPlex, it also could be used with any IBM server that was capable of virtualizing a desktop. IBM had agreed to assign this product an Original Equipment Manufacturer ("OEM") part number for Devon IT.  Devon IT was to receive a royalty for each sale of a TC5 unit.

116.    During the negotiations surrounding the Restructured Agreements, specifically throughout June of 2008, Meyerson and other IBM employees continued to assure Devon that Devon's TC5 thin client terminal would be assigned an IBM OEM part number.  By having an IBM part number assigned to Devon IT's thin client, the thin client would be released as a standard product from IBM and would have immediate name recognition and credibility in the market place by virtue of its association with IBM.

117.    It was critical to the business of Devon IT that IBM follow through on its assurance to OEM the TC5, and Devon relied on the representations that IBM would do so in entering into the Restructured Agreements.

118.    However, promptly after Devon entered into the Restructured Agreements with IBM and without consulting Devon, the RICO Defendants advised Devon that it had cancelled plans to assign the TC5 an OEM number.

119.    Instead of assigning the TC5 an OEM part number as originally promised, Meyerson advised Devon that the TC5 instead would be marketed through IBM's vlh program. According to Meyerson, Devon would enjoy greater monetary benefits through the vlh program than had IBM assigned TC5 an OEM part number because IBM would only mark up the sale

price of the TC5 by only 5 - 10%, a much lower mark up than the mark up that would be made if the TC5 were assigned an OEM part number.

120.    Additionally, David Tjon ("Tjon"), another IBM employee assigned to work with Devon on the vlh part number program, advised Devon in a presentation on September 24, 2008 that the vlh part number program would be better for Devon than the OEMing by IBM of the TC5.  He specifically advised that the likelihood of success under the vlh program was high and that the likelihood of success if IBM OEM'ed the TC5 was low.  Upon information and belief, Tjon's statements and the assurances of other IBM employees were made at the direction of Meyerson and Adkins, and were known by Meyerson and Adkins to be false at the time.

121.    Devon relied on these representations and proceeded with extensive efforts and expense to make the TC5 part of the IBM vlh part number program.

122.    However, despite the representations from Meyerson that Devon's TC5 would be marketed at a competitive price, the RICO Defendants proceeded to mark up the TC5's sale price by a substantially higher amount than the 5 – 10% than had been represented, thereby making it exceedingly expensive and less appealing to customers.

123.    Upon information and belief, had the RICO Defendants assigned an OEM part number to the TC5 as originally promised, Devon would have likely garnered $900 million from the OEM program.

124.    Upon information and belief, the RICO Defendants' improper actions as outlined above are part of their scheme to defraud investment partners whereby they keep its investment partners in the dark while promoting their own agenda to increase the financial performance of STG.

## The RICO Defendants' Cessation of Communications with Devon

125.    Despite the RICO Defendants' repeated representations over the course of the parties' five-year relationship that they intended to work in the best interest of Devon, reserving only the best deals for their esteemed "partner," one-by-one the RICO Defendants started to sever their ties with Devon as Devon began to discover the RICO Defendants' serious transgressions.

126.    For instance, as discussed above, on June 1, 2008, Bradicich – the biggest proponent of the IBM-Devon relationship, who even taped a webcam message for Devon IT's web site – suddenly resigned from Devon IT and DIG's Board.  Bradicich's unexpected departure in June 2008 came on the heels of Devon's discovery that the RICO Defendants had deceitfully cancelled the Blade Project in January of 2008 without Devon's knowledge. Bradicich's communications with Devon thereafter terminated.

127.    Nearly around the same time that Bradicich resigned, Gargan suddenly ceased communicating with Devon without explanation.

128.    In early 2008, Adkins and Bennett planned a trip to Italy with their wives for October 2008.  After Devon learned in April 2008 about the termination of the Blade Project and the status of the idataPlex/ClientPlex Projects, Adkins drastically reduced his communications with Devon and he would not communicate with Bennett at all about the planned trip to Italy, which never took place.

129.    Thereafter, in October 2009, the remaining RICO Defendants, Meyerson and Adkins, refused to communicate with anyone from Devon.  Upon information and belief, the RICO Defendants' termination of communications is part of their scheme to defraud their

34

investment partners – namely, entice a business partner to enter into development projects that the RICO Defendants have no intention of pursuing, drain the partner of its investment money, and then simply walk away and ignore the problems that arise.

130.    At all relevant times, Devon has performed all of its obligations under the Blade Agreement, iDataplex Agreement, Restructured Agreements and the Addenda, including paying Defendants more than $12,000,000, used without its knowledge to fund projects unrelated to those Devon contractually agreed to fund.  Indeed, Devon reorganized its entire business model to accommodate its partnership with the RICO Defendants, losing more than $50 million in the process.  In return, Defendants improperly withdrew their support from all of the projects.

