**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DEVON IT, INC., et al. | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | NO. 2:10-cv-02899-JHS |
| IBM CORP., et al. | : | |
| | : | |
| Defendants. | : | |
| | : | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO
<u>DEFENDANTS' MOTION TO DISMISS</u>**

Maurice R. Mitts, Esquire
Mark L. Rhoades, Esquire
Amy L. Blackmore, Esquire
MITTS MILAVEC, LLC
Two Logan Square, 12th Floor
Eighteenth and Arch Streets
Philadelphia, Pennsylvania  19103
Telephone (215) 569-1800
Facsimile (215) 569-1822

*Counsel for Plaintiffs*

Dated: September 24, 2010

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DEVON IT, INC., et al. | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | NO. 2:10-cv-02899-JHS |
| IBM CORP., et al. | : | |
| | : | |
| Defendants. | : | |
| | : | |

## [PROPOSED] ORDER ON DEFENDANTS' MOTION TO DISMISS

AND NOW, this ___ day of _____, 2010, upon consideration of Defendants'

Motion to Dismiss, Plaintiffs' opposition thereto, and oral argument, if any, IT IS HEREBY

ORDERED that said motion is DENIED.


BY THE COURT:


_____
The Hon. Joel H. Slomsky
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| DEVON IT, INC., et al. | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | NO. 2:10-cv-02899-JHS |
| IBM CORP., et al. | : | |
| | : | |
| Defendants. | : | |
| | : | |

**PLAINTIFFS' BRIEF IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS**

Plaintiffs Devon IT, Inc., Devon AD Tech, Inc., and Devon IT (Europe), Ltd. (collectively, "Devon") respectfully submit this brief in opposition to the Motion to Dismiss of Defendants IBM Corporation ("IBM"), Thomas Bradicich ("Bradicich"), Bernard Meyerson ("Meyerson"), James Gargan ("Gargan"), and Rodney Adkins ("Adkins") (the "Motion to Dismiss") (we refer to IBM, Bradicich, Meyerson, Gargan, and Adkins collectively as the "Defendants," and to Bradicich, Meyerson, Gargan, and Adkins collectively as the "Individual Defendants").

Plaintiffs respectfully request oral argument on this Motion to Dismiss pursuant to Local Rule 7.1(f).  E.D. Pa. Local R. 7.1(f).

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS .................................................................................. i

TABLE OF AUTHORITIES ........................................................................... iii

I.   PRELIMINARY STATEMENT ............................................................... 1

II.  FACTUAL BACKGROUND .................................................................... 1

III. STANDARD OF REVIEW ...................................................................... 4

IV.  ARGUMENT .......................................................................................... 5

  A.  The Alleged Releases Do Not Extend to the Conduct of the Individual
      Defendants and in Any Event Are Invalid. ...................................... 6

    1.  Because the Releases Extend Only to Actions Against the
        Individual Defendants in Their Official Capacity, They Apply,
        At Most, to the Single Claim Based on Conduct of IBM that
        Predates the Releases (Count VII for Negligence). ................ 6

    2.  The Alleged Releases Are Invalid Because the Defendants
        Procured Them By Fraud. ...................................................... 9

  B.  The Allegations of Breach of Contract in Count IV Give Fair Notice of
      the Claim and the Relief Sought by Devon. ................................... 10

  C.  The Counts for Racketeering, Conspiracy to Engage in Racketeering,
      and Aiding and Abetting Racketeering State Valid Causes of Action. ... 11

    1.  The Count for Aiding and Abetting Racketeering (Count IX)
        States a Valid Cause of Action. ........................................... 11

    2.  The Racketeering Enterprise (STG) Is Distinct from the
        Individual Defendants. ......................................................... 12

    3.  The Complaint Specifically Alleges Numerous Acts of Wire
        Fraud. .................................................................................. 13

      a.  Statements Known To Be False and Made With the Intent to Deceive
          Are Fraudulent. ............................................................... 13

      b.  The Complaint Provides Adequate Support for the Inferences It
          Suggests. ......................................................................... 14

      c.  The Alleged Predicate Acts Establish a Scheme to Defraud. .......... 14

    4.  The Complaint Establishes a Pattern of Racketeering Activity. ........ 17

  D.  The Individual Defendants Fraudulently Induced the Restructured
      Agreements. ..................................................................................... 21

    1.  Devon Reasonably Relied on the Fraudulent Misrepresentations
        of the Individual Defendants. ............................................... 21

i

2.    Devon Alleges Numerous False Representations That Induced Devon's Agreement to the Restructured Agreements. ........................................23

E.    Bradicich Had a Fiduciary Duty to Devon. ................................................................25

F.    The Count for Participation in a Breach of Fiduciary Duty (Count VIII) States a Valid Cause of Action. ................................................................................26

G.    The Count for Prima Facie Tort (Count VI) States a Valid Cause of Action.............................................................................................................................27

H.    The Count for Negligence (Count VII) States a Valid Cause of Action. ....................30

V.    CONCLUSION.................................................................................................................31

# TABLE OF AUTHORITIES

CASES

*Ashcroft v. Iqbal,*
  129 S. Ct. 1937 (2009) .................................................................................................... 5

*Barker v. Brown,*
  340 A.2d 566 (Pa. Super. Ct. 1975) ............................................................................. 28

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ........................................................................................................ 5

*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.,*
  757 F.2d 523 (2d Cir. 1985) ......................................................................................... 9

*Brandow Chrysler Jeep Co. v. Datascan Techs.,*
  511 F. Supp. 2d 529 (E.D. Pa. 2007) ........................................................................... 5

*Camiolo v. State Farm Fire & Cas. Co.,*
  334 F.3d 345 (3d Cir. 2003) ....................................................................................... 13

*Carbone v. Marone,*
  No. 04 Civ 2001 (NRB), 2007 U.S. Dist. LEXIS 92350 (S.D.N.Y. Dec. 14, 2007) ................. 7

*Central Bank, N.A. v. First Interstate Bank,*
  511 U.S. 164 (1994) ..................................................................................................... 12

*Consorcio Prodipe, S.A. v. Vinci,*
  544 F. Supp. 2d 178 (S.D.N.Y 2008) ........................................................................... 9

*Constant v. Hallmark Cards, Inc.,*
  568 N.Y.S.2d 441 (N.Y. App. Div. 1991) ................................................................... 29

*Cox v. Administrator U.S. Steel & Carnegie,*
  17 F.3d 1386 (11th Cir. 1994) ..................................................................................... 12

*Crowe v. Henry,*
  43 F.3d 198 (5th Cir. 1995) ......................................................................................... 12

*Danann Realty Corp. v. Harris,*
  5 N.Y.2d 317 (N.Y. 1959) ........................................................................................... 22

*DirectTV Group, Inc. v. Darlene Invs., LLC,*
  No. 05 Civ 5819 (WHP), 2006 U.S. Dist. LEXIS 69129 (S.D.N.Y. Sept. 27, 2006) ............... 9

*Efron v. Embassy Suites (Puerto Rico), Inc.*,
　223 F.3d 12 (1st Cir. 2000) ................................................................. 20

*First Bank of Am. v. Motor Car Funding, Inc.*,
　257 A.D.2d 287 (N.Y. App. Div. 1999) ............................................... 24

*Foster v. Wintergreen Real Estate Co.*,
　363 F. App'x 269 (4th Cir. 2010) (per curiam) .................................... 20

*Galdieri v. Monsanto Co.*,
　245 F. Supp. 2d 636 (E.D. Pa. 2002) ................................................... 24

*Gilbert v. Korvette's Inc.*,
　327 A.2d 94 (1974) ............................................................................... 28

*Gross v. Waywell*,
　628 F. Supp. 2d 475 (S.D.N.Y. 2009) ................................................. 20

*H.J. Inc. v. Northwestern Bell Tel. Co.*,
　492 U.S. 229 (1989) ............................................................................. 17

*Hafer v. Melo*,
　502 U.S. 21 (1991) ................................................................................. 7

*Havoco of Am., Ltd. v. Sumitomo Corp.*,
　971 F.2d 1332 (7th Cir. 1992) ............................................................. 10

