IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DEVON IT, INC., et al,                  :
                                        :        CIVIL ACTION
                    Plaintiffs,         :
                                        :        NO. 10-2899
          v.                            :
                                        :
IBM CORP., et al,                       :
                                        :
                    Defendants.         :

## OPINION

**Slomsky, J.**                                          **March 31, 2011**

## I.    INTRODUCTION

On June 16, 2010, Plaintiffs Devon IT, Inc. ("Devon IT "), Devon AD Tech, Inc. ("Devon

AD"), and Devon IT (Europe), Ltd. ("Devon Europe") (collectively "Plaintiffs") commenced this

action against Defendants International Business Machine Corp. ("IBM"), Thomas S. Bradicich,

Bernard S. Meyerson, James A Gargan, and Rodney C. Adkins (collectively "Defendants"),

asserting nine claims upon which Plaintiffs allege relief should be granted.  On August 17, 2010,

Defendants filed a Motion to Dismiss the Complaint (Doc. No. 22).  On September 24, 2010,

Plaintiffs filed a Response in Opposition to Defendants' Motion to Dismiss (Doc. No. 27).  On

October 18, 2010, Defendants filed a Reply (Doc. No. 33).  On November 2, 2010, the Court

held a hearing on Defendants' Motion, and on November 9, 2010, the parties filed supplemental

briefs (Doc. Nos. 37 & 38).

Plaintiffs make the following claims in the Complaint:  Count I–Conduct and

Participation in a RICO Enterprise Through a Pattern of Racketeering in violation of 18 U.S.C.

§ 1962(c) by Defendants Bradicich, Meyerson, Gargan and Adkins;  Count II–Conspiracy to

Engage in a Pattern of Racketeering in violation of 18 U.S.C. § 1962(d) by Defendants

Bradicich, Meyerson, Gargan and Adkins;  Count III–Breach of Fiduciary Duty by Defendant

Bradicich;  Count IV–Breach of Contract by Defendant IBM;  Count V–Fraud in the Inducement

by all Defendants;  Count VI–Prima Facie Tort Under the Restatement (Second) of Torts § 870

by all Defendants;  Count VII–Negligence by Defendant IBM;  Count VIII–Participation in a

Breach of Fiduciary Duty by Defendant IBM;  Count IX–Aiding and Abetting A Pattern of

Racketeering Activity and Conspiracy to Engage in a Pattern of Racketeering Activity in

violation of 18 U.S.C. § 1962(c) and (d) by Defendant IBM.

For the following reasons, Defendants' Motion to Dismiss will be granted in part and

denied in part.

## II.    FACTUAL BACKGROUND

### A.    <u>Blade Agreement</u>

In September 2005, Defendants[1] approached Plaintiffs[2] regarding a potential investment

in a new IBM server project referred to as "Blade."  (Doc. No. 1 ¶¶ 19-20.)  The project involved

---

[1] The Complaint asserts claims against IBM and four executives employed in the Systems and Technology Group ("STG") of IBM.  STG is an unincorporated division within IBM that focuses on the sale of computer hardware, such as servers and data storage products.  The four STG executives involved are: Bernard Meyerson, who is a Vice President and Strategic Alliances Chief Technology Officer; James Gargan, who was a Vice President at all relevant times but has since been transferred; Rodney Adkins, who is a Senior Vice President; and Thomas Bradicich, who is a Vice President.  Bradicich also served on the independent Advisory Board set up by Plaintiffs.  His service began in March 2007.  He was appointed as a Board member to provide technical and business advice to Plaintiffs and to assist in increasing Plaintiffs' presence in the information technology industry.

[2] The primary Devon Executives are John Bennett, the Chief Executive Officer and Chairman of Devon IT, and Joe Makoid, the President of Devon IT.

the development of a Blade computer or workstation, designed to replace the typical stand-alone desktop personal computer.  (Id. ¶ 21.)  Blade was intended to save space, reduce energy costs, increase efficiency and security, as well as provide business clients with flexible information technology solutions based on individual needs.  (Id.)  In a presentation to Plaintiffs, Defendant Bradicich represented that Blade would be available for sale during the first quarter of 2006 at the competitive price of $1,500 a unit.  (Id. ¶ 24.)  He also projected that 500,000 units would be sold over the first three years, and informed Plaintiffs that several prominent companies such as Honda and Merrill Lynch were interested in purchasing Blade once it was available for sale.  (Id. ¶¶ 25-26.)  Total revenue was projected by Defendants to be $33,800,000 in the first year.  (Id. ¶ 28.)  Defendants represented that any investment by Plaintiffs in the Blade project would be applied to the design, development, and marketing of Blade.  (Id. ¶ 29.)  On November 7, 2005, Plaintiffs entered into an agreement (the "Blade Agreement") in reliance on Defendants' representations regarding market potential.  (Id. ¶ 30.)

The Blade product itself was designed to function based on a link between a desktop computer terminal and a centralized server.  Plaintiffs agreed to develop the desktop computer terminal, and Defendant IBM agreed to develop the centralized server.  This relationship would give Plaintiffs an opportunity to enter the PC market in conjunction with IBM's valuable brand name and well established sales channels.  (Id. ¶ 32.)  Pursuant to the Blade Agreement, Plaintiffs made $4,000,000 in development payments to IBM between January 2006 and October 2007. (Id. ¶ 34.)

**B.    iDataPlex Agreement**

In February 2007, Defendants approached Plaintiffs about another investment

opportunity. This time the investment was to be in a complex data server called "iDataPlex." (Id. ¶ 37.) This device was intended to be a state of the art computer rack, which would be used to store servers, switches, and other equipment. (Id. ¶ 38.) iDataPlex would provide exceptional density and would be energy efficient. (Id.)

The sales projection given to Plaintiffs for this project was 85,000 units to be sold in the first year, 540,000 to be sold in the second year, and 1,000,000 to be sold in the third year. (Id. ¶ 49.) In April 2007, Plaintiffs were advised that an $11,000,000 investment was required in order to become a partner in the iDataPlex project. (Id. ¶ 50.) Plaintiffs were further advised that their investment would be applied to the design, development, and marketing of the project, and that another company, Intel Corporation, would also invest in the project in order to ensure the use of Intel chips in the units. (Id. ¶ 51.)