131.    As a result of the RICO Defendants' improper conduct, in addition to losing millions of dollars by reorganizing its business, Devon IT was forced to lay off more than sixty employees and was unable to repay Claret the amounts it loaned Devon.  Claret has since obtained a judgment against Devon IT, Devon AD, Devon Europe and Bennett in the amount of $3,449,000.

**COUNT I-CONDUCT AND PARTICPATION IN A RICO ENTERPRISE THROUGH A PATTERN OF RACKETEERING – 18 U.S.C. § 1962(c)**
**(Plaintiffs v. Bradicich, Meyerson, Gargan and Adkins)**

132.    Plaintiffs incorporate by reference the averments of the preceding paragraphs as if set forth at length herein.

**The Enterprise**

133.    Plaintiff is informed and believes and based thereon alleges that an enterprise, specifically STG, existed within the meaning of 18 U.S.C. § 1961, and that the RICO Defendants Bradicich, Meyerson, Gargan and Adkins associated together, under the organization of IBM,

with the common purpose of using STG as a vehicle for defrauding Plaintiffs of more than

$12,000,000 in investment monies.

134.    STG is ongoing and functions as a continuing unit.

135.    The activities of the RICO Defendants related to STG involve, without limitation:
(a) grossly and/or purposefully overstating the market potential of various products including the
Blade, iDataPlex, ClientPlex and planar for the purpose of inducing Devon and others unknown
to Devon into sham development deals or other agreements with STG; (b) repeatedly insisting on
up-front payments from Devon for the subject development projects without actually developing
or marketing Blade, iDataPlex, ClientPlex or the ClientPlex node; (c) procuring and accepting
wire payments in excess of $12,000,000 from Devon and putting such payments toward STG
purposes other than the projects in which Devon had agreed to invest; (d) unilaterally canceling
development projects funded by Devon without Devon's knowledge or consent and purposefully
concealing the cancellation of the development projects for the purpose of obtaining future
payments from Devon; (e) securing positions on Devon IT and DIG's Board to siphon payments
away from Devon and direct payments to STG and other companies related to IBM or the RICO
Defendants, including GeeVee, Inc.; (f) using payments from Devon to illegally overstate the
earnings of STG; (g) inducing Devon to market its TC5 product under the vlh program as
opposed to the much more lucrative OEM program; and (h) concealing the enterprise and pattern
of racketeering activity from Devon.

136.    STG has an independent existence and purpose beyond the predicate acts and
pattern of racketeering itself, which includes the design, development, marketing and sale of
various information technology products worldwide.

137.    STG has a distinct structure based on the essential operating functions of STG and on each RICO Defendants' particular role within it.  Additionally, at certain relevant times, Meyerson, Bradicich, Gargan and Adkins all worked within STG under the direction and control of Moffat.

138.    STG is engaged in interstate and foreign commerce.  Specifically, it designs, develops, markets and sells various information technology products worldwide.

## Pattern of Racketeering

139.    The pattern of racketeering involved more than seven (7) predicate acts since December 2005, all constituting wire fraud as defined by 18 U.S.C. § 1343 and directly causing financial harm to Devon, including the loss of more than $12,000,000 in direct investment in IBM, and more than an additional $20,000,000 in related development expenses for these projects.

140.    Bradicich, Meyerson, Gargan and Adkins were able to commit the predicate offenses specifically alleged below by virtue of their positions within STG or involvement in and control over the affairs of STG.

141.    The RICO Defendants, acting in the conduct of STG's affairs, engaged in a pattern of racketeering by:  (a) grossly and/or purposefully overstating the market potential of various products including the Blade, iDataPlex, ClientPlex and planar for the purpose of inducing Devon and others unknown to Devon into sham development deals or other agreements with STG; (b) repeatedly insisting on up front payments from Devon for the subject development projects without actually developing or marketing Blade, ClientPlex or the ClientPlex node; (c) procuring wire payments in excess of $12,000,000 from Devon and putting such payments

37

towards STG purposes other than the projects in which Devon had agreed to invest; (d) unilaterally canceling development projects funded by Devon without Devon's knowledge or consent and purposefully concealing the cancellation of the development projects for the purpose of obtaining future payments from Devon; (e) securing positions on Devon IT and DIG's Board to siphon payments away from Devon and direct payments to STG and other companies related to IBM and the RICO Defendants, including GeeVee, Inc.; (f) using payments from Devon to illegally overstate the earnings of their component at IBM; (g) inducing Devon to market its TC5 product under the vlh program as opposed to the much more lucrative OEM program; and (h) concealing the enterprise and pattern of racketeering activity from Devon.