*Kentucky v. Graham*,
　473 U.S. 159 (1985) ............................................................................... 8

*Kolar v. Preferred Real Estate Inv., Inc.*,
　361 F. App'x 354 (3d Cir. 2010) ......................................................... 20

*MBIA Ins. Corp. v. Royal Bank of Canada*,
　No. 12238/09, 2010 N.Y. Misc. LEXIS 3958 (N.Y. Sup. Ct. Aug. 19, 2010) ............ 22, 23, 24

*Mertens v. Hewitt Assocs.*,
　508 U.S. 248 (1993) ............................................................................. 26

*Nami v. Fauver*,
　82 F.3d 63 (3d Cir. 1996) ....................................................................... 5

*Rolo v. City Investing Co. Liquidated Trust*,
　155 F.3d 644 (3d Cir. 1998) ................................................................. 11

*Schwartz v. Lawyers Title Ins. Co.*,
　680 F. Supp. 2d 690 (E.D. Pa. 2010) ................................................. 5, 14, 17, 25

iv

*Schwegel v. Chiaramonte*,
    772 N.Y.S.2d 379 (N.Y. App. Div. 2004) ............................................................. 29

*Sovereign Bank v. Valentino*,
    914 A.2d 415 (Pa. Super. Ct. 2006) ...................................................................... 26

*Tabas v. Tabas*,
    47 F.3d 1280 (3d Cir. 1995) (en banc) ................................................................. 17

*Tahini Inv., Ltd. v. Bobrowsky*,
    99 A.D.2d 489 (N.Y. App. Div. 1984) .................................................................. 23

*Thompson Coal Co. v. Pike Coal Co.*,
    412 A.2d 466 (Pa. 1979) ....................................................................................... 26

*United Group of Nat'l Paper Distribut., Inc. v. Vinson*,
    666 So. 2d 1338 (La. Ct. App. 1996) .................................................................... 25

*Zahl v. N.J. Dep't of Pub. Safety*,
    No. 06-3749 (JLL), 2009 WL 806540 (D.N.J. Mar. 27, 2009) ............................ 20


## STATUTES

18 U.S.C. § 1961(5) ............................................................................................... 17

18 U.S.C. § 1962(c) ............................................................................................ 1, 12

18 U.S.C. § 1962(d) ................................................................................................. 1

18 U.S.C. § 2 ......................................................................................................... 12


## RULES

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 5


## OTHER AUTHORITIES

3 A. Scott & W. Fratcher, Law of Trusts § 224.1 (4th ed. 1988) ........................... 26

Christine M. Gimeno, 1 Summ. Pa. Jur. 2d Torts §1.7 .......................................... 28

*Restatement (Second) of Torts* § 870 ............................................................ 27, 28, 29

## I.  PRELIMINARY STATEMENT

The Motion to Dismiss suffers from two essential flaws.  First, its central argument—that the claims in our complaint in this matter (the "Complaint") were waived or settled—ignores the terms of the releases and the factual allegations of the Complaint.  Second, the bulk of the defenses on the merits are almost entirely factual—resting on factual allegations directly contrary to the allegations of the Complaint.  To the extent Defendants interpose serious legal challenges to the causes of action the Complaint pleads, we explain below why none of those challenges has merit.

## II.  FACTUAL BACKGROUND

Although the dismissive rhetoric of the Motion to Dismiss obscures it, the Complaint presents a detailed and carefully organized summary of transactions between the Defendants and Devon, which generally involved the Defendants defrauding Devon into investing in relationships with IBM in response to promises of actions by IBM that the Individual Defendants had no intention of fulfilling.

The Complaint details several distinct causes of action against the Defendants: for participating in a racketeering enterprise (18 U.S.C. § 1962(c)), conspiracy to engage in racketeering (18 U.S.C. § 1962(d)), breach of fiduciary duty, breach of contract, fraud and fraudulent inducement, prima facie tort, negligence, participation in a breach of fiduciary duty, and aiding and abetting racketeering.  As detailed in the RICO Statement previously filed with the Court, the Complaint raises serious claims, which fall directly within the core of the relevant sections of the racketeering statute and the other relevant bodies of law.  As discussed below, a careful reading of the Complaint against the background of the applicable law demonstrates the frivolity of the Motion to Dismiss.

In general, the Complaint alleges that the Individual Defendants intentionally misrepresented the market potential of the products they touted and continued to demand funding from Devon—an admittedly smaller company with less resources than IBM—even after the Individual Defendants secretly cancelled at least one of the subject development projects.  The Complaint alleges that the Individual Defendants, acting with the intention to entice Devon to continue its relationship with IBM and continue the flow of funds from Devon to IBM's hardware division ("STG"), engaged in a pattern of deception successfully designed to mislead Devon into believing that its failing relationship with IBM would continue to expand.  Compl. ¶ 1.  Although it was unknown to Devon at the time, we now know that the head of STG at the time (Robert Moffat), the immediate predecessor and mentor of Defendant Adkins, was engaged in a pattern of criminal misconduct for which he has since pleaded guilty and been sentenced. *Id.* ¶ 4.  The misconduct for which he was convicted relates directly to the manufacturing relationships with Devon because it involves the requirement to use Intel rather than AMD chips in the devices Devon was designing.

In reality, the Complaint alleges, instead of using the more than $12,000,000 invested by Devon for the projects that Devon agreed to fund, the Individual Defendants used a substantial portion of Devon's investment money to inflate the earnings of STG and for purposes other than the projects they touted to Devon. While leading Devon down this road of deceit and as part of their scheme, the Individual Defendants improperly included the funding provided by Devon on the financial reports of STG, thereby exaggerating its performance.  *Id.* ¶ 2. The allegations of improper revenue recognition at STG mirror charges that IBM at the corporate level was, at that time, transgressing tolerable bounds of "revenue-smoothing."  *See* Release, SEC, SEC Settles With IBM for Misleading Statements Regarding Stock Option Expenses, 2007-109 (June 5,

2007); Lit. Release, SEC, SEC Files Settled Actions Against Kevin B. Collins and IBM for Assisting in Dollar General Corporation's Accounting Fraud, Lit. Release No. 20166 (June 25, 2007).

To summarize the allegations briefly, the overall scheme proceeded in three stages related to the so-called Blade, iDataPlex, and TC5 projects. The Blade project involved a server-based "blade PC" or workstation, which Devon was to develop. Based on a pitch from the Individual Defendants in late 2005 about the role that IBM would play and the market potential for the device, Devon contributed four million dollars to IBM and redirected a large share of its corporate emphasis to the project. Compl. ¶¶ 19-36.

The second stage began in February of 2007, when the Individual Defendants approached Devon regarding a data center server complex called iDataPlex. The Individual Defendants claimed that IBM would develop a data center node and urged Devon to develop the remote PC that would operate with the IBM-developed node. Again, detailed commitments about IBM's future behavior, promised investments by Intel, and representations about market potential induced Devon to contribute eight million dollars to IBM and to redirect more than twenty million dollars of corporate resources to the project. Compl. ¶¶ 37-60.

Unbeknownst to Devon, the Individual Defendants did not use the funds contributed by Devon for the Blade and iDataPlex projects. Rather, furthering their own interests instead of IBM's, they treated the development funds as income earned from sales and used them as the basis for bonuses Moffat and Adkins awarded. Indeed, without even telling Devon, IBM terminated the Blade project in January of 2008. By hiding the termination from Devon, they ensured that Devon would make its $3 million contribution to iDataPlex that spring, and at the same time left Devon to continue working on the secretly cancelled project. During this same

period, Adkins sought Bradicich's appointment to one of Devon's boards.  Although the stated purpose was to allow him to bolster Devon's market footprint and visibility within IBM, Bradicich in fact used his position to extract revenue from Devon, to give Devon a false sense of alliance with IBM, and to gain information about Devon's situation that facilitated the continuing development of the scheme.  Compl. ¶¶ 61-96.