On June 7, 2007, Plaintiffs entered into an agreement with Defendants (the "iDataPlex Agreement") for the design, development, and marketing of the iDataPlex project. (Id. ¶ 52.) iDataPlex also appears to involve a link between an end point terminal unit and a centralized server, similar to the overall structure of Blade. Again, Plaintiffs agreed to focus on the development of the end point device, while IBM focused on the development of the centralized server components. Pursuant to the iDataPlex Agreement, Plaintiffs made $8,000,000 in payments to Defendants by wire transfer between June 2007 and March 2008.

On October 3, 2007, Plaintiffs sent an email to Defendant Meyerson seeking a confirmation that Intel was committed to investing in the project. (Id. ¶ 55.) The Complaint alleges that Defendant Meyerson emailed back in the affirmative, stating that Intel was fully committed and the project was "fully funded and going," when in fact this statement was false.

(Id.)  In reliance on these assurances, Plaintiffs wired another $2,000,000 to Defendants on October 24, 2007 and on December 20, 2007.  (Id. ¶ 56.)  Plaintiffs now claim that the project was not fully funded at the time the representations were made, and Defendants knew it would not be fully funded.  (Id. ¶ 56.)

### C.    Breakdown Of Blade And iDataPlex Agreements

The Blade release date was delayed many times.  Plaintiffs were finally advised that units would be available for sale in the third quarter of 2007.  According to Plaintiffs, Defendants knew that this representation was not true.  (Id. ¶ 62.)   The Complaint states that Defendants were dishonest about the ongoing viability of the Blade project, which had in fact been terminated, so that Plaintiffs would not be deterred from making payments under the iDataPlex Agreement.  Defendants then used the payments for a purpose other than designing, developing and marketing iDataPlex, all in violation of the iDataPlex agreement.  (Id. ¶¶ 62-63.)  During a meeting held on February 2008, when asked why Blade sales were so low, Defendant Meyerson advised that low numbers were typical at the start of any project.  (Id. ¶ 65.)  Contrary to this assertion, Plaintiffs maintain that the real reason for the poor number of sales was the termination of the Blade project by Defendants.  (Id.)  According to Plaintiffs, Defendants concealed the fact that they had already terminated the Blade project in order to induce Plaintiffs to continue to invest in Blade and iDataPlex.  (Id.)  For example, Defendants solicited and accepted a wire transfer payment of $3,000,000 on March 1, 2008 under the iDataPlex Agreement, a date after the Blade project was cancelled but before it was made known to Plaintiffs.  (Id. ¶ 67.)  Ultimately, in April 2008, Defendants advised Plaintiffs that the Blade project was at the "end of life," and that the future of iDataPlex was also in doubt.  (Id. ¶ 66.)

## D.    Restructured Agreements And Releases

Subsequent to the disclosure that the Blade project was cancelled and that the iDataPlex project was struggling, and the revelation in the spring of 2008 that both projects failed to meet robust sales projections, the parties began to negotiate new agreements.  On July 10, 2008, the parties entered into new agreements ("July 2008 Agreements") that restructured the previous Blade Agreement and iDataPlex Agreement.[3]  (Id. ¶¶ 97-98.)  These agreements provided for a lump sum payment to Plaintiffs.  (Id. ¶¶ 99-102.)  They also gave Plaintiffs the right to use sixty IBM part numbers that would be readily available worldwide.  (Id.)  Plaintiffs wanted to use an IBM Original Equipment Manufacture ("OEM") part number because it would allow another product Plaintiffs produced, a terminal referred to as TC-5, to be marketed and sold as a standard IBM product under IBM's valuable logo.  This is significant because an IBM part number is a unique identification number that would give the product immediate name recognition by virtue of its association with IBM.  (Id. ¶ 99.)

In addition to assigning to Plaintiffs' products valuable IBM part numbers, the July 2008 Agreements allowed Plaintiffs to receive a substantial royalty stream for each individual server node installed into the iDataPlex terminal, called a planar.  (Id. ¶ 100.)  Individual Defendants again projected high profit sales for these planars and a lucrative arrangement for Plaintiffs.  (Id. ¶¶ 101-103.)  According to the Complaint, during the negotiations that led to the July 2008 Agreements, Individual Defendants knew Plaintiffs would not be given actual IBM part numbers, that the corresponding parts would not be available worldwide, and that the projections were

---

[3] These two restructured agreements were negotiated at the same time, and the signing of one was made expressly dependent on the signing of the other.

inaccurate. Plaintiffs claim they would not have signed the July 2008 Agreements had they been told the truth. (Id. ¶ 104.)

In any event, the July 10, 2008 Agreements contain a broad release. They are nearly alike in each agreement and provide:

> In exchange for the payment of $4,760,000 pursuant to Section 19.0 of this Agreement, Devon Entities hereby release and forever discharge the IBM Entities, and its assigns, stockholders, as well as their respective distributors, sub-distributors, agents and contractors, in each case, on a worldwide basis (collectively, "IBM" Releases) and each of them, from any and all claims, suits, actions, liabilities, damages, costs or losses of any kind or nature whatsoever, known or unknown, suspected or unsuspected, in law, in equity, or otherwise, whether individual or otherwise in nature, including but not limited to those arising under state, federal, or other law, that the Devon Entities ever had, now have or hereafter can, shall or may have, arising from or relating in any way to the IBM Releases (or any of them) for the time up to and including the date of the execution of this Agreement including, but not limited to any and all after-discovered claims, and whether directly or indirectly in connection with the Prior Agreement, and all related agreements including the CDA and any prior or successor confidentiality agreements, the Blade or any of the activities contemplated by the Prior Agreement (the "Devon Released Claims").

(Doc. No. 1 Ex. F § 15.3; Ex. G § 15.)

On February 23, 2009, the parties entered into an addenda to the July 2008 Agreements, which added and modified certain terms ("Addenda"). Specifically, the Addenda provided that IBM's hardware division would be prohibited from proactively enabling thin client hardware products which are "similar or reasonably equivalent in function to [Plaintiffs'] TC-5 and/or TC-2 product."[4] (Id. ¶ 106.) This provision prohibited IBM from promoting products of third parties similar to designated products of Plaintiffs. Essentially, between the July 2008 Agreements and

_____

[4] A TC-5 is referred to as a thin client hardware product and is an end point or terminal unit, similar to a desktop computer.

the date of the Addenda in 2009, aside from lump sum payments and substantial royalties, Plaintiffs believed that their thin client hardware products were going to have great success because they expected to receive worldwide recognition through the use of IBM part numbers without any competition from IBM. However, Plaintiffs allege that the competition prohibition was not complied with, the part numbers were not properly supplied, and notably, Individual Defendants knew that these terms would not be fulfilled when the July 2008 Agreements and Addenda were signed. (Doc. No. 1 ¶¶ 107-108.)