142.    The RICO Defendants in their pattern of racketeering activity regularly used interstate telephone and facsimile transmission lines, cellular phones and internet transmission, while engaging in interstate commerce for the purposes of committing fraud or deceit, and conspiring to commit fraud or deceit, and divesting Devon of over $12,000,000.

## RICO Offenses

143.    As alleged with particularity below, each RICO Defendant is associated with STG and conducted or participated in STG's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) and (d).

144.    As alleged with particularity below, RICO Defendants Meyerson, Bradicich, Adkins and Gargan conspired together to violate 18 U.S.C. § 1962(c) and/or (d).

## Predicate Offenses – Wire Fraud

145.    The RICO Defendants knowingly and willfully devised a scheme to defraud Devon of more than $12,000,000 through repeated false representations concerning the

38

marketability of the Blade, iDataPlex, ClientPlex node, and planar and the purpose of Devon's investment.  In doing so, the RICO Defendants used interstate telephone and facsimile transmission lines, cellular phones, and internet or wire transmission to secure multiple payments from Devon.

146.    Each of the RICO Defendants committed numerous predicate acts in the nature of knowingly fraudulent communications by wire.  By way of example, the discussion below of the participation of each of the RICO Defendants in the racketeering activities specifies for each of the RICO defendants particular predicate acts used to further the pattern of racketeering activity.  On the dates listed below, the Defendants committed the predicate acts and knowingly and willfully defrauded Devon of the following amounts via wire transfer:

### *IBM's account at JP Morgan Chase, New York, New York*

| **Date** | **Amount** |
|---|---|
| January 5, 2006 | $ 500,000  (Devon IT) |
| December 18, 2006 | 1,500,000  (Devon Europe) |
| October 24, 2007 | 2,000,000  (Devon Europe) |

### *IBM's account at PNC Bank, 500 First Avenue, Pittsburgh, PA*

| **Date** | **Amount** |
|---|---|
| June 11, 2007 | $ 500,000 |
| September 28, 2007 | 2,000,000 |
| December 20, 2007 | 2,500,000 |
| March 3, 2008 | 3,000,000 |

147.    The  RICO Defendants' scheme began in September 2005 and has continued uninterrupted since that time.  As a result of the scheme, Devon has incurred damages in excess of $12,000,000, and additional damages from the redirection of its entire business operations to focus on its relationship with STG and the RICO Defendants.

**Bradicich, Meyerson, Gargan and Adkins'
Participation in the Pattern of Racketeering Activity**

148.    *Adkins' Participation:*

a.   As Senior Vice President of IBM's Development and Manufacturing, Systems and Technology Group, Adkins directed, controlled and approved all racketeering activities taken in furtherance of the racketeering activity including:  (a) the RICO Defendants' gross and purposeful overstatement of the market potential of various products including the Blade, iDataPlex, ClientPlex and planar for the purpose of inducing Devon and others unknown to Devon into sham development deals with STG; (b) the RICO Defendants' repeated insistence upon up front payments from Devon for the subject development projects without actually developing or marketing Blade, iDataPlex, ClientPlex or ClientPlex node; (c) procuring wire payments of more than $12,000,000 from Devon and putting such payments towards STG purposes other than the projects in which Devon had agreed to invest; (d) unilaterally canceling development projects funded by Devon without Devon's knowledge or consent and purposefully concealing the cancellation of the development projects for the purpose of ensuring future payments from Devon; (e) securing positions on Devon IT and DIG's Board to siphon payments away from Devon and direct payments to STG and other companies related to IBM and the RICO Defendants, including GeeVee, Inc.; (f) using payments from Devon to illegally overstate IBM's earnings; (g) inducing Devon to market its TC5 product under the vlh program as

40

opposed to the much more lucrative OEM program; and (h) concealing the enterprise and pattern of racketeering activity from Devon.

b.     At the direction, control and approval of Adkins, Devon was repeatedly invoiced for payments under the Blade and iDataPlex Agreements via electronic mail, facsimile and/or telephone.  See, e.g., September 20, 2007 email from Kathleen Goetz, Director of Technology Alliances for IBM, to Bob Chrisfield, Devon IT's Vice President – Strategic Alliances, attached hereto as Exhibit "J"; see also September 26, 2007 email from Donna Earley, IBM Manager of Procurement, to Makoid, attached hereto as Exhibit "K."

c.     Adkins received and accepted the fraudulently obtained wire payments from Devon in the amount of $12,000,000 on the dates set forth above.

d.     Upon information and belief, Adkins directed, controlled or approved the cancellation of the Blade Project and directed FoxConn to cease manufacturing efforts without Devon's consent by means of interstate telephone and facsimile transmission lines, and by the internet.

e.     Upon information and belief, Adkins and representatives of Adkins, transmitted and received correspondence, documents and other data used in furtherance of the scheme to defraud Devon of its investment monies via interstate telephone and facsimile transmission lines, and by the internet.  See, e.g., Exhibits "J" and "K."