When Devon learned of the secret cancellation of Blade, the Individual Defendants were driven to take new steps to prevent Devon from ceasing its continuing monetary contributions to IBM.  Accordingly, they induced Devon to execute a series of restructured agreements and addenda (collectively, the "Restructured Agreements") by promising that they would arrange for Devon to sell some of its products (including its TC5 thin client terminal) under IBM's vendor program and that they would not promote competing products.

They did not disclose their prior misuse of the funds Devon had invested, nor did they have any intention of complying with those agreements any more than the earlier ones.  Shortly after IBM executed those documents, Devon became concerned that IBM might not provide parts numbers for Devon's products and was actively promoting the competing products of at least one competitor, Wyse Technology.  At that point, as Devon's suspicions about the credibility of the Individual Defendants grew, the relationship finally unraveled and this litigation ensued.  Compl. ¶¶ 97-131.

### III.  STANDARD OF REVIEW

The most general defect in the Motion to Dismiss is Defendants' pervasive reliance on disputed assertions of historical fact.  Except in the most unusual of circumstances, factual questions are not appropriate bases for a Motion to Dismiss, and nothing in this case suggests anything unusual about the garden-variety factual defenses that Defendants interpose.

4

Notwithstanding Defendants' claims that the Supreme Court recently has abrogated longstanding doctrine in the area, it remains undisputed that a complaint "does not need detailed factual allegations." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Rather,

> a complaint must contain sufficient factual matter, accepted as true, to state a
> claim to relief that is plausible on its face.  A claim has facial plausibility when
> the plaintiff pleads factual content that allows the court to draw the reasonable
> inference that the defendant is liable for the misconduct alleged.

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotations and citations omitted).  In sum, the allegations "must be enough to raise a right to relief above the speculative level . . . on the assumption that all of the complaint's allegations are true [even if doubtful in fact]." *Brandow Chrysler Jeep Co. v. Datascan Techs.*, 511 F. Supp. 2d 529, 534 (E.D. Pa. 2007) (*quoting Twombly*, 550 U.S. at 555) (internal citations omitted); *see Schwartz v. Lawyers Title Ins. Co.*, 680 F. Supp. 2d 690, 700 (E.D. Pa. 2010) (explaining, in denying motion to dismiss racketeering complaint, that the relevant question is whether the "factual allegations [are] enough to raise a right to relief above the speculative level").  The complaint will be deemed to have alleged sufficient facts "if it adequately put [the] defendant on notice of the essential elements of the plaintiff[s'] cause of action." *Brandow*, 511 F. Supp. 2d at 534 (*citing Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996)).  Importantly, when considering a Rule 12(b)(6) motion to dismiss, the Court may not "inquire whether the plaintiffs will ultimately prevail, only whether they are entitled to offer evidence to support their claims." *Id.* (citing *Nami*, 82 F.3d at 65).  Applying that standard, the Complaint is sufficient.

## IV.  ARGUMENT

Implicitly conceding that no single argument is compelling, Defendants' Motion to Dismiss presents a laundry list of almost every conceivable type of defense.  Although many of

the defenses are plainly factual (and thus inappropriate bases for a Motion to Dismiss) or ignore the actual text of the Complaint, we offer a careful point-by-point examination of each argument to assist the Court in analyzing the Motion to Dismiss.

      **A.**    **The Alleged Releases Do Not Extend to the Conduct of the Individual Defendants and in Any Event Are Invalid.**

The centerpiece of the Motion to Dismiss (and of Defendants' related motion to stay discovery) is the contention that substantially all of Devon's Complaint is barred by a series of alleged releases (the "Alleged Releases") contained in the Restructured Agreements executed by Devon in July 2008 and February 2009. Defs.' Mem. Supp. Mot. to Dismiss 12-17. That contention is flawed for two separate reasons: it ignores the plain language of the relevant releases, which by their own terms are limited to claims seeking relief against IBM; and it fails to accept the specific factual allegations of the Complaint, which contend that the Restructured Agreements were induced by fraud and thus should be rescinded.

      *1.*    *Because the Releases Extend Only to Actions Against the Individual Defendants in Their Official Capacity, They Apply, At Most, to the Single Claim Based on Conduct of IBM that Predates the Releases (Count VII for Negligence).*

Defendants' quotation of the language from the releases, Defs.' Mem. Supp. Mot. to Dismiss 13-14, fails to mention the most important feature of the Alleged Releases: they are limited to claims against IBM and against the Individual Defendants in their official capacities. Because the Complaint is brought against them as individuals, and seeks relief from them individually based on their own misconduct, the Alleged Releases are wholly irrelevant to the individual claims. Because most of the claims against IBM challenge its aiding and participating in that individual misconduct, the narrowly drafted releases are inapplicable to those claims as well.

"A release is merely a species of contract and, as such, its interpretation is governed by general principles of contract law." *Carbone v. Marone*, No. 04 Civ 2001 (NRB), 2007 U.S. Dist. LEXIS 92350, at *13 (S.D.N.Y. Dec. 14, 2007) (brackets, citations, and internal quotation marks omitted). So in assessing Defendants' bold reliance on the Alleged Releases, the first step is to note a crucial qualification to the language absent from their florid presentation. The quotation that the Defendants provide shows that the release extends to the "IBM Releasees," but it fails to mention the oddly narrow definition the Restructured Agreements give to that term. Referring to the Blade Enablement Agreement, for example, the term is limited to the "IBM Entities, and its assigns, stockholders, as well as their respective distributors, sub-distributors, agents and contractors, in each case, on a worldwide basis." § 15.3.1 (Compl. Ex. F). The term "IBM Entities," in turn, is limited to "IBM and its present and former (i) officers, directors, agents, employees, representatives, attorneys (***each in their capacity as such***), and (ii) parents, subsidiaries (of any tier), affiliates, divisions, predecessors and successors in interest." Blade Enablement Agreement § 15.2 (Compl. Ex. F) (emphasis added); *see also* Hosted Client Enablement Agreement § 15.0 (Compl. Ex. G) (substantially identical limitations).

Because the release as to the Individual Defendants is limited to their official capacity, it can at most release IBM from financial responsibility. As the Supreme Court has explained, "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent. . . . Personal-capacity suits, on the other hand, seek to impose individual liability." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (internal quotation marks and citation omitted). Thus, the suits for which IBM sought release were suits seeking to impose responsibility on IBM: "As long as the . . . entity receives notice and an opportunity to respond,

an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (internal citations omitted).

The touchstone in cases of ambiguity is "the nature of the liability sought to be imposed." *Id.* at 167 n.14 (internal citations omitted).  The Complaint in this case unambiguously seeks to impose personal liability on the Individual Defendants.  *Compare id.* at 167-68 ("A victory in a personal-capacity action is a victory against the individual defendant, rather than against the entity that employs him.").  Accordingly, the plain language of the Alleged Releases has no application to any of the claims against the Individual Defendants.[1]

Turning to the four counts against IBM, even the Defendants acknowledge, Defs.' Mem. Supp. Mot. to Dismiss 17, that the alleged releases do not bar Count IV (for breach of contract), because the alleged breach plainly took place after the Alleged Releases.  Next, the understanding of the Alleged Releases explained above permits Devon to pursue Counts VIII and IX (aiding and abetting the breach of fiduciary duty and the racketeering).  Because those claims are derivative of the claims against the Individual Defendants, they do not attempt to hold IBM responsible directly (by respondeat superior) for the actions of the Individual Defendants, but rather indirectly because of IBM's participation in that conduct.  Because the Alleged Releases explicitly exclude the underlying conduct, the Alleged Releases can have no more effect on the claims against IBM than they can on the claims against the Individual Defendants.

The only claim as to which the Alleged Releases might apply, then, is Count VII (against IBM, for negligence).  As to that claim, we stand on our argument (detailed in the next section

---

[1] Although it should not be relevant given the clarity of the language, we note that IBM drafted the language of the Alleged Releases, which thus should be construed against the Defendants.

and discussed in more detail in Section D below) that the Alleged Releases are invalid because they were fraudulently induced.