Plaintiffs allege a violation of RICO, breach of agreements and a fiduciary duty, as well as being subjected to various misrepresentations by Defendants that induced Plaintiffs to invest with them and agree to restructure agreements and releases. In their Motion to Dismiss, Defendants deny these claims and assert that the releases contained in the July 2008 Agreements and the subsequent Addenda should be enforced, and seek the dismissal of the Complaint in its entirety. Defendants also advance other arguments, apart from relying on the releases, in support of dismissal of the Complaint.

## III.    LEGAL STANDARD

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) has been the subject of recent examination, culminating with the Supreme Court's Opinion in  Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009).  After Iqbal it is clear that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" to defeat a Rule 12(b)(6) motion to dismiss.  Id. at 1949; see also Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).  Applying the principles of Iqbal and Twombly, the Third Circuit in Santiago v. Warminster Twp., No. 10-1294, 2010 WL 5071779 (3d Cir. Dec. 14, 2010), set forth a three-part

analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a 12(b)(6) motion to dismiss. 2010 WL 5071779, at *4; see also Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (applying the principles of Iqbal and articulating the 12(b)(6) analysis as a two-part test).

"First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Finally, 'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.'" Santiago v. Warminster Twp., 2010 WL 5071779, at *4 (quoting Iqbal, 129 S. Ct. at 1947-50). A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler, 578 F.3d at 210-11 (citing Phillips v. County of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)). "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'shown'– 'that the pleader is entitled to relief.'" Iqbal, 129 S Ct. at 1950. The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

## IV. DISCUSSION

The crux of Defendants' argument is that eight of the nine claims are barred by the plain terms of the releases and covenants not to sue entered into by the parties. The releases are included in the July 2008 Agreements (Doc. No. 1, Ex, "F" & "G") and extended and acknowledged in the February 2009 Addenda to the July 2008 Agreements (Doc. No. 1, Ex. "H" & "I") and contain substantially similar language. Defendants agree that the only claim not

barred by the releases is the breach of contract claim in Count IV.  In the alternative, Defendants

argue that Plaintiffs have failed to state a claim in Count IV.  As noted, Defendants maintain that

even if the barred claims were allowed to proceed, the claims should be dismissed on other

grounds.

> A.    The Releases Do Not Bar The Claims Because Plaintiffs Have Sufficiently
>       Alleged Fraud In The Inducement

Defendants initially contend that eight of the nine claims in the Complaint are barred by

the releases contained in the July 2008 Agreements and the Addenda.  Plaintiffs assert that the

releases should be set aside because they were fraudulently induced.

Under New York law,[5] "a valid release constitutes a complete bar to an action on a claim

which is the subject of the release.  However, a release is treated just as any other contract . . .

and may be set aside on the traditional basis of fraudulent inducement, misrepresentations,

mutual mistake or duress."  Id.  A general release does not bar suits seeking damages for fraud in

the inducement of the release itself.  Id. (citing Goldsmith v. Nat'l Container Corp., 287 N.Y.

443, 440 (1942)).  However, conclusory allegations of fraudulent inducement are insufficient to

overcome a release's unambiguous language.  Consorcio Prodipe, S.A. v. Vinci, S.A., 544 F.

Supp. 2d 178, 189 (S.D.N.Y. 2008).   When a party releases claims, it can later challenge that

release for fraudulent inducement only by identifying a separate and distinct fraud from that

contemplated by the agreement.  Id. at 190; DirectTV Group, Inc. v. Darlene Investments, LLC.,

---

[5] Defendants apply New York law in their briefs, asserting that the contracts between the
parties contain a New York choice of law provision.  (Doc. No. 22 at 12.)  Plaintiffs do not
dispute this choice of law.  (Doc. No. 27 at 9.)  Therefore, for purposes of this Opinion, the Court
will apply New York law on issues pertinent to the contracts.  Pennsylvania law with be applied
to the tort claims unless otherwise specified.

No. 05-5819, 2006 WL 2773024, at *4 (S.D.N.Y. Sept. 27, 2006).

Here, Plaintiffs have alleged fraudulent inducement that is separate and distinct from the matters which the agreements were meant to settle.  The Complaint initially alleges various misrepresentations throughout the course of the parties' relationship regarding the Blade and iDataPlex projects.  Thereafter, given the lack of success and alleged misconduct by Defendants in relation to the projects, the parties engaged in negotiations in an attempt to address Plaintiffs' dissatisfaction with the handling of the Blade and iDataPlex projects by Defendants.  The July 2008 Agreements were the product of these negotiations.  These agreements provided for, among other things, a refund to Plaintiffs as well as the right to use valuable IBM part numbers for their own products.  This is significant because an IBM part number is a unique identification number that would give the product immediate name recognition by virtue of its association with IBM.  However, Plaintiffs allege that at the time of the negotiations over the terms of the July 2008 Agreements, Defendants knew that Plaintiffs would not receive the promised IBM part numbers, made misrepresentations that the part numbers would be available in geographical areas across the world, and knew that these representations would induce Plaintiffs to sign the new agreements.

Moreover, the February 23, 2009 Addenda modified certain terms of the July 2008 Agreements.  Notably, they provided that IBM's hardware division would be prohibited from proactively enabling thin client hardware products which are "similar or reasonably equivalent in function to [Plaintiffs'] TC-5 and/or TC-2 product."  (Doc. No. 1 ¶ 106.)   However, the Complaint alleges that Defendants knew at the time that they would not be able to get the hardware division of IBM to comply with this prohibition, and made the false representation to

induce Plaintiffs to sign the Addenda, which included releases similar to the ones in the July 2008 Agreements.

The misrepresentations that induced the July 2008 Agreements and subsequent Addenda are separate and distinct from previous misrepresentations made by Defendants in regard to the Blade and iDataPlex projects. Plaintiffs apparently were aware to some extent of the previous false representations when they entered into the July 2008 Agreements and the Addenda. They entered into the new agreements in an effort to move on and continue their relationship with Defendants. Plaintiffs claim, however, that the misconduct continued and induced the releases in the July 2008 Agreements and the Addenda that followed.

The Court recognizes the broad and encompassing nature of the releases. In order for the releases not to be enforced, Plaintiffs must assert inducement that is separate from what the underlying agreements attempted to resolve. There must be distinct misrepresentations that induced Plaintiffs to sign the release itself. Plaintiffs have sufficiently alleged such inducement at the motion to dismiss stage.