149.   *Meyerson's Participation:*

a.     During the February 2008 meeting in Ireland outlined above, Meyerson induced Devon to continue making wire payments by, among other things, wrongfully concealing the cancellation of the Blade Project.

41

b.   At the direction, control and approval of Meyerson, Devon was repeatedly invoiced for payments under the Blade and iDataPlex Agreements via electronic mail, facsimile and telephone.  See, e.g., Exhibits "J" and "K."

c.   Meyerson received and accepted the fraudulently obtained wire payments from Devon in the amount of $12,000,000 on the dates set forth above.

d.   Upon information and belief, Meyerson directed, controlled and approved the cancellation of the Blade Project in January of 2008 and directed FoxConn to cease manufacturing efforts by means of interstate telephone and facsimile transmission lines, and by the internet.

e.   Upon information and belief, Meyerson and representatives of Meyerson transmitted and received correspondence, documents, and other data used in furtherance of the scheme to defraud Devon of its investment monies via interstate telephone and facsimile transmission lines, and by the internet.

150.   ***Bradicich's Participation:***

a.   Bradicich used his position as a Director for Devon IT to request and acquire funding and marketing resources for his son's company, GeeVee, Inc..  Such requests were made by email and interstate telephone lines.  See, e.g., June 25, 2007 email from Bradicich to Kane, Bennett, and Makoid, attached hereto as Exhibit "L"; see also January 15, 2008 email from Bradicich to Makoid, attached hereto as Exhibit "M."  Bradicich pressured Devon's executives, including Bennett and Makoid, to invest in GeeVee, Inc. by implying that Devon IT's investment in GeeVee, Inc. would secure IBM'S continued support and partnership in other lucrative

42

projects.  Bradicich knew those representations to be false when he made them, and they resulted in Devon IT investing in GeeVee, Inc. for no purpose other than to accommodate Bradicich.

b.   At the direction, control and approval of Bradicich, Devon was repeatedly invoiced for payments under the Blade and iDataPlex Agreements via electronic mail, facsimile and telephone.  See, e.g., Exhibits "J" and "K."

c.   Bradicich received and accepted the fraudulently obtained wire payments from Devon in the amount of $12,000,000 on the dates set forth above in detail above.

d.   Upon information and belief, Bradicich directed, controlled and approved the cancellation of the Blade Project and directed FoxConn to cease manufacturing efforts without Devon's consent by means of interstate telephone, telefax lines, and by the internet.

e.   Upon information and belief, Bradicich and representatives of Bradicich transmitted and received correspondence, documents, and other data used in furtherance of the scheme to defraud Devon of its investment monies via interstate telephone, telefax lines, and the internet.

151.   *Gargan's Participation:*

a.   At the direction, control and approval of Gargan, Devon was repeatedly invoiced for payments under the Blade and iDataPlex Agreements via electronic mail, facsimile and telephone.  See, e.g., Exhibits "J" and "K"; see also February 19, 2008 email from Gargan to Makoid, attached hereto as Exhibit "N."

b.   Gargan received and accepted the fraudulently obtained wire payments from Devon in the amount of $12,000,000 on the dates set forth above in detail above.

c.   Upon information and belief, Gargan and representatives of Gargan transmitted and received correspondence, documents, and other data used in furtherance of the scheme to defraud Devon of its investment monies via interstate telephone, telefax lines, and by the internet.

### Violation of Section 1962(c)

152.   As alleged with particularity above, Bradicich, Meyerson, Gargan and Adkins worked together and in concert, participating in the conduct of STG's affairs through a pattern of racketeering activities.

153.   As alleged with particularity above, the facts demonstrate that Bradicich, Meyerson, Gargan and Adkins each unlawfully, willingly and knowingly performed the acts or omissions and conducted or participated, directly or indirectly, in the conduct of STG's affairs through the means of a pattern of racketeering activities.

154.   As a direct and proximate result of the aforementioned RICO conduct, Devon has incurred damages in excess of $12,000,000, and additional damages from the redirection of its entire business operations in order to focus on the STG relationships.

**WHEREFORE**, Plaintiffs, Devon IT, Inc., Devon AD Tech, Inc., and Devon IT (Europe), Ltd. respectfully request that this Honorable Court enter judgment in their favor and against Defendants Bradicich, Meyerson, Gargan and Adkins for treble damages, together with interest, costs and reasonable attorneys' fees as provided by 18 U.S.C. § 1964, and such other relief as the Court deems just and proper.