> 2.   *The Alleged Releases Are Invalid Because the Defendants Procured Them By Fraud.*

More generally, the Motion to Dismiss fails to grapple with the implications of the allegations that the Alleged Releases were fraudulently induced.  Compl. ¶¶ 173-185.  Thus, the general contention, Defs.' Mem. Supp. Mot. to Dismiss 12-13, that it is possible to release all manner of claims is wholly irrelevant.  It is logically incoherent to assert that a fraudulently induced release (or covenant not to sue) can bar the claim that it was fraudulently induced.[2]  Not surprisingly, New York law recognizes the problem.[3]  Thus, as the Southern District of New York explains, a party to an alleged release can invalidate the release if it can demonstrate "a separate and distinct fraud from that contemplated by the [releasing] agreement."  *Consorcio Prodipe, S.A. v. Vinci*, 544 F. Supp. 2d 178, 190 (S.D.N.Y 2008) (*quoting DirectTV Group, Inc. v. Darlene Invs., LLC*, No. 05 Civ 5819 (WHP), 2006 U.S. Dist. LEXIS 69129, at *11 (S.D.N.Y. Sept. 27, 2006)).  As the Second Circuit explains, fraudulent inducement claims can vitiate even a broadly worded release if the claimants can prove that "the settlement or release had been part of the very transaction attacked as fraudulently induced."  *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985).

---

[2] In addition to the discussion that we rebut here, Defendants separately argue that the count of the Complaint for fraud and fraudulent inducement (Count V) fails to state a claim for which relief can be granted.  Defs.' Mem. Supp. Mot. to Dismiss 31-36.  We discuss that argument in Section D, below.

[3] We do not challenge the Defendants' contention that New York law applies to the contract claims and Pennsylvania law to the state-law tort claims.  Defs.' Mem. Supp. Mot. to Dismiss 20 n.5, 41.

Defendants are simply wrong to contend that the Second Circuit or New York courts have recognized a general rule that a release or covenant not to sue categorically bars claims of fraudulent inducement. *See, e.g.*, *Havoco of Am., Ltd. v. Sumitomo Corp.*, 971 F.2d 1332, 1341 n.6 (7th Cir. 1992) (rejecting argument that "a release may not be avoided on the basis of the same conduct that was released," in part because "we doubt that *Bellefonte* created such a broad rule"). In sum, New York courts adhere to traditional contract principles, so that "[a]s with any contract, [a] release may be set aside if there is fraud in the inducement." *Id.* at 1341 (internal quotation marks and citation omitted).

The allegations of the Complaint are more than adequate to satisfy that standard. The purpose of the Restructured Agreements was to resolve disputes about the prior conduct related to the Blade and iDataPlex projects. Nothing in those documents refers—or even alludes—to the scheme of misconduct alleged in the Complaint. The Complaint alleges that Devon would not have entered into the Restructured Agreements had it understood the truth about the prior conduct of the Individual Defendants, and that the Individual Defendants concealed the truth about that conduct for the purpose of inducing Devon to agree to the Restructured Agreements. Compl. ¶¶ 178-84.

### B.   The Allegations of Breach of Contract in Count IV Give Fair Notice of the Claim and the Relief Sought by Devon.

Defendants' next challenge, Defs.' Mem. Supp. Mot. to Dismiss  17-20, the claim for breach of contract (Count IV), as to which even Defendants acknowledge there has been no release. Apparently unable even to imagine a legal basis for dismissal of this claim, Defendants fall back on the tired argument that the allegations are so "threadbare" as to fail under *Iqbal*, *supra*. In the Defendants' view, allegations that IBM proactively enabled a competing product are not sufficiently specific to provide notice of the claim.

But even Defendants acknowledge, Defs.' Mem. Supp. Mot. to Dismiss 18-19, that the Complaint identifies the manufacturer of the competing product (Wyse) and a specific location at which a specified employee of IBM promoted the competing product, Compl. ¶¶ 109-112, complete with the url of a Youtube video demonstrating IBM's active participation. The most that can be said is that IBM believes that the conduct in question does not amount to proactive enablement of the competing product. But that plainly is a factual claim, not a legal one proper for consideration on a motion to dismiss.

Defendants also briefly suggest, Defs.' Mem. Supp. Mot. to Dismiss 19-20, that the claim for breach of contract must be dismissed because Devon identifies no valid relief. Generally, Defendants contend that the contract provides that the sole remedy will be specified injunctive relief and that the Complaint seeks only monetary relief. Without addressing the validity of Defendants' reading of the contract, we note that Defendants concede, Defs.' Mem. Supp. Mot. to Dismiss 19, that the contract permits the relief described in Section 2.0 of the Addenda. The Complaint (in a portion omitted from Defendants' selective quotation) seeks "such other relief as the Court deems just and proper." Compl. ¶ 172. Because the Complaint explicitly asks for relief that Defendants concede is available, this suggestion is meritless.

**C.     The Counts for Racketeering, Conspiracy to Engage in Racketeering, and Aiding and Abetting Racketeering State Valid Causes of Action.**

Defendants interpose numerous challenges to the racketeering counts in the Complaint, but none of the various contentions has merit. Defs.' Mem. Supp. Mot. to Dismiss 20-31.

*1.     The Count for Aiding and Abetting Racketeering (Count IX) States a Valid Cause of Action.*

Defendants' first argue that there is no cause of action for aiding and abetting racketeering. Defs.' Mem. Supp. Mot. to Dismiss 20 (*citing Rolo v. City Investing Co. Liquidated Trust*, 155 F.3d 644 (3d Cir. 1998)). We recognize that the Third Circuit has stated

11

that civil claims for aiding and abetting racketeering under 18 U.S.C. § 1962(c) did not survive the Supreme Court's decision in *Central Bank, N.A. v. First Interstate Bank*, 511 U.S. 164 (1994). We respectfully note, however, that courts in other circuits have concluded that such claims continue, particularly if they can be grounded on common law doctrines of aiding and abetting rather than 18 U.S.C. § 2. *E.g.*, *Crowe v. Henry*, 43 F.3d 198, 206 (5th Cir. 1995); *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1410 (11th Cir. 1994). Accordingly, notwithstanding the current state of the law in the Third Circuit, we believe it is appropriate to present this claim in our Complaint to preserve our opportunity to argue for a change of law in the court of appeals.

       2.     *The Racketeering Enterprise (STG) Is Distinct from the Individual Defendants.*

Defendants next contend that the Complaint does not identify a racketeering enterprise that is distinct from the racketeering defendant. Defs.' Mem. Supp. Mot. to Dismiss 20-21. First, we note that this contention applies only to the aiding and abetting racketeering count (Count IX)—the Motion to Dismiss implicitly concedes that the Complaint identifies an enterprise for the substantive racketeering counts. Thus, even if the Court accepts this contention, it would affect only Count IX against IBM, and not the substantive RICO counts (Counts I and II) against the Individual Defendants.

In any event, the contention misreads the Complaint. The basic contention is that the Individual Defendants have committed racketeering (Count I) and conspired to commit racketeering (Count II) in their participation in the affairs of STG. We contend in Count IX that the larger IBM entity aided and abetted that racketeering. Because the aiding and abetting count is derived from the substantive counts, there is no separate requirement that the enterprise be distinctly alleged for the aiding and abetting count: it would make no sense for the enterprise to be defined differently in the substantive counts than it is in the aiding and abetting counts.

12

Because Defendants do not challenge the adequacy of the allegations of an enterprise for the substantive racketeering counts, their challenge to the adequacy of that element of the derivative count must fail.

> 3.     *The Complaint Specifically Alleges Numerous Acts of Wire Fraud.*

Defendants next contend that the Complaint fails to allege acts of wire fraud.  Defs.' Mem. Supp. Mot. to Dismiss 22-27.  This contention is almost inexplicable.  The Complaint includes a lengthy section, Compl. ¶¶ 145-51, that specifies separately for each of the Individual Defendants a set of overt acts taking place on specific dates, at specific places, including in several cases documentary evidence of the acts in question.  The Defendants acknowledge, as they must, that the "wire transmission in a fraud claim need not itself be deceptive."  Defs.' Mem. Supp. Mot. to Dismiss 22.   And they admit that it is enough to allege "fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension."  Defs.' Mem. Supp. Mot. to Dismiss 22-23 (*quoting Camiolo v. State Farm Fire & Cas. Co.*, 334 F.3d 345, 364 (3d Cir. 2003)). In light of that legal standard, the most that Defendants can contend is that the factual allegations of the Complaint are incorrect.