Taken as true, the allegations that new and separate representations were fraudulently made to induce Plaintiffs into signing the July 2008 Agreement and the Addenda, which contain the releases, provide grounds with which to challenge the releases contained in the agreements. See Consorcio, 544 F. Supp. 2d at 189; DirectTV, 2006 WL 2773024, at *4. Therefore, at this stage of litigation, the Court will not enforce the releases and for this reason will not dismiss Plaintiffs' claims. The other reasons for dismissal of the Complaint advanced by Defendants will now be discussed seriatim.

B.    Since The Releases At This Stage Do Not Bar The Claims, The Sufficiency of
      The Remaining Claims Under Fed. R. Civ. P. 12(b)(6) Will Be Considered

Defendants contend that even if the releases are set aside, the Complaint still fails to state claims under Fed. R. Civ. P. 12(b)(6), and that it should be dismissed in its entirety.  The Court agrees that Counts III, VIII, and IX should be dismissed for reasons set forth by Defendants. Counts I, II, IV, V, VI, and VII will not be dismissed.

            i.    RICO Claims In Counts I And II

Individual Defendants contend that Plaintiffs' RICO claims set forth against them in Counts I and II of the Complaint should be dismissed because insufficient facts have been pled to support the predicate act of wire fraud and a "pattern" of racketeering activity.  The Court disagrees.

In Count I, Plaintiffs allege that the Individual Defendants violated 18 U.S.C. § 1962(c).[6] In Count II, Plaintiffs allege that Individual Defendants conspired to violate Section 1962(c), which is a violation of 18 U.S.C. § 1962(d).  Section 1962(c) provides as follows:

> It shall be unlawful for any person employed by or associated with
> any enterprise engaged in, or the activities of which affect,
> interstate or foreign commerce, to conduct or participate, directly
> or indirectly, in the conduct of such enterprise's affairs through a

---

[6] Though Congress created RICO in 1970 to prosecute organized criminal conduct, courts have refused to adopt a narrow construction of civil RICO.  In Tabas v. Tabas, the court explained, "We recognize that our ruling means that RICO, with its severe penalties, may be applicable to many 'garden variety' fraud cases . . . particularly considering the judiciary's broad interpretation of the mail fraud statute . . .We are bound, however, by the language of RICO itself and the Supreme Court's instruction that 'RICO is to be read broadly.'" 47 F.3d 1280, 1296-97 (3d Cir. 1995) (quoting Sedima S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 497-98 (1985)).  RICO is to be "liberally construed to effectuate its remedial purposes."  Pub. L. 91-452 § 904(a), 84 Stat. 947.

pattern of racketeering activity . . . .

18 U.S.C. § 1962(c) (2000). To state a claim under § 1962(c), Plaintiffs must allege that a "person" employed by or associated with an enterprise engaged in the following: "(1) conduct (2) of an enterprise[7] (3) through a pattern (4) of racketeering activity." Camiolo v. State Farm Fire & Cas. Co., 334 F.3d 345, 364 (3d Cir. 2003) (quoting Sedima, 473 U.S. at 496).

Racketeering activity is defined in Section 1961(1) to include acts indictable under certain provisions of the federal crimes code. Wire fraud under 18 U.S.C. § 1343 is included. A pattern of racketeering activity requires at least two acts of racketeering. 18 U.S.C. § 1961(5). The predicate acts of racketeering activity alleged here involve wire fraud, which encompasses fraudulent conduct that triggers the pleading requirements of Federal Rule of Civil Procedure 9(b). Under Rule 9(b), a court must decide if plaintiff has pled with particularity the "circumstances" of the alleged fraud "in order to place defendants on notice of the precise misconduct with which they are charged, and to safeguard against spurious charges of immoral and fraudulent behavior." Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984); see also Banks v. Wolk, 918 F.2d 418, 422 n.1 (3d Cir. 1990) (finding that blanket allegations of mail and wire fraud without information of who made or received the fraudulent representations are insufficient to satisfy Rule 9(b)); Lum v. Bank of America, 361 F.3d 217, 223-24 (3d Cir. 2004) (requiring some means of precision when pleading fraudulent circumstances, such as date, place, or time of fraud).

Construing the Complaint in a light most favorable to Plaintiffs, and assuming all facts in

---

[7] The Complaint alleges that STG, the division of IBM where Individual Defendants work, is the enterprise.

the Complaint as true, the Court finds that Plaintiffs have provided sufficient facts to comply with Rule 9(b), and to establish the commission of wire fraud and a "pattern" of racketeering activity.

a.    <u>Predicate Act of Wire Fraud</u>

The elements of wire fraud are: (1) a scheme to defraud; (2) use of the wires for the purpose of executing the scheme; and (3) fraudulent intent.  <u>United States v. Pharis</u>, 298 F.3d 228, 234 (3d Cir. 2002).

A scheme to defraud encompasses any deliberate plan of action or course of conduct by which someone intends to deceive or cheat another or by which someone intends to deprive another of something of value.  Plaintiffs may satisfy the burden of showing the existence of a scheme to defraud with "some sort of fraudulent misrepresentation or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension."  <u>Kehr Packages, Inc. v. Fidelcor, Inc.</u>, 926 F.2d 1406, 1415 (3d Cir. 1991).  Deceitful statements, half truths, or the knowing concealment of material facts are all actionable under the wire fraud statute.  <u>United States v. Townley</u>, 665 F.2d 579, 585 (5th Cir. 1982).

> The statements need not be false or fraudulent on their face, and the accused need not misrepresent any fact, since all that is necessary is that the scheme be reasonably calculated to deceive a person of ordinary prudence and comprehension, and that the [mail or wires] be used in the execution of the scheme.

<u>Id.</u>

Additionally, Plaintiffs must allege that Defendant acted with an intent to defraud, which is to act knowingly and with the intention to deceive or to cheat.  <u>United States v. Hoffecker</u>, 530 F.3d 137, 181 (3d Cir. 2008).  "An intent to defraud is ordinarily accompanied by a desire or a

purpose to bring about some gain or benefit to oneself or some other person or by a desire or a purpose to cause some loss to some person." United States v. Leahy, 445 F.3d 634, 644 (3d Cir. 2006) (quoting the district court's jury instructions).

Further, Plaintiffs must show "the use of the mails or wires for the purpose of executing the scheme [to defraud]." Pharis, 298 F.3d at 234. "To be part of the execution of the fraud . . . the use of the mails need not be an essential element of the scheme." Schmuck, 489 U.S. at 710.