**COUNT II-CONSPIRARCY TO ENGAGE
IN A PATTERN OF RACKETEERING – 18 U.S.C. § 1962(d)**
**(Plaintiffs v. Bradicich, Meyerson, Gargan and Adkins)**

155.    Plaintiffs incorporate by reference the averments of the preceding paragraphs as if set forth at length herein.

156.    As specifically enumerated above, Bradicich, Meyerson, Gargan and Adkins associated with an enterprise (STG) engaged in interstate commerce and whose activities directly affected interstate commerce.

157.    Bradicich, Meyerson, Gargan and Adkins did conduct and participate, either directly or indirectly, in the conduct of the affairs of STG through a pattern of racketeering in violation of 18 U.S.C. § 1962(c) and (d).

158.    Since 2005, Bradicich, Meyerson, Gargan and Adkins cooperated jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in 18 U.S.C. § 1961 (1)(A) and (B), and did so in violation of 18 U.S.C. § 1962(d).

159.    Bradicich, Meyerson, Gargan and Adkins did commit two (2) or more of the predicate acts itemized above in a manner that they calculated and premeditated intentionally would continue their racketeering activities in violation of 18 U.S.C. § 1962(d).

160.    As a result of the scheme, Devon has incurred damages in excess of $12,000,000, and additional damages from the redirection of the entire business operations in order to focus on the IBM relationships.

**WHEREFORE**, Plaintiffs, Devon IT, Inc., Devon AD Tech, Inc., and Devon IT (Europe), Ltd. respectfully request that this Honorable Court enter judgment in their favor and against Defendants Bradicich, Meyerson, Gargan and Adkins for treble damages, together with

interest, costs and reasonable attorneys' fees as provided by 18 U.S.C. § 1964, and such other

relief as the Court deems just and proper.

## COUNT III-BREACH OF FIDUCIARY DUTY
### (Devon IT v. Bradicich)

161.   Plaintiffs incorporate by reference the averments of the preceding paragraphs as if

set forth at length herein.

162.   As a member of Devon IT's and DIG's Boards, Bradicich owed Devon IT

fiduciary duties, including the duty of loyalty.

163.   Bradicich breached his fiduciary duties, including the duty of loyalty, by

unreasonably and wrongfully concealing STG's termination of the Blade Project to the detriment

of Devon IT, advising Devon to invest in the Blade and iDataPlex projects based on trumped up

sales projections and market information that Bradicich knew to be false, failing to disclose to

Devon that the projections were false, and by diverting Devon's funding and marketing resources

to his son's company, GeeVee, Inc., for his own benefit.

164.   Bradicich also breached his fiduciary duties by failing to disclose to Devon IT

that the $8,000,000 it invested in the iDataPlex Project was being used for STG purposes other

than the projects in which Devon agreed to invest.

165.   As a result of Bradicich's breach, Devon IT suffered damages, including the loss

of no less than $12,000,000 in investment monies and additional damages from the redirection of

its entire business operations in order to focus on the STG relationships.

**WHEREFORE**, Plaintiff, Devon IT, Inc., respectfully requests that this Honorable Court

enter judgment in its favor and against Thomas Bradicich in an amount in excess of Seventy-

Five Thousand Dollars ($75,000.00) for compensatory and punitive damages, together with interest, costs and attorneys fees, and such other relief as the Court deems just and proper.

## COUNT IV BREACH OF CONTRACT
### (Plaintiffs v. IBM)

166.    Plaintiffs incorporate by reference the averments of the preceding paragraphs as if set forth at length herein.

167.    On July 10, 2008, IBM and Devon entered into the Restructured Agreements.  See Exhibits "E" and "F."

168.    Pursuant to the Restructured Agreements, IBM agreed, *inter alia*, to award Devon the right to use up to 60 part numbers (30 per Restructured Agreement) under IBM's modified vendor logo for hardware program.  See Exhibit "F" at §§ 3.5.1, 19.0; Exhibit "G" at § 3.6.1.

169.    Following the execution of the Restructured Agreements, on February 23, 2009, Devon and IBM entered into the Addenda to the Restructured Agreements adding and/or modifying certain terms in the Restructured Agreements.  See Exhibits "H" and "I" respectively.

170.    Pursuant to the Addenda, IBM agreed to refrain, until December 31, 2010, from proactively enabling thin client hardware products that are "similar or reasonably equivalent in function to Devon's TC-5 and/or TC-2 product."  See Exhibit "H" at § 2.0; Exhibit "I" at § 2.0.