> a.     Statements Known To Be False and Made With the Intent to Deceive Are Fraudulent.

Thus, Defendants first argue that the most Devon can prove is that the Individual Defendants "provided Devon with forecasts . . . that missed the mark."  Defs.' Mem. Supp. Mot. to Dismiss 23.   To be sure, a Complaint that alleged a simple honest mistake would be inadequate.   But the Complaint instead alleges, repeatedly and explicitly, that the so-called forecasts were known to be false when made and presented for the explicit purpose of deceiving Devon into investing.  *E.g.*, Compl. ¶¶ 24, 25, 26, 28, 29, 49, 51, 56, 63, 71, 92, 104, 108, 114, 120, 148, 150, 178, 179.  Moreover, the suggestion that Devon was advised that it could ignore

the forecasts ignores the deceptions related to the use of funds, the secret cancellation of the Blade project, the participation of investors like Intel, and IBM's future actions.  Collectively, those allegations satisfy any conception of the appropriate legal standard.  *See Schwartz*, 680 F. Supp. 2d at 709 ("Deceitful statements, half truths, or the knowing concealment of material facts are all actionable under the mail and wire fraud statutes.") (internal citations omitted).

      b.      The Complaint Provides Adequate Support for the Inferences It Suggests.

Defendants next contend that the Complaint fails to provide a "factual basis for plausibly concluding that the individual Defendants did not believe any forecasts they provided."  Defs.' Mem. Supp. Mot. to Dismiss 24.  This contention has no relevance to a Motion to Dismiss.  The detailed summary of fraudulent statements provides notice of Devon's claim.  There will be time enough at summary judgment, after adequate development of the factual record, for the Court to assess the weight of evidence in support of those allegations.

Moreover, the contention ignores the detailed explanation in the Complaint of an overarching and coherent scheme to defraud Devon by inducing its investments in the STG projects the Individual Defendants touted. The benefit to the Individual Defendants of boosting STG's income for accounting purposes (and thus their bonuses) provides the motivation for fraud that makes it plausible to infer that they knew the statements were false when made.  The criminal conduct of Adkins' mentor during this time period belies any suggestion of a lawful "business-as-usual" atmosphere at STG.  The fraudulent misstatements are perfectly logical when considered within the context of such a scheme.  Even after *Iqbal*, this is adequate notice of a claim to entitle Devon to collect and present evidence to buttress its allegations.

      c.      The Alleged Predicate Acts Establish a Scheme to Defraud.

Defendants next offer a lengthy list of reasons why the individual predicate acts that Devon alleges are not, standing alone, evidence of fraud.  Defs.' Mem. Supp. Mot. to Dismiss

25-27.   Generally speaking, this section of the Motion to Dismiss ignores the Complaint's explication of the overall scheme and presents a series of specific challenges to the fraudulent intent Devon perceives in undisputed historical facts.   As such, those contentions reflect an implicit concession that there is no legal defect in this portion of the Complaint; hence, these contentions provide no support whatsoever for dismissal at this point.

Turning to the specific contentions, Defendants contend that the transmission of funds was not itself fraudulent.   Defs.' Mem. Supp. Mot. to Dismiss 25, ¶ a.   But the point of that allegation is to support the demonstration that the use of the wires was integral to the scheme to defraud; as Defendants concede three pages earlier, there is no need to show that the wire transmission was itself fraudulent.

Similarly, Defendants contend that the cancellation of the Blade Project and related communications to Foxconn were not fraudulent, pointing to IBM's unilateral right to terminate. Defs.' Mem. Supp. Mot. to Dismiss 25, ¶ b.   But the argument is not that IBM could not cancel the Blade project.   The point is that the Individual Defendants never had any intention of pursuing the project and, most importantly, the acknowledged concealment of the termination from Devon.   The allegation related to Foxconn is important to show when the fraudulent concealment of the Blade termination finally came to Devon's attention—after it had contributed an additional $3 million to the iDataPlex project.

Defendants next challenge the fraud and materiality of statements made in Ireland about the status of Blade.   Defs.' Mem. Supp. Mot. to Dismiss 25, ¶ c.   Meyerson's statement that sales were "low" is clearly fraudulent—given the actual cancellation of the project the preceding month.   It is material, again, because continuing concealment motivated Devon to make a

$3 million iDataPlex contribution a few weeks later (using funds borrowed from the Irish lender to whom Meyerson made the false statement).

Defendants next challenge the contention that allegations about investments by Intel were known to be false when made.  Defs.' Mem. Supp. Mot. to Dismiss 26, ¶ d.  Again, it is not the place of the Complaint to prove the statements were known to be false.  It is enough, even after *Iqbal*, to provide credible allegations.  But the direct conflict between the written assurance that Intel already had approved the investment and Intel's failure to fund make an inference of fraud compelling.  Compl. ¶¶ 51, 55, 56.[4]

Defendants next contend that there could be nothing fraudulent about later statements regarding Intel's funding because Devon already had executed the iDataPlex agreement.  Defs.' Mem. Supp. Mot. to Dismiss 26, ¶ e.  But that ignores Devon's unqualified right to terminate the agreement, which likely would have occurred had the truth been disclosed.  Between the time of that false statement and Devon finally learning that Intel did not fund the project, Devon contributed another $5.5 million to the iDataPlex project.

Finally, Defendants contend that the allegations about Bradicich's solicitations of investments in GeeVee are unrelated to the Ponzi scheme that the Complaint alleges.  Defs.' Mem. Supp. Mot. to Dismiss 26-27, ¶ f.  Again, those allegations provide support for the thesis of the Complaint that the purpose of the Ponzi scheme was to enrich the Individual Defendants through obtaining a wide range of financial benefits from Devon and others similarly situated.  To be sure, it is not at this time clear how the GeeVee matter directly benefited any of the

---

[4] We rebut in Section D below the suggestion that an anti-reliance clause in an Agreement that does not even mention the subject matter could waive the ability to complain about a fraudulent statement.

Individual Defendants other than Bradicich, but the all-for-one mentality of the group suggests that the GeeVee matter is best regarded as part of the same pattern of racketeering activity.

        4.      *The Complaint Establishes a Pattern of Racketeering Activity.*

The fourth and final challenge to the RICO Counts is the contention that the Complaint does not allege a pattern of racketeering activity. Defs.' Mem. Supp. Mot. to Dismiss 27-31. Again, this contention for the most part reflects a willful failure to consider the allegations of the Complaint. As the Complaint alleges, the pattern of racketeering was to grossly overstate the potential of STG projects, repeatedly insist on up front payments from Devon and divert the funds to other uses, use those activities to enhance the apparent profitability of STG (and thus the compensation of the Individual Defendants), and conceal that scheme from Devon for as long as possible. Each of the alleged predicate acts is part of that coherent set of means to the ultimate end. Compl. ¶¶ 139-42 (discussion of pattern); *see id.* ¶¶ 145-51 (detailed discussion of predicate acts).

Although some parts of the standard for alleging a "pattern" of racketeering activity are imprecise, the general pattern of the legal framework is clear. First, the pattern must involve at least two acts of racketeering activity. *See Tabas v. Tabas*, 47 F.3d 1280, 1290 (3d Cir. 1995) (en banc) (*quoting* 18 U.S.C. § 1961(5)); *Schwartz*, 680 F. Supp. 2d at 703 (same). Second, the predicate acts must satisfy a "relatedness" requirement: they must "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise [be] interrelated by distinguishing characteristics and [not be] isolated events." *Tabas*, 47 F.3d at 1292 (*quoting H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 240 (1989)) (internal quotation marks omitted). Finally, they must satisfy a "somewhat flexible" "continuity" prong. *Id.* at 1292. The continuity requirement involves a multi-factor test in which the length of time is but a single element. Among other things, plaintiffs can satisfy that prong if (as here) they can establish that

17

the defendant is "an ongoing entity which commits the predicate acts or offenses as its regular way of doing business." *Id*. at 1293.