Here, the Complaint alleges a series of predicate acts that caused financial harm to Plaintiffs. Among other things, Plaintiffs allege that as part of a scheme to defraud, Individual Defendants fraudulently misrepresented the market potential of various products, including Blade and iDataPlex; the use to which Plaintiffs' investments in the Blade and iDataPlex projects would be made; and the stages of these two projects. (Doc. No. 1 ¶ 141.) The misrepresentations were made to induce Plaintiffs to continue to invest in the projects in accordance with the schedule in the agreements. The participation and activity of each Individual Defendant is also set forth in the Complaint. (Doc. No. 1 ¶ 148.)

More specifically, Plaintiffs assert that sales "forecasts" were known to be false when made and were for the purpose of deceiving Plaintiffs into investing in the two projects. Plaintiffs allege in the Complaint specific acts occurring on specific dates that were done with the intent to deceive or cheat Plaintiffs throughout the ongoing business relationship. For example, the Complaint states that Individual Defendants projected that 500,000 Blade units would be sold over the first three years with 100,000 units sold in the first year alone, and that this representation was a conservative projection which is usually surpassed. Further, Individual Defendants stated that several prominent companies such as Honda and Merrill Lynch were

interested in purchasing the Blade product once sales began. Additionally, Plaintiffs were informed that their investment would be used for the design, development and marketing of the Blade project. Similar misrepresentations made by Defendants are detailed in the Complaint about the iDataPlex project, the use of IBM part numbers, and other matters. Plaintiffs allege that all of these statements were known to be false at the time they were made, but were made anyway for the purpose of luring Plaintiffs into investing in the projects. The Complaint also contains dates and dollar amounts of wire transfers that were caused to be sent in furtherance of the scheme to defraud. (Doc. No. 1 ¶ 146.)

Consequently, at this stage, Plaintiffs have sufficiently alleged various fraudulent misrepresentations made with intent to deceive, and the use of the wires in furtherance of the scheme. The Complaint complies with heightened pleading requirements for fraud since it identifies specific persons, dates, and conduct, which serve to place Defendants on notice of the precise misconduct charged. Therefore, Plaintiffs have sufficiently alleged predicate acts of wire fraud or "racketeering activity."

> b.    Pattern Of Racketeering Activity

Defendants argue that the Complaint does not sufficiently plead a pattern of racketeering. The RICO statute defines a "pattern" of racketeering activity as requiring "at least two acts of racketeering activity" within a ten year period. 18 U.S.C. § 1961(5). In order to show a "pattern of racketeering activity a plaintiff must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." Tabas v. Tabas, 47 F.3d 1280, 1292 (3d Cir. 1995) (quoting H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989)). Predicate acts are related if they "have the same or similar purposes, results, participants, victims,

or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." Id.

The precise methods by which a "pattern" may be established "cannot be fixed in advance with such clarity that it will always be apparent whether in a particular case a 'pattern of racketeering activity' exists." Tabas, 47 F.3d at 1296. Therefore, when determining whether relatedness and continuity has been proven, it is helpful to use a fact-oriented, case by case approach. Id.

The continuity prong of the analysis is temporal and can be both a closed and open-ended concept. Tabas, 47 F.3d at 1292. These concepts refer to either a "closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." Id. (quoting H.J., 492 U.S. at 241). Continuity over a closed period can be established by "proving a series of related predicates extending over a substantial period of time." Id. (quoting H.J., 492 U.S. at 242). What constitutes a "substantial period of time" is not clearly defined. Id. at 1293. However, the Third Circuit has held on several occasions that conduct lasting less than twelve months did not meet the standard for closed continuity. Id. In Tabas, the Court found that misrepresentations which implemented the purported scheme to defraud which lasted over three years is a "substantial" period of time. Id. at 1294.

Here, Plaintiffs allege an ongoing scheme by Defendants to obtain investment funds through various acts of fraud.[8] The Complaint alleges that the scheme occurred over a five year period and alleges numerous acts taking place between September 2005 and February 2009.

---

[8] The acts of fraud were related because they were not isolated events and involved the same participants, victims, methods, and purpose.

According to Plaintiffs, the Individual Defendants made the numerous misrepresentations noted above. In addition, each Individual Defendant is alleged to have directed, approved, and solicited payments from Plaintiffs through the wires knowing that the money was going to be used for improper purposes. Further, Plaintiffs have set forth specific acts undertaken by each Individual Defendant separately, and allege that these acts were done repeatedly over at least a four year period as part of the scheme to insure that Plaintiffs continued to make investments, which were used for purposes other than those agreed upon.

For example, as to Defendant Adkins, Plaintiffs allege, among other things, that he directed and approved the repeated overstatements of market projections regarding the Blade and iDataPlex projects for the purpose of enticing investments in the projects; the repeated insistence of up front payments for "project development" knowing that the funds would not be used for such development; the procurement of wire transfer payments and the use of them for unapproved purposes; and the purposeful concealment of a project cancellation in order to ensure Plaintiffs would continue to invest.

As to Defendant Meyerson, Plaintiffs allege that he directed the cancellation of the Blade project and subsequently concealed the cancellation in order to induce Plaintiffs to continue their investments. According to Plaintiffs, Defendant Gargan was knowingly involved in the misrepresentations and participated throughout both the Blade and iDataPlex projects as well. Plaintiffs allege that Defendant Bradicich was at the forefront of the fraudulent projections and product release date on the Blade Project, and that he induced them to invest in the project while

occupying the trusted position as a member of Plaintiffs' Advisory Board.[9]  The Complaint

alleges that many of these actions by the Individual Defendants were accomplished by interstate

telephone calls, emails, fax and wire transfers.  Notably, Plaintiffs allege that they are not the

only victims, and that Defendants have engaged in a similar scheme to defraud other companies.

Consequently, the Court finds that at this stage of the litigation, Plaintiffs have

sufficiently pled a series of related predicate acts extending over a time period substantially in

excess of the twelve month minimum period noted in Third Circuit decisions.  Contrary to

Defendants' contentions, Plaintiffs have pled facts that support the predicate act of wire fraud

and a pattern of racketeering activity.  Consequently, Defendants' Motion to Dismiss Counts I

and II will be denied.

ii.    <u>Aiding And Abetting A Pattern of Racketeering Activity</u>

In Count IX, Plaintiffs allege that Defendant IBM aided and abetted the Individual

Defendants' RICO violations.  Defendants contend that this claim should be dismissed because

the Third Circuit has held there is no cause of action for aiding and abetting a civil RICO

violation.  The Court agrees.