171.    Following the execution of the Addenda, IBM (through its component STG) proactively enabled a similar or reasonably equivalent thin client hardware product developed by Wyse, in breach of IBM's obligations under the Addenda.

172.    As a result of IBM's breach of the Addenda, Devon has suffered damages.

**WHEREFORE**, Plaintiffs, Devon IT, Inc., Devon AD Tech, Inc., and Devon IT (Europe), Ltd. respectfully request that this Honorable Court enter judgment in its favor and against IBM in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) for compensatory and such additional damages permitted by law, together with interest, costs and attorneys fees, and such other relief as the Court deems just and proper.

### COUNT V-COMMONLAW FRAUD/FRAUD IN THE INDUCEMENT
### (Plaintiffs v. Defendants)

173.    Plaintiffs incorporate by reference the averments of the preceding paragraphs as if set forth at length herein.

174.    The RICO Defendants intentionally misrepresented the circumstances of the Blade and iDataplex investments for the purpose of inducing investments from Devon that the RICO Defendants could use for purposes inconsistent with those for which they were solicited.

175.    At the time the RICO Defendants solicited the investments, they did not believe that the representations they made to Devon were truthful, and did not believe that Devon would have made those investments if the RICO Defendants had disclosed their actual expectations about the potential for profit from those investments.

176.    During the June 2008 negotiations surrounding the restructuring of the Blade and iDataplex Agreements, Meyerson fraudulently misrepresented that expected sales were at least 100,000 planars per quarter with a likelihood of more than 500,000 planar sales per quarter. Meyerson represented that the royalty stream based upon the payment of $100 per planar through the second quarter of 2010 would return to Devon the $8 million that had been invested in the iDataPlex Project, plus reasonable interest.  Meyerson characterized the proposed restructuring of the iDataPlex Agreement as an "underhand" pitch.

48

177.     In reality, the planar sales to date have not come anywhere near Meyerson's projections.  Indeed, the actual planar sales and royalty payments have been as follows:

| Quarter | Units Sold | Cap | Actual Royalty |
|---------|-----------|-----|----------------|
| 3Q08 | 755 | $ 400,000 | $ 75,500 |
| 4Q08 | 5,626 | 750,000 | 562,600 |
| 1Q09 | 2,687 | 1,325,000 | 268,700 |
| 2Q09 | 7,431 | 1,325,000 | 743,100 |
| 3Q09 | 3,964 | 1,325,000 | 396,400 |
| 4Q09 | 9,623 | 1,325,000 | 962,300 |
| 1Q10 | 3,484 | 1,325,000 | 348,400 |

178.     Meyerson's representations regarding the planar sales projections constituted a false representation of material fact, and Meyerson knew that the representations were false at the time he made them.

179.     Meyerson made these false statements with the specific intent that Devon would rely upon them and enter into the restructured July 2008 Blade and iDataplex Agreements with IBM.

180.     It was reasonable and justified for Devon to rely upon these misrepresentations because it was in the interest of both Devon and IBM to work out an amicable solution to the issues surrounding the failed Blade and iDataplex Projects.

181.     Devon would not have entered into the July 2008 restructured agreements had it known the actual projections.

182.     During the negotiations for the Addenda, IBM agreed to refrain, until December 31, 2010, from proactively enabling thin client hardware products that are "similar or reasonably equivalent in function to Devon's TC-5 and/or TC-2 product."  See Exhibit "H" at § 2.0; Exhibit "I" at § 2.0.  The RICO Defendants had no present intention of causing STG to comply with that agreement.

183.     At the same time, the RICO Defendants and STG continued to withhold from Devon true information regarding the uses made by the RICO Defendants of the funds invested by Devon and regarding the future intentions of the RICO Defendants regarding those projects.

184.     Devon would not have entered into the Addenda if the RICO Defendants or IBM had accurately disclosed the previous uses made of Devon funds or the future intentions of the RICO Defendants regarding those projects.

185.     As a result of those false statements, Devon has suffered damages.

**WHEREFORE**, Plaintiffs, Devon IT, Inc., Devon AD Tech, Inc., and Devon IT (Europe), Ltd. respectfully request that this Honorable Court enter judgment in their favor and against Defendants for rescission of the Restructured Agreements and the Addenda, and also for damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) for compensatory and punitive damages, together with interest, costs and attorneys fees, and such other relief as the Court deems just and proper.

## COUNT VI-PRIMA FACIE TORT –  RESTATEMENT (SECOND) § 870
### (Plaintiffs v. Defendants)

186.     Plaintiffs incorporate by reference the averments of the preceding paragraphs as if set forth at length herein.

187.    Through operation of the Ponzi scheme caused above, IBM and the RICO Defendants have intentionally caused injury to Devon.  The conduct of IBM and the RICO Defendants in fraudulently soliciting and using the investments from Devon is culpable and has no lawful justification.