The allegations of the Complaint easily satisfy that legal standard.  First, the Complaint alleges numerous acts of racketeering activity.  Compl. ¶¶ 145-51.  Second, they are related, all operating to serve the scheme summarized in paragraphs 3-7 of the Complaint; they cannot fairly be characterized as isolated events.  Third, and finally, they satisfy the standard of continuity. The duration of the alleged scheme is extensive; the Complaint alleges overt and continuing fraudulent activity extending from at least 2005 (Compl. ¶ 24) to 2009 (Compl. ¶¶ 111-112). And nothing about the texture of the activity undermines the allegations regarding length.  The racketeering involved three distinct (albeit related) schemes (with different participants each time) to defraud Devon.  It involved a wide variety of fraudulent acts (not only intentionally fraudulent forecasts, but also diversion of funds, misrepresentations about IBM's likely future activities, misrepresentations about the investments of third parties, and deceptive behavior as a Devon board member).

Moreover, the Individual Defendants continued their efforts to entice Devon into investments with STG far past the events alleged in the Complaint.  Their efforts extended well into 2010, up to the eve of the filing of the Complaint.  The Individual Defendants apparently tried to resuscitate the TC5 project in an effort to trick Devon into yet again investing resources in the STG relationship.  The continuation of the activities well into 2010 underscores the continuity of the pattern of racketeering alleged in the Complaint.

Furthermore, even aside from the pattern of racketeering directed at Devon, the Complaint alleges that the Individual Defendants perpetrated similar schemes against other companies investing in STG.  Discovery will reveal that Adkins was disciplined internally for

18

using exaggerations about potential investments from several parties other than Devon to enhance his bonus compensation—a practice referred to within STG as "stuffing the channel." The parallels between that information and Devon's experience support the inference that the Individual Defendants solicited those partners in the same way they did Devon.

Against that backdrop, Defendants' criticisms of the Complaint are fruitless.  The central argument is that the Complaint fails to allege continuity because, in Defendants' jaundiced reading, the Complaint alleges "only" a single three-year scheme, with a single victim targeted by a handful of IBM employees.  Defs.' Mem. Supp. Mot. to Dismiss 28-30.  As discussed above, this is not a fair reading of the Complaint.  Defendants reasonably can argue that Devon has not yet *proved* a pattern of racketeering activity.  But it is disingenuous to suggest Devon has failed to allege one.

None of the cases on which Defendants rely supports dismissal of the Complaint.  First, as mentioned above, the Complaint credibly alleges that the Individual Defendants have executed similar schemes not only with respect to Devon, but with respect to others similarly situated.  The acknowledged criminal behavior at the highest levels of STG, underscored by the recent guilty plea and sentence of Adkins' mentor Moffat, makes those allegations inherently plausible, at least for purposes of a motion to dismiss.  Giving credence to those allegations, there can be no serious contention that the Complaint fails to allege a pattern of racketeering.

But even putting those allegations to the side, the allegations with respect to the defrauding of Devon are an order of magnitude more continuous than was presented in any of the cases on which Defendants rely.  None of the cases on which Defendants rely involves a scheme with such a long time span (more than four years), so many differing modes of misrepresentation, and such a variation of investments.  For example, *Efron v. Embassy Suites*

*(Puerto Rico), Inc.*, 223 F.3d 12 (1st Cir. 2000) emphasizes the fluidity of the continuity requirement and emphasizes that a pattern "does not necessarily require proof of multiple criminal schemes." *Id*. at 16 (internal quotations omitted).  The court went on to hold that in that particular case the limitation to a single scheme with a singular objective weighed in favor of dismissal.  The scheme in that case involved siphoning of funds from a single investment, *id.* at 16-18, a far cry from the step-by-step bait-and-switch schemes the Individual Defendants used against Devon.  Similarly, the unpublished opinion in *Foster v. Wintergreen Real Estate Co.*, 363 F. App'x 269, 274 (4th Cir. 2010) (per curiam), explains that continuity "depends on the specific facts of each case" and rejects efforts to allege extension of the scheme to third parties as amounting to no more than speculation.   The length and complexity of the scheme, its participants, and the variety of the predicate acts in this case reflect a much more continuous enterprise than in *Foster*.  *See Zahl v. N.J. Dep't of Pub. Safety*, No. 06-3749 (JLL), 2009 WL 806540, at *7 (D.N.J. Mar. 27, 2009) (finding continuity satisfied, in part, because of the "kaleidoscope" of different fraudulent misrepresentations).

Defendants' reliance on *Kolar v. Preferred Real Estate Inv., Inc.*, 361 F. App'x 354, 365 & n.11 (3d Cir. 2010) is even less persuasive.   With regard to continuity analysis, that unpublished opinion remarked only that it was not enough to allege a single speedy transaction, coupled with a tacit threat to continue wholly lawful behavior.  This case, of course, involves multiple transactions effectuated by ever-shifting fraudulent means over a period of years.

Finally, the main issue in *Gross v. Waywell*, 628 F. Supp. 2d 475 (S.D.N.Y. 2009) was that the complaint failed to identify the wrongful activity of each of the individuals, generally alleging that the predicate acts were committed by the Defendants as a group.  *Id*. at 495.  The Complaint in this case, by contrast, includes a separate section specifically identifying the

predicate acts alleged for each of the Individual Defendants.  Compl. ¶¶ 148-151.  Defendants might scoff that those allegations do not show the fraudulent participation of each of the Individual Defendants in each of the separate activities of the scheme, Defs.' Mem. Supp. Mot. to Dismiss 30-31, but the allegations do satisfy the relevant legal standard: they show how the predicate acts of each of the Individual Defendants worked to further the goals of the overall scheme, and they show that each of the Individual Defendants contributed in a significant way to the duration and success of the scheme.

In sum, none of the cases on which Defendants rely can compel the Court here to depart from the standard understanding of the Third Circuit, which compels a finding of continuity and pattern.

**D.     The Individual Defendants Fraudulently Induced the Restructured Agreements.**

The Defendants next challenge Devon's claim that the Restructured Agreements were fraudulently induced (Count V).  Defs.' Mem. Supp. Mot. to Dismiss 31-36.  Neither of the bases Defendants offer for that contention is meritorious.

*1.     Devon Reasonably Relied on the Fraudulent Misrepresentations of the Individual Defendants.*

Defendants first argue that non-reliance and integration clauses in the Restructured Agreements interpose a conclusive legal barrier to their claims that the Individual Defendants fraudulently induced those agreements.  Defs.' Mem. Supp. Mot. to Dismiss 32-34.  But that argument flies in the face of hornbook principles of New York law.  A cursory examination of the relevant cases shows that these sorts of clauses bar fraudulent inducement claims only if they specifically refer to the misrepresentations in question.  As with the argument (addressed in Section A above) that the Restructured Agreements bar Devon's claims entirely, the contentions

21

of the Individual Defendants founder on the language of the agreements, which is not nearly so broad as their carefully snipped quotations suggest.

Turning to the specific contentions, we agree with the Defendants that the applicable law requires Devon to prove both a knowingly false misrepresentation by the Individual Defendants and reliance by Devon. *See* Defs.' Mem. Supp. Mot. to Dismiss 32 n.7. We also agree that contract language disclaiming reliance on a particular representation can undermine a subsequent fraud claim. *See* Defs.' Mem. Supp. Mot. to Dismiss 32. Where we part ways is with Defendants' failure to acknowledge the appropriate standard under New York law for determining whether contract language is adequate to disclaim reliance on a particular representation.

Defendants implicitly suggest that the breadth of the general language of a release makes it adequate to accomplish a categorical release of all claims known and unknown. But New York courts have taken a much more sensible approach. They distinguish between a "general merger clause," which is "ineffective to exclude parol evidence of fraud in the inducement" and a "specific disclaimer," which "destroys the allegations in plaintiff's complaint." *MBIA Ins. Corp. v. Royal Bank of Canada*, No. 12238/09, 2010 N.Y. Misc. LEXIS 3958, **92 (N.Y. Sup. Ct. Aug. 19, 2010). The question is whether the release disclaims an intention to "rel[y] on any representations as to the very matter as to which [the plaintiff] now claims it was defrauded." *Id.* (*quoting Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320-21 (N.Y. 1959)). As the New York Supreme Court explained just last month, "the disclaimer must show a clear indication that the disclaiming party has knowingly disclaimed reliance on the specific representations that form the basis of the fraud claim. Thus, a disclaimer is generally enforceable only if it tracks the

substance of the alleged misrepresentation." *Id.* at **94 (citations and internal quotation marks omitted).