In fact, the Third Circuit has held that there is no private cause of action for aiding and

abetting in violation of RICO.  <u>Pennsylvania Ass'n of Edwards Heirs v. Rightenour</u>, 235 F.3d

839 (3d Cir. 2000).  The RICO statute does not create a cause of action for civil aiding and

abetting liability, and common law principles or policy considerations do not warrant recognition

of such a claim.  <u>Id.</u>

---

[9] In Count III, Plaintiffs brought a separate claim against Defendant Bradicich for breach
of fiduciary duty stemming from his service on the Advisory Board.  The Court is dismissing this
Count because the facts alleged fail to establish a fiduciary duty in relation to Plaintiffs.

Here, Plaintiffs recognize that the Third Circuit has rejected the viability of this claim (Doc. No. 27 at 11-12), but note that other circuits have allowed such claims to continue and urge the Court to allow the claim in order to preserve the issue on appeal. Plaintiffs have properly preserved this claim by asserting it in the Complaint. However, this Court is bound to follow the law of the Third Circuit, which has held that aiding and abetting a RICO violation is not a viable cause of action. Therefore, Count IX of the Complaint will be dismissed.

### iii. Fraudulent Inducement

In Count V of the Complaint, Plaintiffs allege fraud in the inducement. To state a claim for fraudulent inducement under New York law, "the defendant must have made a misrepresentation of a material fact, that was known to be false and intended to be relied on when made, and that the plaintiff justifiably relied on that misrepresentation to its injury." Amida Capital Management II, LLC v. Cerberus Capital Management, L.P., 669 F. Supp. 2d 430, 444 (S.D.N.Y. 2009); Nat'l Union Fire Ins. Co. v. Worley, 690 N.Y.S.2d 57, 61 (N.Y. App. Div. 1999).

Defendants contend that Plaintiffs cannot establish the element of justifiable reliance because there is a non-reliance clause in the July 2008 Agreements. They also argue that the Complaint fails to allege any false representation of material fact.

### a. Reasonable Reliance

Defendants assert that the claim fails because there was no justifiable reliance on the alleged misrepresentations. In support of their claim, Defendants point to a non-reliance clause in the July 2008 Agreements. The non-reliance clause provides that:

> except for the express terms of this agreement, the parties do not rely on any

statement, representation or promise of any other party (or any officer, agent, employee, representative or attorney of or for any other party) in executing this Agreement . . . .

(Doc. No. 1, Ex. F § 15.6; Ex. G § 15.0.)

"Where a party specifically disclaims reliance upon a representation in a contract, that party cannot, in a subsequent action for fraud, assert it was fraudulently induced to enter into the contract by the very representation it has disclaimed." Grumman Allied Indus., Inc. v. Rohr Indus., Inc., 748 F.2d 729, 734-35 (2d Cir. 1984). However, to be enforceable, "a disclaimer must show a clear indication that the disclaiming party has knowingly disclaimed reliance on the specific representations that form the basis of the fraud claim." MBIA, 2010 N.Y. Misc. LEXIS 3958, at *94 (quoting JP Morgan Chase Bank v. Liberty Mutual Ins. Co., 189 F. Supp. 2d 24, 27 (S.D. NY 2002)). It follows that a "disclaimer is generally enforceable only if it tracks the substance of the alleged misrepresentation." Id.

Here, Defendants argue that when a party specifically disclaims reliance upon a particular representation, that party cannot, in a subsequent action for common law fraud, claim it was fraudulently induced to enter into the contract by the very representation upon which it had disclaimed reliance. (Doc. No. 22 at 32.) However, this contention is unpersuasive at this stage of litigation because Plaintiffs have alleged misrepresentations that were not specifically disclaimed in the non-reliance clause.

The non-reliance clause is broadly worded and lacks specificity. The language does not track the substance of the alleged misrepresentations in the Complaint such as, among other things, the misuse of Plaintiffs' investment in the projects, the availability of part numbers, the interest of other companies in investing in the projects, and their true viability. On its face, the

non-reliance clause provides that Plaintiffs cannot rely on anything except for the express terms of the agreement.  However, the law requires that Plaintiffs must have knowingly disclaimed reliance on the *specific* representations that are alleged to be false in the Complaint.  At the motion to dismiss stage, assuming all facts as true, the disclaimers fall short of satisfying this specificity requirement.

b. <u>False Representation Of Material Fact</u>

Secondly, Defendants contend that the Complaint lacks any misrepresentations of present, material facts, another element of fraud in the inducement, and only sets forth opinion or predictions about the future.

A false representation of fact in a fraud claim must be of "present fact" and not of "future intent."  <u>Citibank v. Plapinger</u>, 485 N.E.2d 974, 976 (N.Y. 1985).  Further, a mere representation of opinion, or something hoped or expected to occur in the future, will also not sustain an action for fraud.  <u>Zanani v. Savad</u>, 630 N.Y.S.2d 89, 90 (N.Y. App. Div. 1995).  Misrepresentation of the future intent to perform under a contract is not sufficient to allege fraud, a present intent to deceive must be alleged.  <u>MBIA</u>, 2010 N.Y. Misc. LEXIS 3958, at *86.  However, a misrepresentation "of material fact that is collateral to the contract and serves as an inducement for the contract is sufficient to sustain a cause of action alleging fraud."  <u>Id.</u>

Here, Plaintiffs do not allege only a forecast or projection which was not achieved.  Rather, the allegations with regard to sales forecasts infer that Defendants were aware that the projections were false when made.  For example, the Complaint states that Defendants "misrepresented that expected sales were at least 100,000 planars per quarter," and that Plaintiffs would not have entered the contract if it had "known the *actual* projections."  (Doc. No. 1 ¶ 181.)

These allegations, and others, show that Plaintiffs are not referring to mere opinions or future intent. Plaintiffs have alleged that Defendants had actual sales projections in hand with lower numbers, and were not truthful about the real numbers in order to induce Plaintiffs into continuing to invest in the projects. The Complaint raises the inference that Defendants misrepresented present facts regarding, among other things, projections, use of funds, success of projects, and availability of product numbers. As such, Plaintiffs have alleged misrepresentation of present material facts.