**WHEREFORE**, Plaintiffs, Devon IT, Inc., Devon AD Tech, Inc., and Devon IT (Europe), Ltd. respectfully request that this Honorable Court enter judgment in their favor and against Defendants for an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) for compensatory and punitive damages, together with interest, costs and attorneys fees, and such other relief as the Court deems just and proper.

## COUNT VII-NEGLIGENCE
### (Plaintiffs v. IBM)

188.    Plaintiffs incorporate by reference the averments of the preceding paragraphs as if set forth at length herein.

189.    IBM had a duty to supervise and monitor the activities of the STG Division and the RICO Defendants.

190.    IBM acted with negligence when it established a system of compensation that gave the RICO Defendants an incentive to defraud those with whom they do business and when it failed to establish monitoring systems reasonably designed to prevent and detect such fraud.

191.    IBM's failure to supervise and monitor its employees led directly to and proximately caused the injury to Devon described above.

192.    Devon has suffered actual harm as a result of IBM's failure.

**WHEREFORE**, Plaintiffs, Devon IT, Inc., Devon AD Tech, Inc., and Devon IT (Europe), Ltd. respectfully request that this Honorable Court enter judgment in their favor and

against IBM for an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) for compensatory damages, together with interest, costs and attorneys fees, and such other relief as the Court deems just and proper.

## COUNT VIII-PARTICIPATION IN A BREACH OF FIDUCIARY DUTY
### (Plaintiffs v. IBM)

193.    Plaintiffs incorporate by reference the averments of Count III (for breach of fiduciary duty) as if set forth at length herein.

194.    IBM had actual knowledge of the fiduciary obligations Bradicich owed to Devon and of the actions he took to breach those obligations.  Among other things, the general counsel of IBM was instrumental in arranging the precise role Bradicich would play at Devon and acted with full awareness of the potential for harm to Devon.

195.    IBM profited from the deception of Devon that was effected by Bradicich's breach of his duty of loyalty to Devon.

196.    Devon has suffered actual harm as a result of the breach of fiduciary duty and IBM's participation in it.

**WHEREFORE**, Plaintiffs, Devon IT, Inc., Devon AD Tech, Inc., and Devon IT (Europe), Ltd. respectfully request that this Honorable Court enter judgment in their favor and against IBM for an amount in excess of Seventy -Five Thousand Dollars ($75,000.00) for compensatory and punitive damages, together with interest, costs and attorneys fees, and such other relief as the Court deems just and proper.

## COUNT IX-AIDING AND ABETTING A PATTERN OF RACKETEERING ACTIVITY AND CONSPIRACY TO ENGAGE IN A PATTERN OF RACKETEERING ACTIVITY – 18 U.S.C. § 1962(c) & (d)
### (Plaintiffs v. IBM)

197.    Plaintiffs incorporate by reference the averments of Counts I (for racketeering) and II (for conspiracy to engage in racketeering) as if set forth at length herein.

198.    IBM had actual knowledge of many of the activities of the RICO Defendants. Among other things, IBM's general counsel participated in the fraudulent inducement of the Restructured Agreements and the Addenda.  IBM's general counsel also participated in the structuring of Bradicich's role on the advisory boards of first Devon IT and then DIG.

199.    On information and belief, IBM acted with the intention to facilitate the racketeering activities of the RICO Defendants.

**WHEREFORE**, Plaintiffs, Devon IT, Inc., Devon AD Tech, Inc., and Devon IT (Europe), Ltd. respectfully request that this Honorable Court enter judgment in their favor and against IBM for treble damages, together with interest, costs and reasonable attorneys' fees as provided by 18 U.S.C. § 1964, and such other relief as the Court deems just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial of all claims for relief that may be tried before a jury.

Respectfully submitted,

Dated: June 16, 2010

**MITTS MILAVEC, LLC**

Maurice R. Mitts, Esquire
Mark L. Rhoades, Esquire
Amy L. Blackmore, Esquire
Attorney Id. Nos.: 50297/80641/209584
Two Logan Square, 12th Floor
Eighteenth and Arch Streets
Philadelphia, PA 19103
(215) 569-1800 (telephone)
(215) 569-1822 (facsimile)