Defendants do not, and cannot, allege that the Restructured Agreements track, or even refer to, the bulk of the misrepresentations discussed in the Complaint. *E.g.*, Compl. ¶¶ 104, 108 (alleging that Meyerson knew at the time of the negotiation of the Restructured Agreements that Devon would not receive the IBM part numbers he had promised and that the Individual Defendants did not intend to comply with the thin client hardware prohibition). Accordingly, it is clear under New York law that the claim for fraudulent inducement is unaffected by the clauses on which Defendants rely.

Moreover, even if the clauses had been drafted much more specifically, they would not bar the fraud in the inducement claim under New York law because a party "may not be precluded from claiming reliance on any oral misrepresentations if the facts allegedly misrepresented are peculiarly within the seller's knowledge." *MBIA Ins. Corp.*, 2010 N.Y. Misc. LEXIS 3958 at **100 (*quoting Tahini Inv., Ltd. v. Bobrowsky*, 99 A.D.2d 489, 490 (N.Y. App. Div. 1984)).

2. *Devon Alleges Numerous False Representations That Induced Devon's Agreement to the Restructured Agreements.*

Defendants next contend, offering distinct criticisms of several of the Complaint's allegations, that Devon has failed to allege representations that are sufficiently false to justify a claim for fraud. Defs.' Mem. Supp. Mot. to Dismiss 34-36. None of those criticisms holds water. We have addressed above the contention, repeated at Defs.' Mem. Supp. Mot. to Dismiss 35, that the false representations about anticipated sales were merely puffery: the Complaint alleges that those statements were known to be false when made and were made with the intention to induce Devon's agreement to the Restructured Agreements.

23

The contention that New York will not recognize a fraud claim based on the knowingly false promises about IBM's future conduct is similarly unjustified.  We acknowledge that a fraud claim does not lie where the only fraud alleged arises from the breach of contract.  The question is whether "a plaintiff alleges that it was induced to enter into a transaction because a defendant misrepresented material facts. . . . Unlike a misrepresentation of future intent to perform, a misrepresentation of present facts is collateral to the contract (though it may have induced the plaintiff to sign the contract) . . . ." *MBIA Ins. Corp.*, 2010 N.Y. Misc. LEXIS 3958 at **87 (quoting *First Bank of Am. v. Motor Car Funding, Inc.*, 257 A.D.2d 287, 291-92 (N.Y. App. Div. 1999)) (internal quotation marks omitted).

The Complaint readily satisfies that standard.  For one thing, because the claim for fraudulent inducement is against the Individual Defendants (who were not party to the contract), rather than against IBM (the party to the contract), an allegation that they had no intention to cause IBM and STG to perform under the Contract is quite distinct from an allegation that IBM and STG had no intention to perform.  *Compare Galdieri v. Monsanto Co.*, 245 F. Supp. 2d 636, 650 (E.D. Pa. 2002) (barring fraud claim based on allegation that "***the contracting parties*** never intended to perform") (emphasis added).

For another, the Complaint is replete with allegations of misrepresentations of material facts collateral to the intention of the contracting party to perform.  Among other things, the Complaint alleges that the Defendants continued through the time of the Restructured Agreements to misrepresent their use of funds Devon had invested in IBM, and that they would give only their "best deals" to Devon.  Compl. ¶ 125.  Those allegations are completely collateral to the intention of the Defendants to perform under the Restructured Agreements.  Defendants allege, Defs.' Mem. Supp. Mot. to Dismiss 36, that the fraud related to use of the funds is not a

representation, but merely a withholding of information, but that is not a fair reading of the Complaint. *E.g.*, Compl. ¶¶ 71-72 (alleging affirmatively false representations about use of Devon funding). Similarly, false representations about the worldwide availability of the part numbers, *id.* ¶ 114, are collateral to IBM's contractual obligation to provide the numbers in the first instance.

In sum, a fair reading of the Complaint acknowledges numerous allegations of fraudulent representations by the Individual Defendants on which Devon reasonably relied.

### E.   Bradicich Had a Fiduciary Duty to Devon.

Defendants next argue that Bradicich had no fiduciary duty to Devon. Defs.' Mem. Supp. Mot. to Dismiss 36-39. That argument is almost entirely factual. The basic contention is that the nature of these particular boards was such that their members owed no fiduciary duty to the entities they had agreed to advise. They can cite only a single 15-year-old decision of an intermediate court in Louisiana addressing the fiduciary duty of any advisory board. Defs.' Mem. Supp. Mot. to Dismiss 37 (*citing United Group of Nat'l Paper Distribut., Inc. v. Vinson*, 666 So. 2d 1338 (La. Ct. App. 1996)). They acknowledge, however, that the question of fiduciary obligation depends on the facts of the particular relationship. *See* Defs.' Mem. Supp. Mot. to Dismiss 38-39; *Schwartz*, 680 F. Supp. 2d at 711 n.12 ("A fiduciary relationship arises under Pennsylvania law where one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side, or . . . justifiable trust, on the other") (citations and internal quotation marks omitted).

Although Defendants contend that the advisory board in this case "was understood—and intended—to lack fiduciary character," they cannot identify any allegations in the Complaint that suggest such an understanding or intention. Defs.' Mem. Supp. Mot. to Dismiss 39. Nor can

they point to any agreement authorizing Bradicich to act disloyally to the companies he was paid so handsomely to advise.

At bottom, the Complaint alleges that the boards were intended to include a duty of loyalty to Devon.  Compl. ¶ 86.  Indeed, it is Devon's contention, implicit in the allegations of the Complaint, that the styling of the boards as "advisory" was wholly window-dressing designed to paper over, rathern than resolve, Bradicich's conflict of interest.  These were the only boards these entities had.  Their responsibilities were the same as those of typical boards of directors.  Their pay was similar to that of typical boards of directors and wholly inconsistent with an advisory role.  Taking the allegations in the Complaint at face value, there is no basis for doubting Bradicich's fiduciary duty.

**F.    The Count for Participation in a Breach of Fiduciary Duty (Count VIII) States a Valid Cause of Action.**

Defendants next contend, that IBM cannot be held accountable for aiding and abetting Bradicich's breach of fiduciary duty.  Defs.' Mem. Supp. Mot. to Dismiss 39-41.

First, they accurately point out that the Pennsylvania Supreme Court has not yet recognized a claim for participating in a breach of fiduciary duty.  Defs.' Mem. Supp. Mot. to Dismiss 39.  But they identify no decision from that Court justifying a contrary expectation. This cause of action has been recognized for centuries.  *See, e.g.*, *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993) ("It is also true that money damages were available . . . against third persons who knowingly participated in the trustee's breach.") (citing authorities); *see also* 3 A. Scott & W. Fratcher, Law of Trusts § 224.1 (4th ed. 1988).  Pennsylvania has long recognized the similar tort of civil conspiracy.  *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979).  Pennsylvania traditionally follows the *Restatement* rules related to aiding and abetting. *E.g.*, *Sovereign Bank v. Valentino*, 914 A.2d 415, 427 (Pa. Super. Ct. 2006).  Hence, the default

presumption should be that Pennsylvania courts will follow the general rule, not they will depart from the general common law on this point.

Defendants also contend that the factual allegations of the Complaint are inadequate to support a cause of action under traditional rules for participation in a breach of fiduciary duty. Defs.' Mem. Supp. Mot. to Dismiss 39-41.  They acknowledge that participation is enough to state a cause of action, Defs.' Mem. Supp. Mot. to Dismiss 39 (citing New York law), but contend that the Complaint fails to allege knowing participation, Defs.' Mem. Supp. Mot. to Dismiss 40-41.  But this ignores the allegations of the Complaint that the general counsel of IBM "was instrumental in arranging the precise role Bradicich would play at Devon," "acted with full awareness of the potential for harm to Devon," and "profited from the deception of Devon that was effected by Bradicich's breach of his duty of loyalty to Devon."  Compl. ¶¶ 194-95. Notwithstanding IBM's characterization of this as failure to act, the Complaint plainly alleges affirmative and knowing participation by the general counsel.