Accordingly, at this stage of the proceedings, Plaintiffs have properly alleged a claim of fraud in the inducement. The Motion to Dismiss Count V will be denied.

iv. Breach Of Contract

Count IV alleges that a breach of contract occurred when Defendant IBM "proactively enabled" or promoted the sale of thin client hardware products developed by Wyse Technology ("Wyse"), an unrelated company, that were similar to the TC-5 and/or TC-2 products developed by Plaintiffs. Defendants contend that this claim should be dismissed because the Complaint merely restates the provisions of the contract without supporting factual averments.

To establish a claim for a breach of contract, "a complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004) (quoting Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996)).

Here, Defendants claim that Plaintiffs have failed to allege facts in the Complaint to establish the third element – a breach of contract. The provision of the Addenda alleged to have

-24-

been breached provides as follows:

> [Defendants] agree, with regard to a third party thin client hardware
> product which is similar or reasonably equivalent in function to
> [Plaintiffs'] current TC5 and/or TC2 product, not to proactively enable
> part numbers under IBM's Third Party Hardware Sales Process in advance
> of a customer order or a customer request for such a product

(Doc. No. 1 ¶ 170; Ex. H § 2.0.)

Contrary to Defendants' assertion, Plaintiffs have alleged more than a mere restatement of this provision. Plaintiffs describe in the Complaint how in September 2009, an IBM employee attended a conference in San Francisco, California, where he secretly created a marketing video with a Senior Vice President of a competing company, Wyse Technology. At this conference, the IBM employee promoted and "proactively enabled" a thin-client product produced by Wyse that was similar to a product of Plaintiffs referred to in the Addenda. As such, the Complaint has set forth facts describing the date and place where a specific IBM employee engaged in conduct in breach of the contract. Although Plaintiffs have not alleged in the Complaint a specific IBM part number that was similar to the Wyse product that was promoted by the IBM employee, at the motion to dismiss stage, the facts that have been alleged plausibly show that a breach of contract occurred.

Defendants also claim that money damages, as requested by Plaintiffs, are not an available form of relief under the terms of the contract, which provides:

> The parties acknowledge and agree that [Plaintiffs'] sole remedy for a
> breach of this section shall be to (a) permit IBM to withdraw the proactive
> part numbers causing the breach, and (b) extend the December 31, 2010
> date above by one month for each calender month, or portion thereof, in
> which IBM breaches this provision

(Doc. No. 1, Ex. H § 2.0.)

At the hearing on the Motion to Dismiss, Plaintiffs conceded that money damages were not an appropriate prayer for relief at this time, but they included the request in order to preserve a claim for money damages at a later time. (Transcript, 11/2/2010, 85:3-23.) Since the Complaint does seek other relief that is just and proper, the Court will not dismiss the prayer for money damages at this point and will reconsider the matter at an appropriate time in the litigation. Accordingly, Defendants' Motion to Dismiss Count IV will be denied.

> v.   Fiduciary Duty Claims

In Count III, Plaintiffs contend that Defendant Bradicich breached his fiduciary duty while serving on their independent Advisory Board. Plaintiffs further allege in Count VIII that Defendant IBM contributed to the breach of fiduciary duty. Defendants assert that both claims must fail because Defendant Bradicich owed no fiduciary duty to Plaintiffs. The Court agrees.

A fiduciary relationship exists when there is a "special relationship" between parties, which involves confidentiality, special trust or fiduciary responsibilities. Siematic Mobelwerke GMBH & Co. v. Siematic Corp., No. 06-5165, 2009 WL 2526436, at *4 (E.D. Pa. Aug. 12, 2009). "In the business context, a confidential relationship is formed 'only if one party surrenders substantial control over some portion of his affairs to the other.'" Id. (quoting In re Scott's Estate, 316 A.2d 883, 886 (Pa. 1974)). Further, the mere "taking and receiving of business advice does not generally create a fiduciary relationship in the business context." Siematic, 2009 WL 2526436, at *5. A fiduciary relationship does not arise merely because one party relies on and pays for a specialized skill or expertise of another party. EToll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10, 23 (Pa. Super. Ct. 2002). Rather, "the critical question is whether the relationship goes beyond mere reliance on superior skill, and into a relationship

characterized by 'overmastering influence' on one side or 'weakness, dependence, or trust, justifiably reposed' on the other side." Id. The relationship exists when the inferior party places "complete trust in the superior party's advice and seeks no other counsel." Id. Additionally, "implicit in the long-standing Pennsylvania requirement that the principal manifest an intention that the agent act on the principal's behalf is the notion that the agent has authority to alter the principal's relationships with third parties, such as binding the principal to a contract." EToll, 811 A.2d at 22.

Here, assuming the facts in the Complaint as true, the allegations do not establish the creation of a fiduciary duty under the law. Plaintiffs allege that as a member of the Advisory Board, Defendant Bradicich agreed to provide strategic advice regarding technical and business issues, and that he would work to increase the presence of Plaintiffs in the information technology industry. Plaintiffs also allege that he misused his position in order to mislead them into investing in the Blade and iDataPlex projects. The Complaint alleges that he also was aware of various misrepresentations noted above regarding market projections, use of funds and success of projects, and that he concealed this information and advised Plaintiffs to make investments that he knew would not succeed. Plaintiffs claim that they relied on his advice because he was an executive at IBM with sound knowledge of the technology industry.

The Advisory Board Agreement, which is attached to the Complaint, describes Defendant Bradicich as a consultant who will render advice. (Doc. No. 1, Ex. E.) More importantly, paragraph three of the agreement states "[Defendant Bradicich] shall have no authority to enter into contracts, including letters of intent, on behalf of [Plaintiffs] or to create any other obligations on the part of [Plaintiffs] without written consent of the Board of Directors.

[Defendant Bradicich] is <u>not</u> an agent of [Plaintiffs]." (<u>Id.</u>) (emphasis in original). In view of these restrictions, there are no allegations in the Complaint that Defendant Bradicich had any authority to legally bind Plaintiffs or was an agent. The Complaint only alleges that Defendant Bradicich gave misleading advice, which was relied upon by Plaintiffs. But the relationship must go beyond mere reliance on superior skill or knowledge. <u>EToll</u>, 811 A.2d at 23. From the facts alleged in the Complaint, there is no inference that Plaintiffs surrendered control over any portion of its affairs to Defendant Bradicich. Receiving advice on how to conduct business activity or recommendations on how to invest is insufficient to create a fiduciary relationship. <u>See</u> <u>Siematic</u>, 2009 WL 2526436, at *4-5. This precept applies even if the motivation to supply the information was for a bad purpose.