*Counsel for Plaintiffs*

# Devon IT, et al. v. IBM Corporation, et al.
# Index of Exhibits to the Complaint

| Exhibit | Date | Document | Description |
|---|---|---|---|
| A | 10-3-05 | IBM/DevonIT Blade Collaboration Agreement | Agreement #4905RL2238<br><br>Signed by Ronald Clarke, Director of ISC for IBM on 11/7/05 and Joe Makoid, President of Devon IT on 10/31/05<br><br>10 pages |
| B | 9-28-07 | Marketing Agreement | Agreement between IBM and Devon IT<br><br>Signed by Bernard Meyerson, Vice President and CTO of IBM and Joe Makoid, President of Devon IT on 9/28/07<br><br>7 pages |
| C | 6-7-07 | IBM/Devon IT Hosted Client Collaboration Agreement | Agreement #L075173<br><br>Signed by Bernard Meyerson, VP Strategic Alliances and CTO STG of IBM on 6/7/07, and John Bennett, M.D., Chairman and CEO of Devon IT on 6/4/07<br><br>16 pages |
| D | March 2007 | Advisory Board Retainer and Appointment Agreement | Appointment of Thomas M. Bradicich, Ph.D., to be a member of Devon IT's Advisory Board and to act as a consultant to Devon IT and the Advisory Board<br><br>Signed by John Bennett, M.D., Chairman and CEO of Devon IT on 3/8/07, and Thomas M. Bradicich, Ph.D., on 3/6/07<br><br>2 pages |

| E | | Advisory Board Retainer and Appointment Agreement | Appointment of Thomas M. Bradicich, Ph.D., to be a member of Devon Group's Advisory Board and to act as a consultant to Devon Group and the Advisory Board<br><br>Signed by John Bennett, M.D., Chairman and CEO of Devon International Group on 2/1/07, and Thomas M. Bradicich, Ph.D., on 12/18/01 (?)<br><br>2 pages |
| F | July 2008 | Blade Enablement Agreement | Agreement restructures prior agreement<br><br>Agreement Effective Date of 7/9/08, page signed by John Bennett, CEO and Chairman of Devon IT on 7/9/08 and Bernard Meyerson, VP and CTO of IBM on 7/10/08<br><br>24 pages |
| G | July 2008 | Hosted Client Solution Enablement Agreement | Agreement restructures prior agreement 1 & 2 (marketing agreement)<br><br>Agreement Effective Date of 7/9/08, page signed by John Bennett, CEO and Chairman of Devon IT and CEO and Chairman of Devon AD Tech on 7/9/08, and Bernard Meyerson, VP and CTO of IBM on 7/10/08<br><br>25pages |
| H | February 2009 | Addendum 1 to Blade Enablement Agreement | Agreement between IBM, Devon IT, and Devon Europe to include: Devon IT, Devon Europe and Devon AD Tech and to make change to prior agreements<br><br>Signed by Bernard Meyerson ,VP and CTO of IBM on 2//16/09, Joe Makoid, Director and President of Devon IT (Europe) on 2/23/09;  Also signed by Makoid as President of Devon IT on 2/23//09, and as Director and President of Devon AD Tech on 2/2309<br><br>39 pages |

| | | | |
|---|---|---|---|
| I | February 2009 | Addendum 1 to Hosted Client Solution Enablement Agreement | Agreement between IBM, Devon AD Tech<br><br>Signed by Bernard Meyerson, VP and CTO of IBM on 2/16/09 and Joe Makoid, as Director and President of Devon AD Tech, President of Devon IT and Director and President of Devon IT (Europe) on 2/23/09<br><br>28 pages |
| J | 9-20-07 | Email | Email to Bob Chrisfield from Kathy McGroddy<br><br>Subject: Idataplex Contract<br><br>Re: LOI and future payments to Devon AD<br><br>1 page |
| K | 9-26-07 | Email string | Original email dated 9/25/07 from Tim Jones to Bill Horrocks:<br>Subject Aspen GA Milestone<br><br>Email dated 9/26/07 from Bill Horrocks to Tim Jones responding to Jones' email  and confirming that Devon will accelerate payment process<br><br>Email dated 2/26/07 from Donna Earley to Joe Makoid re: discussion about payment o IBM<br><br>Email dated 9/26/07 from Joe Makoid to Donna Earley re: OEMS<br><br>2 pages |
| L | 6-25-07 | Email | Email dated 6/25/07, from Joe Makoid to Tom, Bennett, Makoid and Mancini<br><br>Subject: GEEVEE.com is hot…<br>Re: success of GEE VEE<br><br>1 page |
| M | 1-15-08 | Email | Email dated 1/15/08 from Tom Bradicich to Joe Makoid |

| | | | | Subject: Sungard collocation facilities Jason's new invention and feature to launch<br><br>1 page |
|---|---|---|---|---|
| N | 2-19-08 | Email | | Email dated 2/19/08 from James Gargan to Joe Makoid<br>Subject: Cplex funding<br><br>1 page |