At bottom, IBM's real defense is its view that Devon cannot prove that the general counsel understood what was happening when it devised the so-called "Advisory" board as a way to circumvent the apparent conflict of interest.  But that is not a defense for a motion to dismiss.  The Complaint credibly alleges facts that would support liability and gives notice of Devon's claim, which is all that is required at this time.

### G.   The Count for Prima Facie Tort (Count VI) States a Valid Cause of Action.

Defendants present similar contentions about the count for prima facie tort (Count VI)— contending that Pennsylvania does not recognize such a tort and that in any event the allegations as a factual matter are inadequate.  Defs.' Mem. Supp. Mot. to Dismiss 41-42.  Neither argument is persuasive.

On the first point, again, we acknowledge that the Supreme Court of Pennsylvania has not yet adopted *Restatement (Second) of Torts* § 870.  But Defendants offer no more evidence here than they do with regard to participation in a breach of fiduciary duty to suggest that Pennsylvania courts will fail to follow the general trend of decisions and the *Restatement.* Pennsylvania courts traditionally have shown great respect for the *Restatement (Second) of Torts*. *E.g.*, *Gilbert v. Korvette's Inc.*, 327 A.2d 94, 100 n. 25 (1974) ("In recent years, this Court has not hesitated to adopt sections of the Restatement (Second) of Torts (1965) when our common-law precedents varied from the Restatement or when the Pennsylvania common law provided no answer."); *Barker v. Brown*, 340 A.2d 566, 569 (Pa. Super. Ct. 1975) ("No citation of authority is necessary to support the proposition that the Restatement of Torts (1939) and the Restatement (Second) of Torts (1965) are highly regarded by Pennsylvania courts."); *see also* Christine M. Gimeno, 1 Summ. Pa. Jur. 2d Torts §1.7 ("The Restatement of Torts is highly regarded by Pennsylvania courts . . . ."). There is no particular controversy about § 870 that makes Pennsylvania courts particularly unlikely to follow it.

Defendants also argue that the Complaint fails in three respects to satisfy the elements of the tort, but in each case they rely on limitations unique to New York, departures from the normal understanding of the tort reflected by the *Restatement*.  Thus, they first contend that defendants acting to further their own interests cannot be liable for prima facie tort.   Defs.' Mem. Supp. Mot. to Dismiss 41-42.  To be sure, there are cases to that effect in New York, but it is clear that New York is an outlier.  For example, when the *Restatement* discusses the defenses that might arise based on the interests promoted by the actor's conduct, it suggests that the relevant question is whether "there is some social interest in not putting undue restrictions" on

the conduct in question.  *Restatement (Second) of Torts* § 870 comment g.  There is no social interest in tolerating the splenetic greed delineated in the Complaint.

Second, Defendants contend that "ordinary economic losses" are not compensable under prima facie tort as recognized in New York.  Defs.' Mem. Supp. Mot. to Dismiss 42.  The case on which Defendants rely, however, does not even mention prima facie tort, much less articulate a doctrine of special damages.  *Schwegel v. Chiaramonte*, 772 N.Y.S.2d 379, 380 (N.Y. App. Div. 2004) (dismissing claim for intentional infliction of emotional distress for failure to allege outrageous conduct).  Again, any such restriction (*e.g.*, *Constant v. Hallmark Cards, Inc.*, 568 N.Y.S.2d 441, 442 (N.Y. App. Div. 1991)), is an eccentric attribute of New York law.  *See Restatement (Second) of Torts* § 870 comment m (suggesting that "proof of actual harm is required," that the "harm need not be pecuniary," and that punitive damages are available under traditional doctrines for such damages).  The Complaint's allegations of harm are adequate under the *Restatement* standard.  Compl. ¶ 187.

Finally, Defendants contend that the prima facie tort is available only for "otherwise lawful conduct."  Defs.' Mem. Supp. Mot. to Dismiss 42.  Again, Defendants proffer no reason to believe that Pennsylvania courts, customarily respecting the *Restatement*, would adopt New York's peculiarly limited version of the tort.  There is no basis in the *Restatement* for such a limitation, *see Restatement (Second) of Torts* § 870 comment e (discussing the basis for liability), and thus no basis for believing the Pennsylvania Supreme Court would craft such a limitation.

The allegations of the Complaint state a cause of action under traditional principles of tort law.  Given Defendant's contention that Pennsylvania law rather than New York law applies to this Count, Defs.' Mem. Supp. Mot. to Dismiss 20 n.5, 41, their arguments based on the peculiarities of New York law in this area are of no moment.

**H.      The Count for Negligence (Count VII) States a Valid Cause of Action.**

Finally, Defendants contend that the cause of action against IBM for negligence (Count VII) fails to state a cause of action.  Defs.' Mem. Supp. Mot. to Dismiss 42-44.  IBM makes two points here.  First, it contends that the negligence claim is so related to the fraud claim against the Individual Defendants that it must fall with that claim; but we explain above why the fraud claim is meritorious.

IBM's sole challenge to the negligence claim itself is that the Complaint fails to allege facts suggesting that IBM knew or should have known that the Individual Defendants were engaging in, or were likely to engage in, the misconduct in question.  Defs.' Mem. Supp. Mot. to Dismiss 43-44.  But the Complaint alleges that IBM's organization of STG exposed Devon to the risks challenged in the Complaint.  Compl. ¶¶ 190-191.  And the allegations of the criminal conduct at STG during Moffat's tenure, Compl. ¶ 4, are more than adequate to suggest that IBM was on notice of the propensity for misconduct at STG at that time.  The developing investigation of Moffat and his associates can be expected to shed more light on what IBM knew about this at the relevant time.  The allegations in the Complaint are more than adequate to give IBM fair notice of the claim against it.

## V.  CONCLUSION

For the reasons set forth in detail above, we respectfully request that this Court deny the

Motion to Dismiss in its entirety.

Respectfully submitted,

Dated:  September 24, 2010                MITTS MILAVEC, LLC


  /s/ Maurice R. Mitts
Maurice R. Mitts, Esquire
Mark L. Rhoades, Esquire
Amy L. Blackmore, Esquire
Attorney Id. Nos.:  50297/80641/209584
Two Logan Square, 12th Floor
Eighteenth and Arch Streets
Philadelphia, PA 19103
(215) 569-1800 (telephone)
(215) 569-1822 (facsimile)
 *Counsel for Plaintiffs*

31

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| DEVON IT, INC., et al. | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | NO. 2:10-cv-02899-JHS |
| IBM CORP., et al. | : | |
| | : | |
| Defendants. | : | |
| | : | |

## CERTIFICATE OF SERVICE

I, Maurice R. Mitts, Esquire, hereby certify that on September 24, 2010 a true and correct copy of the foregoing Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss was served on the individuals named below by Electronic Case Filing using the CM/ECF system which will send notification of such filing to the following:

> Robert N. Feltoon, Esquire
> Conrad O'Brien Gellman & Rohn, PC
> 1515 Market St., 16th Floor
> Philadelphia, PA 19102
> *Counsel for Defendants IBM Corporation,*
> *Rodney Adkins, James Gargan and Bernard*
> *Meyerson*

> Theresa E. Loscalzo, Esquire
> Timothy K. Lewis, Esquire
> Schnader Harrison Segal & Lewis LLP
> 1600 Market Street
> Suite 3600
> Philadelphia, PA 19103
> *Counsel for Defendant, Thomas M.S. Bradicich*

Glen D. Nager (admitted *pro hac vice*)
Michael R. Shumaker (admitted *pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington D.C. 20001
*Counsel for Defendants IBM Corporation,*
*Rodney Adkins, James Gargan and Bernard*
*Meyerson*

/s/ Maurice R. Mitts