Consequently, Plaintiffs have not sufficiently alleged the existence of a fiduciary duty, and for this reason their claim in Count III will be dismissed. Since Plaintiffs have failed to state a claim of breach of fiduciary duty, the claim in Count VIII alleging the participation of IBM in such a breach will also be dismissed. Therefore, Defendants Motion to Dismiss will be granted as to Counts III and VIII.

vi.    <u>Prima Facie Tort</u>

Count VI of the Complaint alleges a claim for commission of a prima facie tort. Defendants assert that the claim should be dismissed because it is not recognized in Pennsylvania, and even if it was, insufficient facts are alleged to state a claim. Plaintiffs acknowledge that Pennsylvania has not recognized a claim for a prima facie tort, but submit that it has not been rejected either, and that they should be allowed to pursue the claim in this case.

The elements of a prima facie tort are set forth in Section 870 of the Restatement

(Second) of Torts.  Utz v. Johnson, No. 04-0437, 2004 WL 1368824, at *1-2 (E.D. Pa. June 16, 2004); D'Errico v. DeFazio, 763 A.2d 424, 433 (Pa. Super. Ct. 2003); See Banerjee v. Temple Univ., No. 96-1733, 1996 WL 479662 (E.D. Pa. Aug. 20, 1996); L&M Beverage Co. v. Guinness Imp. Co., No. 94-4492, 1995 WL 771113 (E.D. Pa. Dec. 29, 1995).  While courts have acknowledged the existence of a prima facie tort as set forth in Section 870 of the Restatement (Second) of Torts, there is no precedent binding this Court on the matter.  Utz., 2004 WL 1368824, at *1.  In fact, district courts in the Third Circuit, when faced with a motion to dismiss a prima facie tort claim, have divided on its viability.  Some courts have dismissed it, predicting that the Pennsylvania Supreme Court would not recognize it, and others have allowed the claim to proceed.  Id. at *1-3.  The Third Circuit has not yet made a prediction on whether it will be approved by the Supreme Court of Pennsylvania.

Assuming that Pennsylvania would allow a prima facie tort, courts confronted with the issue are in agreement that it would be applied as stated in Section 870 of the Restatement (Second) of Torts, which provides:

> One who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances.  This liability may be imposed although the actor's conduct does not come within a traditional category of tort liability.

Id. at *1.

In order to recover under this theory, Plaintiffs must establish that Defendants committed an intentional act which was "unjustifiable" and "culpable" and which injured "a legally protected interest of Plaintiffs."  Shaid v. George Hyman Construction Co., 947 F. Supp. 844, 849 (E.D. Pa. 1996).  Upon evaluating a claim for prima facie tort, a court should consider "(1)

-29-

the nature and seriousness of the harm to the injured party, (2) the nature and significance of the interests promoted by the actor's conduct, (3) the character of the means used by the actor and (4) the actor's motive." Id. (citing Restatement (Second) of Torts § 870). However, this doctrine does not establish precise and inflexible requirements for liability. Id. at 849. Instead, "it lays down general guidelines and uses words expressing standards that vary with the circumstances to which they are applied." Id. at 848.

Here, given these factors, the Court will allow the claim to proceed. A reading of the Complaint demonstrates that facts are alleged which establish a prime facie tort claim. For example, Plaintiffs allege that Defendants intentionally caused harm by soliciting investments when they knew that projected sales of the Blade project were being misrepresented and that the Blade project was terminated; the success of the iDataPlex project was in doubt; the use of investment money was for improper purposes; and the interest in the projects by other large companies was falsely represented. These allegations, among others, make out a prima facie case that Defendants intentionally caused harm to Plaintiffs for no justifiable reason under the circumstances.

Defendants contend that if the claim were to be recognized in Pennsylvania, it should be subject to the New York law prima facie standard, which is unique, rather than under the Restatement (Second) standard. New York law requires a showing of malice, special damages, and "action that is otherwise lawful." McKenzie v. Dow Jones & Co., 355 Fed. App'x 533, 536 (2d Cir. 2009). This argument is unavailing. Courts in Pennsylvania have consistently examined the Pennsylvania prima facie tort under the Restatement standard, which does not require the additional elements asserted by Defendants. Here, the Court has considered the elements of this

tort under Pennsylvania law, including the nature of the harm, the nature of the interests promoted by the actor, the character of the means used, and the motive. See Shaid, 947 F. Supp. at 849. Given the allegations in the Complaint, a claim of a prima facie tort has been sufficiently pled. Consequently, Defendants Motion will be denied as to Count VI.

vii. Negligence

In Count VII, Plaintiffs assert a negligence claim against Defendant IBM. Defendants maintain that this claim is really one of negligent supervision. In Plaintiffs' brief (Doc. No. 27 at 30), and at the hearing on the Motion, Plaintiffs did not dispute that the claim focuses on supervision of Individual Defendants. (Transcript, 11/2/2010, 104:10-20.) Here, Defendants contend that this claim should be dismissed because the Complaint is devoid of facts which establish that Defendant IBM knew or should have known that the Individual Defendants had a propensity for misconduct. The Court disagrees.

Under Pennsylvania law, it has long been held that an employer may be liable for negligence if it knew or should have known of the necessity for exercising control of its employee. Brezenski v. World Truck Transfer, Inc., 755 A.2d 36, 39-40 (Pa. Super. Ct. 2000) (citing Dempsey v. Walso Bureau, Inc., 246 A.2d 418 (Pa. 1968)). If Plaintiffs can establish Defendant IBM knew or should have known that its employees had a propensity for misconduct, liability could be established. Id.

Here, Plaintiffs allege in the Complaint that the Individual Defendants were acting under direction of a Senior Vice President at IBM, who had been indicted and pled guilty to securities fraud in connection with his position at IBM. In addition, the Complaint states that Defendants have executed this investment scheme on other companies as well. Given these facts and the

extensive time period and the large amount of money involved, there is a factual basis to infer at this stage that Defendant IBM, with the exercise of ordinary care, should have known of the alleged propensity for misconduct by Individual Defendants.

Therefore, the Complaint sufficiently pleads a claim of negligence against Defendant IBM and Defendants' Motion to Dismiss Count VII will be denied.

## V.     CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss will be granted in part and denied in part.  The Motion will be granted with respect to the claims of Breach of Fiduciary Duty, Participation in a Breach of Fiduciary Duty, and Aiding and Abetting a RICO violation. Consequently, Counts III, VIII, and IX will be dismissed.  The Motion to Dismiss the remaining Counts will be denied.

An appropriate Order follows.