

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DEVON IT, INC., et al.,

           Plaintiffs,

    v.

IBM CORP., et al.,

           Defendants.

CIVIL ACTION
NO. 10-2899

FILED
DEC 3 0 2013
MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

## OPINION

**Slomsky, J.**

**November 21, 2013**

### TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 5

II.    FACTUAL BACKGROUND ............................................................................. 7

    A.    March 2011 Fee Agreement Between the Mitts Firm and Devon ........................ 7

    B.    Forward Purchase Agreement Between Devon and Burford ................................ 12

    C.    Legal Services Performed During the Course of the IBM Litigation ................... 14

        1.    Discovery in the IBM Litigation ............................................................. 14

            a.    Work Performed by Intervenor EconLit ...................................... 21

            b.    Work Performed by Intervenor ParenteBeard ............................. 24

            c.    Work Performed by Intervenor FranklyLegal ............................. 28

    D.    Settlement of the IBM Litigation ....................................................................... 31

    E.    Alleged Modifications to the March 2011 Fee Agreement .................................. 32

    F.    Funds Sought by the Mitts Firm, Devon, and the Intervenors ............................ 33

III.   ANALYSIS ....................................................................................................... 34

    A.   The Fee Agreement Between the Mitts Firm and Devon Created a Binding

        Contract....................................................................................................... 34

    B.   The Fee Agreement Was Only Modified When Devon Paid the Mitts Firm

        $250,000 for Purposes of Paying Kroll................................................. 35

        1.   Devon's Use of a Portion of the Second Tranche Funding to Pay

            the Mitts Firm $250,000 Modified the Fee Agreement ........................... 37

        2.   The Other Ten Events Cited by the Mitts Firm Did Not Modify

            the Fee Agreement ............................................................................... 38

            a.   Funding by Burford After the Motion to Dismiss Was Granted

                in Part Did Not Modify the Fee Agreement................................... 38

            b.   Devon's Authorization to the Mitts Firm to Produce

                Documents to IBM Without Prior Review Did Not Modify

                the Fee Agreement ...................................................................... 39

            c.   Devon's Authorization to the Mitts Firm to Approach

                Burford for Additional Funding Did Not Modify the Fee

                Agreement................................................................................... 39

            d.   Retention of Macht, Shapiro, Arato & Isseries LLP Did

                Not Modify the Fee Agreement .................................................... 40

            e.   Retention of Kellogg Did Not Modify the Fee Agreement........... 41

            f.   Appointment of Kellogg as Lead Counsel Did Not Modify

                the Fee Agreement ...................................................................... 41

2

g.   Devon's Negotiations with ParenteBeard Did Not Modify
     the Fee Agreement ........................................................ 42

h.   Communications Between Devon and the Mitts Firm
     Regarding a Small Partial Payment to Kroll Did Not Modify
     the Fee Agreement. ........................................................ 43

i.   Negotiations Between Kellogg and Kroll Did Not Modify
     the Fee Agreement ........................................................ 43

j.   Kellogg's Assurances to EconLit Did Not Modify the Fee
     Agreement ........................................................................ 44

C.   The Mitts Firm Breached the Fee Agreement By Failing to Pay
     Outstanding Invoices to Intervenors and Kroll ................................... 44

D.   Breach of the Fee Agreement by the Mitts Firm Bars It From Recovering
     Any Additional Fees ............................................................................. 47

E.   The Mitts Firm Has Failed to Establish that a Charging Lien Should Be
     Applied to the ████████ in Escrow ........................................... 48

     1.   The Mitts Firm Fails to Establish the Third and Fifth Recht Factors ....... 49

     2.   Constructive Trust ........................................................................ 51

     3.   Recoupment Defense ..................................................................... 53

F.   Intervenors' Requests for Relief ........................................................ 53

     1.   Intervenors Are Not Entitled to be Paid by Applying a Charging
          Lien ........................................................................................... 53

     2.   Equitable Estoppel Provides a Remedy for the Intervenors to Be
          Paid a Portion of Their Outstanding Invoices ............................. 54

a.      Controlling Law ................................................................... 54

b.      Devon's Conduct Requires the Application of Equitable

Estoppel............................................................................... 56

c.      Devon's Arguments to Overcome the Application of

Equitable Estoppel are Unavailing................................... 63

3.      A Jury Must Decide Whether the Mitts Firm Acted with Express,

Implied, or Apparent Authority on Behalf of Devon ................................ 69

4.      Intervenors Are Not Entitled to Be Paid Attorney's Fees or Interest........ 72

IV.      CONCLUSION............................................................................................... 73

## I.    INTRODUCTION

On May 11, 2012, the original parties in this case entered into a settlement agreement. [1]
On October 5, 2012, the Court Ordered that ▮▮▮▮▮▮▮ the settlement proceeds be placed in
an escrow account with the Clerk of Court.[2]  The funds were segregated by Court Order after a
law firm that had represented Plaintiffs in this case asserted an attorney charging lien for unpaid
fees on the settlement proceeds on its own behalf and on behalf of vendors it retained to assist in
the litigation.  The third-party vendors with an interest in the escrowed funds and their area of
expertise are as follows: 1) EconLit, LLC, a damages expert; 2) ParenteBeard, LLC, a liability
expert; and 3) FranklyLegal, LLC, a legal staffing firm that provided attorneys who performed
document review.  The events that led up to the assertion of the charging lien and creation of the
escrow account are critical to the decision the Court must now make on the distribution of the
funds.

On the underlying litigation was highly contentious and considerable work was done by all
counsel.[3]  On May 11, 2012, the settlement agreement was executed, in which Defendant IBM

---

[1] Original Plaintiffs in this case are: Devon IT, Inc., Devon Ad Tech, Inc., and Devon IT
(Europe), Ltd.  For purposes of this Opinion, the Court will refer to these entities collectively as
"Devon" or the "Devon entities."

Original Defendants in this case are: International Business Machines Corporation ("IBM"),
Thomas M.S. Bradicich, Bernard S. Meyerson, James A. Gargan, and Rodney C. Adkins.  The
Individual Defendants are employees of IBM or a division of IBM.  Since these Defendants
settled with Devon, they have no stake in the instant litigation over the distribution of the ▮▮▮
▮▮▮▮▮ settlement proceeds in the custody of the Clerk of this Court.

[2] The money held in the escrow account by the Clerk of Court will be referred to as the
"Settlement Fund."

[3] There are currently 304 entries on the docket in this case, which includes over thirty motions
(excluding pro hac vice motions), at least six telephone conferences, and at least four in-court
conferences.

and the Individual Defendants agreed to pay to Plaintiffs ███████ (Ex. M-77.)  On May

16, 2012, the Mitts Law Firm,[4] which represented Plaintiff Devon in this case from 2009 until

May 2012, filed a Motion to Withdraw as Counsel for Devon.  (Doc. No. 143.)  On May 22,

2012, the Mitts Firm filed the Application for an Attorney's Charging Lien or, in the Alternative,

the Imposition of a Constructive Trust against the settlement proceeds.  (Doc. No. 144.)  On July

11, 2012, FranklyLegal, LLC filed a Motion to Intervene in this case.  (Doc. No. 179.)  On

August 24, 2012, ParenteBeard, LLC filed a Motion to Intervene.  (Doc. No. 196.)  On

September 14, 2012, EconLit, LLC filed a Motion to Intervene.  (Doc. No. 203.)

On October 5, 2012, the Court dismissed the settled action between Devon and IBM.

(Doc. Nos. 227, 229.)  That same day, the Court granted the three Motions to Intervene (Doc.

Nos. 224, 225, 226) and ordered IBM to deposit ███████ with the Clerk of Court from the

settlement proceeds.  The funds were to remain in escrow pending a decision by the Court on the

Charging Lien and/or Constructive Trust asserted by the Mitts Firm and the Motions of the

Intervenors.[6]  (Doc. No. 230.)  Thereafter, six days of evidentiary hearings were held on claims

to the escrowed funds.[7]

---

[4] In 2005, Maurice Mitts, Esquire, and Stan Milavec, Esquire, formed "Mitts Milavec, LLC." (Maurice Mitts, Hr'g Testimony ["Mitts"], 1/22/13 at 13.)  Thereafter, Milavec terminated his association with the firm.  In December 2012, the firm formally changed its name to "Mitts Law, LLC."  (Id. at 13; Doc. No. 293 at 1.)  The Court will refer to the movant as the "Mitts Firm."

███████████████████████████████████████████████████
███████

[6] Intervenors FranklyLegal, ParenteBeard and EconLit are collectively referred to as "Intervenors."

[7] The hearings were held on November 14, 15, and 29, 2012 and January 22 to 24, 2013.

## II.   FACTUAL BACKGROUND

At the six day evidentiary hearing, a number of witnesses were presented.  Testifying on behalf of the Mitts Firm was Wendy Rose Hughes, Esquire, an associate at the Mitts Firm, and Maurice Mitts, Esquire, co-founder of the Firm.  Testifying on behalf of Intervenor EconLit, LLC was Dwight Duncan, the managing director of EconLit.  Testifying on behalf of Intervenor FranklyLegal, LLC was Francis Welsh Jr., the principal of FranklyLegal.  Testifying on behalf of Intervenor ParenteBeard, LLC was Glenn Scott Newman and James O'Brien, partners in its forensic litigation group.  The following facts were elicited at the hearings.

### A.   March 2011 Fee Agreement Between the Mitts Firm and Devon

In July 2008, Devon entered into contracts with IBM.  Under the terms of those contracts, Devon was to receive royalty payments.  (Robert Mulhern, Jr.,[8] Hr'g Testimony ["Mulhern"], 1/23/13 at 177.)  Over a year later, after a dispute arose between Devon and IBM over the contracts, the Mitts Firm was retained to represent Devon in litigation with IBM.  (Id.)  At the time, the Mitts Firm had been representing Devon entities in other cases pending in federal court.  On June 16, 2010, the Mitts Firm filed the Complaint in this case on behalf of Devon against

---

In reaching a decision on the claims, the Court has considered: the Motion of Mitts Milavec, LLC for the Application of an Attorneys' Charging Lien or, In the Alternative the Imposition of a Constructive Trust (Doc. No. 144), Devon's Responses in Opposition (Doc. Nos. 156, 157, 217), IBM's Response (Doc. No. 158), Mitts Milavec LLC's Reply (Doc. Nos. 160, 221), Devon's Sur-Reply (Doc. No. 177), the Motions to Intervene (Doc. Nos. 179, 195, 196, 203), Responses to the Motions to Intervene (Doc. Nos. 186, 188, 190, 201, 204), Replies in Support of the Motions to Intervene (Doc. No. 192), the Intervenors' Complaints (Doc. Nos. 271, 272, 273, 276), Devon's Answers (Doc. Nos. 286, 287, 288), the testimony and exhibits introduced during the six days of evidentiary hearings, the Joint Post-Hearing Memorandum of Intervenors (Doc. Nos. 292, 295), the Post-Hearing Memorandum of Mitts Law, LLC (Doc. No. 293), Devon's Responses (Doc. Nos. 296, 297), Mitts Law's Reply (Doc. No. 298), and the Intervenors' Joint Reply (Doc. No. 299).

[8] Robert Mulhern, Jr. is Devon's General Counsel.

7

IBM and the Individual Defendants. (Id.; Doc. No. 1.)   For the next twenty-three months, the

Mitts Firm was counsel of record for Devon and handled this litigation as well as the other cases

it was already handling for Devon.

On March 4, 2011, the Mitts Firm and Devon entered into a fee agreement.[9]   The Fee

Agreement was on "Mitts Milavec, LLC" letterhead and addressed to "John A. Bennett, M.D.,

President & CEO Devon International Group."   The "Re" line of the agreement listed five cases

covered by the Fee Agreement, including the litigation with IBM.[10]   (Id.)   Prior to this Fee

Agreement, the Mitts Firm had billed Devon on a monthly basis for work performed at an hourly

rate of $250 for all attorneys.   (Maurice Mitts, Hr'g Testimony ["Mitts"], 11/15/12 at 86-87.)

The March 4, 2011 fee letter substantially changed this arrangement and provides in full as

follows:

> Dear John:
>
> As you know, Mitts Milavec, LLC (the "firm") is presently
> representing John A. Bennett, M.D., Devon Robotics, LLC, Devon
> Health Services, Inc., Devon International Group, Devon Medical,
> Inc., Devon IT, Inc., Devon Ad Tech, Inc. and Devon IT (Europe),
> Ltd. (the "Devon Entities") in 5 significant federal court cases
> (listed above) pending in the United States District Court for the
> Eastern District of Pennsylvania.   This letter agreement confirms
> the understanding that we have reached regarding the payment of
> outstanding and future legal fees for the Firm's representation of
> the Devon Entities in the above referenced cases (the "Cases").

---

[9]   Hereinafter the fee agreement between the Mitts Firm and Devon will be referred to as the
"Fee Agreement." (Ex. M-1A.)

[10] The cases are: John A. Bennett, M.D., et al. v. Itochu International Inc., et al., No. 2:09-
cv-01819 (E.D. Pa.); Itochu International, Inc. v. Devon Robotics, LLC, et al., No. 2:09-cv-
04123 (E.D. Pa.); Health Robotics, LLC, et al. v. John A. Bennett, et al., No. 2:09-cv-
(E.D. Pa.); Devon Robotics, LLC, et al. v. Gaspar DeViedma, et al., No. 2:09-cv-3552 (E.D.
Pa.); Devon IT, Inc., et al. v. IBM, et al., No. 2:10-cv-02899 (E.D. Pa.) (the "IBM Case").

The Burford Group ("Burford")[11] is prepared to enter into an agreement to provide $4 million to purchase an interest in the IBM Case. The terms of Burford's agreement are the subject of separate agreements. This letter agreement is intended to set forth our collective understanding and agreement on the distribution of funds from Burford.

Burford has informed us that it will provide $2 million upon a successful ruling which denies the Defendants' pending Motions to Dismiss in the IBM Case. Burford will have the option, but not the obligation, to advance an additional $2 million 120 days after the first $2 million is funded. We anticipate that Burford will make this second $2 million funding, but it is Burford's choice whether or not to do so.

In the event of Burford funding, the following shall occur: From the first $2 million, the Devon Entities will receive $925,000 and the Firm will receive $1,075,000. From the second $2 million from Burford, the Devon Entities will receive $250,000 and the Firm will receive $1,750,000. We have agreed that upon the Firm's receipt of both of these payments:

1) all legal fees presently due to the Firm for our representation of the Devon Entities to date will be deemed paid in full. As of the date of this agreement, the arrearage for legal fees due and owing by the Devon Entities to the Firm total $899,033.54.[12]

2) all legal fees that will become due to the Firm for the continuing representation of the Devon Entities in the Cases through the completion of any trial in each of the Cases shall be deemed paid in full. Any appeals in any of the Cases are not covered by this agreement. A separate fee agreement will be negotiated for any such appeals; and

---

[11] Burford is a third-party funder of litigation expenses. "[F]or each financing that Burford makes for any litigation funding they create a special purpose[s] entity for that funding." (Mitts, 11/15/12 at 104-05.) In this case, Burford created a special purpose entity known as Driftwood Investments Limited to provide the funding to Devon. (Id.)

[12] The $899,033.54 was the fee owed by Devon to the Mitts Firm for work done on all five cases, including the IBM matter, as of March 4, 2011 when the fee letter became effective. (Mitts, 11/15/12 at 86-87.)

> 3) from the date of this agreement going forward, all litigation expenses (including expert witness fees) that will be incurred by the Firm to represent the Devon Entities in these Cases will be paid by the Firm.
>
> On the issue of the Burford second $2 million payment, if Burford elects not to fund, the Devon Entities can do one of two things: 1) provide Mitts Milavec with $1,750,000 from some other source (on the same timeline as Burford or within 90 days after notice from Burford that it will not fund the second $2 million) and then the Firm will operate on the same terms as if the funds had come from Burford; or 2) pay current all of the Firm's then outstanding fees and costs, and thereafter continue to pay these fees and costs each month on a going forward basis with a structure that will prevent the recurrence of any arrearages.
>
> As to the pending IBM Case, the Firm will also receive 5% of any recovery in that action, whether such recovery results from a settlement, judgment or otherwise ("Recovery"). This 5% will be paid to the Firm at the same time as the Devon Entities receive their portion of any Recovery.
>
> Provided that the Firm timely receives all of these payments, it is further agreed that if the Firm dissolves, merges into some other firm or if Maurice Mitts leaves the Firm, he will continue to represent the Devon Entities in the Cases without payment of any further sum by the Devon Entities in accordance with paragraphs 2 and 3 above.
>
> The parties to this agreement understand that the Burford funding is still contingent upon a favorable ruling from the Court in the IBM Case, and the terms of this agreement shall only become effective upon such a favorable ruling (as defined in the Burford Term Sheet dated January 11, 2011) and upon the Firm and Devon Entities actual receipt of the funding by Burford as described above. Time is, of course, of the essence for all of us in this matter.

(Ex. M-1A, footnote omitted). The letter is signed by "Maurice R. Mitts" and "Approved, Accepted and Agreed to" on March 4, 2011 by "John A. Bennett, M.D." individually and on behalf of the various Devon Entities. (Id.) Robert B. Mulhern, Esquire, the General Counsel for Devon, was copied on this correspondence. (Id.; Mulhern, 1/22/13 at 201.)

The Fee Agreement references "a favorable ruling (as defined in the Burford Term Sheet dated January 11, 2011)." (Ex. M-1A.)   The Burford Term Sheet states "Funding shall be contingent on the Court's denial in all respects of IBM's Motion to Dismiss – specifically, that the Court denies dismissal of any and all claims against any and all defendants." (Ex. M-1K.)[13]

The IBM litigation included a claim under the Racketeer Influences and Corrupt Organizations ("RICO") statute, 18 U.S.C. § 1961 et seq., which allows for statutory fee shifting and recovery of costs. (Mitts, 11/15/12 at 116.) Thus, Mitts, Burford, and Devon expected to secure a judgment that included an award of costs and fees. (Id. at 117.) This expectation "resulted in [the Mitts Firm] doing detailed time entries and keeping track of all of our expenses." (Id.) Mitts testified that he kept track of his time on an hourly basis for the following three reasons: "The first thing is that's how I actually manage what's going on in the office. So the first piece is that. The second piece is for the element of attorney's fees. And the third piece is to have a sense of what is it costing us to do this case." (Mitts, 11/29/12 at 91.) The Mitts Firm forwarded these monthly invoices to Devon for purposes of giving Devon "a really good understanding of all that we're doing over time." (Mitts, 11/15/12 at 158; Exs. M-9, M-176A-E.) Despite agreeing in the Fee Agreement to charging a flat fee for all the cases plus accepting a bonus of five percent of any recovery in the IBM litigation, Mitts drew against the funds as if his firm was being retained on an hourly basis. On cross-examination Mitts conceded:

> Q.  . . . you made a decision, sir, to take money out of the account
> and pay your firm based on an hourly basis. But you had agreed to
> accept four million in total for all the litigation though the time of

---

[13] The Court granted the Motion to Dismiss in part and denied it in part. (Doc. Nos. 41, 42.) Although the ruling by the Court may be construed as not resulting in "dismissal of *any and all* claims against any and all defendants," Burford still decided to move ahead and advance the funding to Devon for payment of counsel fees and litigation expenses. (emphasis added.)

trial, plus other cases and your expenses, correct?

A.  Yes.

(Mitts, 11/29/12 at 219.)

### B.      Forward Purchase Agreement Between Devon and Burford

The agreement between Devon and Burford is known as a "Forward Purchase Agreement." A Forward Purchase Agreement has its genesis in an English document which is "not a loan" by a third-party financer. Rather, the third-party "actually buy[s] a piece of the case . . . they actually have an ownership interest in the case." (Mitts, 11/15/12 at 106.) Therefore, in effect, through the Forward Purchase Agreement, Burford purchased a portion of the IBM litigation by advancing funds to support the litigation. In the Agreement, Burford is referred to as the "Purchaser" and Devon is referred to as the "Forward Seller." On March 18, 2011, Purchaser Driftwood Investments Limited[14] — the special purpose entity created by Burford to fund the IBM litigation — and Forward Seller Devon entered into several Agreements. (Ex. M-1B.)  The Forward Purchase Agreement executed here is of particular importance.[15] (Id.)

The Forward Purchase Agreement between Burford and Devon provided that Burford "shall make payment of the Prepaid Amount by wire transfer in accordance with Schedule 1

---

[14] For purposes of this Opinion, the Court hereafter will refer to the Driftwood and Burford entities jointly as "Burford."

[15] In addition to the Forward Purchase Agreement, Devon and Burford also entered into a Lien Subordination Agreement with Wilmington Savings Fund Society, FSB ("WSFS"). (Ex. M-1C.) Devon had borrowed money from WSFS and as a result WSFS became a secured creditor of Devon. In the Agreement, WSFS "subordinat[ed] its secured creditor rights to Burford," and created a secured creditor relationship between Devon and Burford." (Mitts, 11/15/12 at 107, 111-12.)

Devon and Burford also entered into a Security Agreement and Collateral Assignment. (Ex. M-1D.) "This is the agreement by which Devon granted a security interest in favor of Burford which gets perfected later by . . . a number of things[.]" (Mitts, 11/15/12 at 113.)

which shall constitute a full discharge of the Purchaser's payment obligations under this Agreement." (Ex. M-1B at 3.) The Prepaid Amount listed in Schedule 1 is "US $2,000,000." (Id. at 18.) In addition, the Agreement provided that Burford would increase its funding for a greater share of any proceeds Devon would receive if successful in the IBM litigation. A provision in the Agreement, known as the Purchase Option, stated that Burford "may make payment of the Purchase Option Price to [Devon] by wire transfer in accordance with Schedule 1 (the "Purchase Option") in return for an increase in the Resolution Amount applicable to the exercise of the Purchase Option provided in Schedule 2." (Id. at 4.) The Purchase Option Price listed in Schedule 1 is an additional advance of "US $2,000,000." (Id. at 18.) The Resolution Amount is listed in Schedule 2 and would raise Burford's share of the proceeds to $16,000,000.[16] (Id. at 20.) According to Mitts, the Forward Purchase Agreement is a "mechanism [that] provided that the first sixteen million dollars of the case, any recovery, whether it's by settlement [or] judgment, goes to Burford." (Mitts, 11/15/12 at 106.).

The Forward Purchase Agreement requires Devon to "[r]etain and remunerate the Nominated Lawyers to prosecute the Litigation Claim vigorously in a commercially reasonable manner and bring about reasonable monetization of the Litigation claim" and "promptly pay all costs and expenses necessary or reasonably desirable in association with the Litigation Claim." (Ex. M-1B at 6.) Schedule 1 lists the Nominated Lawyers as "Mitts Milavec, LLC."[17] (Id. at

---

[16] $16 million is the Resolution Amount under the Agreement. It was contingent on the litigation resolving more than 120 days after the closing date of the Agreement and the Purchase Option being exercised. Schedule 2 required Burford to receive the greater of $16 million or 35% of the settlement proceeds. ████████████████████ (Ex. M-1B at 20.)

[17] The Definition Section of the agreement defines "Nominated Lawyers" as "lawyers specified in Schedule 1." (Ex. M-1B at 27.) Thus, the Court looks to Schedule 1 to determine the identity of "Nominated Lawyers."

18.) On March 18, 2011, Bennett, on behalf of Devon, sent the Mitts Firm as the Nominated
Lawyers a letter informing them of the Forward Purchase Agreement and providing instructions
based on the terms of the Agreement.  (Ex. M-1E.)

In accordance with the Forward Purchase Agreement, Burford distributed two $2 million
tranches of funding.  (Mitts, 11/15/12 at 118.)  In April 2011, Burford disbursed the first tranche.
Approximately $1,064,000 was paid to the Mitts Firm.  These funds covered Devon's delinquent
invoices.  The remaining $925,000 was paid to Devon.  (Id. at 160-62.)  In August 2011, Burford
distributed the second tranche of funding.  (Id.)  From this tranche, the Mitts Firm had agreed in
the Fee Agreement that $250,000 would be paid to Devon.  Devon, however, made this money
available to the Mitts Firm to pay another vendor assisting in the IBM litigation, Kroll Ontrack
("Kroll"), a company that handled electronic document management.  The Mitts Firm had asked
Devon to advance the $250,000 to cover the Kroll expense, and Devon agreed to do so.  The
Mitts Firm, however, never used the money to pay Kroll for its services (Ex. M-222 at ¶4; Mitts,
11/29/12 at 76-77.)

## C.  Legal Services Performed During the Course of the IBM Litigation

### 1.  Discovery in the IBM Litigation

In June 2011, discovery in the IBM litigation commenced.  (Doc. No. 62 (discovery
plan).)  Discovery was considerable, resulting in the parties producing nearly five million pages
of documents.  (Exs. M-198, M-199.)  To manage this large production of documents, Devon
signed an engagement letter with Kroll in June 2011.[18]  (Ex. M-3.)  According to Wendy Hughes,

---

[18] In its Post-Hearing Brief, the Mitts Firm lists unpaid invoices of the following non-intervening
vendors: Kroll, TSG Reporting, Zanaras Reporting and Video, James DeCrescenzo Reporting,
Trial Technologies, and Reliable Copy.  The Court will not address the claims of these entities
since they are not intervening parties in this dispute.

14

an attorney with the Mitts Firm, "Kroll was the document management vendor that [the Mitts Firm] utilized on Devon's behalf in the IBM litigation. They were involved and critical to all aspects of processing the electronic data and the hard-copy data for our document reviewers to review for discoverability, as well as for production then to defendants." (Hr'g Testimony ["Hughes"], 11/14/12 at 207.)

The Mitts Firm encountered a number of challenges during the e-discovery process. For example, the initial Kroll pricing proposal was for 200-280 gigabytes of data, but ultimately 2,500 gigabytes of data was produced. (Ex. M-2); (Hughes, 11/14/12 at 210-12.)   As a result, in August and September 2011, to streamline the production and as a cost-saving measure, Robert Mulhern, Devon's General Counsel, authorized the Mitts Firm to produce Devon's documents to IBM without first reviewing them, as would ordinarily be done in litigation. (Mulhern, 1/23/12 at 6-7.)

Kroll submitted invoices to Devon totaling $712,920.49. (Ex. M-82 through M-91.) When Mulhern received the Kroll invoices, he forwarded them to the Mitts Firm for payment, explaining in one correspondence: "Pursuant to our agreement that your firm is responsible for costs, after receipt of the second tranche of Burford funding we request you make payment directly to Kroll Ontrack." (Ex. D-198; Mulhern, 1/23/13 at 210-12; Mitts, 11/15/12 at 83-85, Mitts, 11/29/12, 102-106.) Thereafter, Mitts was involved in extensive negotiations between Devon and Kroll to seek a compromise on the Kroll invoices. The Mitts Firm used the problems it had encountered with the database as a reason for Kroll to reduce its billing. (Mitts, 11/15/12 at 83-85.)

On December 22, 2011, Mitts sent Bennett and Mulhern an email summarizing the status of the IBM case:

> We have exhausted the Burford money and we forecast it will take
> at least $2 million to take this case to trial.  I have attached a
> spreadsheet which details where we have used the Burford funding
> that you will find helpful.  From the "big picture" perspective,
> please consider the following: of the $4 million we received from
> Burford, ($925,000 was paid back to Devon, $1,086,928 paid
> outstanding fees owed for McKesson, Itochu, Gaspar and the IBM
> cases) which left approximately $2 million for the IBM case since
> last April.
> …
> From our recent discussions, I understand that Devon is currently
> too cash strapped to provide this additional funding to take this
> case to trial.  If my understanding of Devon's current financial
> situation is correct, then we need to approach Burford for more
> money now.

(Ex. M-10 at 1-2.)  Attached to the email was a "Litigation Cost Summary from April 6, 2011

through November 30, 2011" listing various expenses.  (Ex. M-10.)  According to Mitts, this

December 22, 2011 email was a proposal to modify the March 2011 Fee Agreement.  (Mitts,

11/29/12 at 110-14, 149.)

Mulhern testified that "what I understood [from this December 22, 2011 email] is that

these expenses listed here [in the attached litigation cost summary] had been paid; that is, the

Kroll, FranklyLegal, Reliable Court Reporters, and MCS had been paid, and that the firm had

zero dollars left out of the four million dollars that had been provided by Burford."  (Mulhern,

1/24/13 at 22.)  This turned out not to be the case, because the "Litigation Cost Summary"

attached to the email was "a mixture . . . of things that have been paid and things that haven't

been paid."  (Mitts, 11/29/12 at 153; Ex. M-10.)  Mitts had only paid part of the FranklyLegal

invoices, and had not paid Kroll the $250,000 from the second tranche of funding as Devon had

instructed.  (Mulhern, 1/24/13 at 22-23.)  Moreover, at the time this email was drafted, the Mitts

Firm had approximately $720,000 on hand from the second $2 million tranche.  (Mitts, 11/29/12

16

at 154; Mulhern, 1/24/13 at 25.)  Further, on three occasions subsequent to this email, funds were disbursed to the Mitts Firm from the Firm's account to cover its own legal fees and expenses.[19]

Mulhern testified that the December 22, 2011 email was the first time he had heard of any financial problems with the IBM litigation, and he "was extremely shocked." (Mulhern, 1/24/13 at 17.)  On December 27, 2011, Mulhern responded to Mitts:

> I spoke with John [Bennett], and he approves approaching Burford and requesting an additional $2 million on the best terms possible for us.  Hopefully they will agree to accept $4 million for that additional investment.  On the bonus issue [Bennett] wants to hold that open until we see what Burford comes back with.

(Ex. M-11.)  According to Mitts, this email "approves approaching Burford" and is an acceptance of his proposal to modify the March 2011 Fee Agreement.  (Mitts, 11/29/12 at 110-14, 149.) Mitts testified that "the bonus issue" in the email refers to the five percent contingent fee set forth in the March 4, 2011 agreement, and that the bonus is the only part of the Fee Agreement which remains unmodified.  (Mitts, 11/15/12 at 167-68; Mitts, 11/29/12 at 211.)

As a result of this exchange, on December 28, 2011, Mitts emailed Aviva Will, who is the managing director of Burford and formerly worked as counsel at the law firm Cravath, Swaine & Moore and as Assistant General Counsel at Time Warner Inc.  (Mitts, 11/15/12 at 139, 146-47; Ex. M-12.)  Mitts provided Will with a litigation update and requested additional funding.  His email reads as follows:

> We truly appreciate the $4 million of funding that we have received from Burford and we have put all of that money to good use.  We now forecast that it will take at least $2 million more to get this case to trial.  We have exhausted all of the funds that we received and we are deep in the heart of the discovery.  Our burn

---

[19] On January 11, 2012, $300,000 was disbursed, on February 14, 2012, $150,000 was disbursed, and on February 22, 2012, $270,000 was disbursed. (Mitts, 11/29/12 at 168-69.) After December 22, 2011, the Mitts Firm did make partial payments to one or more Intervenors. (Id.)

> rate has soared since October in part because of the massive
> document production and the need to prevent Jones Day[20] from
> benefiting from its strategic late document productions. I have
> discussed this with the client and we are authorized to request this
> additional funding from Burford. Obviously we now know so
> much that is helpful to our case, but we need additional funding to
> complete discovery and to drive this case to trial. Without the
> additional funding, we simply cannot do either.

(Ex. M-12.) On January 3, 2012, Will sent Mitts an email saying "I'm wondering if it makes

sense for me to come down to philly [sic] tomorrow to meet with you to continue the discussion

and to see how we can find a good fix." (Ex. M-13.)

On January 6, 2012, Will attended a meeting at the Mitts Firm where attorneys made a

presentation on the status of the IBM litigation, the discovery process, the use of vendors, the

work of experts drafting reports and running damage models, and the burn rate of fees and

expenses. (Mitts, 11/15/12 at 185-86.) Presentations were also made by two representatives of

ParenteBeard and by a representative of EconLit. (Id.) In addition, during Will's visit, she

observed FranklyLegal reviewers conducting document review on the Kroll database. (Id. at

186.) Mitts testified that:

> the purpose of the meeting was to update her, and to give a sense
> where we are, and so that she had a basis to go get additional
> funding. So she learned where we were, and what there was to do.
> . . . And [Will] said to [Mitts] you keep working; we're going to
> cover – while we're working out our deal with Devon, we're going
> to cover whatever these expenses are. And she said after meeting
> with the team, I'm going to need to make a presentation to the
> board. And I'm only going to be able to do this one time. So we
> need to figure out what we're going to need. And I'm going to
> need to get an opinion from outside counsel who can . . . verify the
> wisdom of what you're doing.

(Id. at 188-89.)

-----

[20] Jones Day is the law firm that represented IBM and the individual Defendants in the litigation
with Devon.

Will recommended that Kellogg Huber Hansen Todd Evans & Figel, PLLC ("Kellogg")[21]

serve as outside counsel to advise on the merits of the case and the amount of additional funding.

(Mitts, 11/15/12 at 194.) On January 11, 2012, Kellogg was brought on as co-counsel in the

IBM litigation with the understanding that Burford would pay Kellogg's fees. (Id.; M-242.)

Mitts testified that shortly thereafter Kellogg's representation transformed into active

representation of Devon in the litigation. (Mitts, 11/15/12 at 194; see also M-242, Kellogg's

proposal of substantive work it will perform.) In the middle of February 2012, Bennett

appointed Kellogg lead counsel in the IBM Litigation, and the Mitts Firm became supporting

counsel. (Mitts, 11/15/12 at 201.) As a result, Kellogg took responsibility for the work

performed by the experts and asked the Mitts Firm to be responsible for paper discovery,

including document production, interrogatories, request for admissions, and, to some extent,

depositions. (Id. at 213.) Mitts testified that use of a co-counsel was not within the terms of the

March 4, 2011 Fee Agreement and therefore was a modification of the agreement. (Mitts,

11/15/12 at 197-98.)

On February 28, 2012, Mitts sent Mulhern a letter regarding Kellogg assuming full

responsibility as lead counsel. Mitts wrote that Burford had "agreed to consider additional

funding and to pay interim case and expert expenses incurred by our firm until a new funding

arrangement was finalized. We have relied on those assurances and on Devon's readiness to

accept this new funding with a modification to Burford's purchase interest in this case." (Ex. M-

23 at 2.) Mitts requested "a workable economic structure going forward that reflects our new

transitional and supporting role." (Id. at 5.) Specifically, Mitts proposed new terms for a fee

agreement as follows:

---

[21] PLLC stands for Professional Limited Liability Company.

> Hourly fees: Our fees for work going forward in the IBM litigation
> will be based on a blended rate of $250 per hour.  You agree to pay
> our invoices within thirty (30) days of issuance.
>
> Contingent Interest in Settlement or Recovery: For the IBM case,
> Mitts Milavec, LLC shall be entitled to receive 5% of any
> recovery, by settlement, verdict or judgment, of any gross amount
> in excess of $50,000,000 million (after the repayment of any costs
> paid by any party).
>
> Costs and Expenses: Litigation costs or expenses incurred going
> forward, if any, will be reimbursed within ten days of monthly
> invoices submitted by Mitts Milavec, LLC to Devon or by a third
> party administering any litigation fund.

(Id. at Ex. B.;) (Mitts, 1/22/12 at 57.)  This offer was never accepted by Devon. (Mitts, 1/22/12

at 58.)

Mitts testified that in March 2012, Burford had a board meeting where there was a

presentation for approval of almost $6 million in additional funding, including over $2 million

for Kellogg's fees. (Mitts, 11/29/12 at 21-22.)  Mitts testified that in April 2012 "Burford had

approved additional funding[, but] Devon and Burford had decided that they would try to settle

the case, and if that were possible they wouldn't have to draw additional funding to litigate the

case, and so they put [the Mitts Firm] into a go slowly mode[.]"  (Id. at 37.)

Meanwhile, on Monday March 19, 2012, Mitts reported to Mulhern that the negotiations

with Kroll became heated when Kroll demanded $250,000 by Friday or it would shut down the

database containing all electronic discovery in the IBM litigation.  (Ex. D-92.)  On March 22,

2012, Mulhern emailed Mitts stating "[i]f it is a question of Devon paying a few thousand

dollars, I can try to see about [that].  However, we cannot pay any substantial amount. . . . [T]his

should not be our problem.  We thought that you were paying the Kroll bills and did not learn

until months later (I think in January) that you had not paid any of the invoices that I had

forwarded to you."  (Ex. D-93.)  Mitts testified that he was not aware of a final proposal

stemming from the Kroll negotiations. (Mitts, 11/15/12 at 83-85.) On March 23, 2012, Kroll

shut down its database, thus ending the document review. (Hughes, 11/15/12 at 60.) Thereafter,

Kellogg was responsible for negotiating with Kroll on the payment of outstanding fees. (Ex. M-

250.)

> ### a.    Work Performed by Intervenor EconLit

On November 18, 2011, Mitts emailed Dwight Duncan, the sole principal of EconLit, to

ask whether EconLit would be interested in being retained as a damages expert in the IBM

litigation. (Dwight Duncan, Hr'g Testimony ["Duncan"], 11/14/12 at 22; Ex. E-2.) EconLit

sent a draft engagement letter to the Mitts Firm, which designated Devon as the party responsible

to pay EconLit. (Duncan, 11/14/12 at 23-24.) Upon request, the letter was revised so that the

Mitts Firm was responsible to pay EconLit. (Id.) On December 12, 2011, EconLit executed the

engagement letter and sent the letter to the Mitts Firm. (Duncan, 11/14/12 at 16; Ex. E-1.) The

EconLit engagement letter states, in relevant part:

> EconLit understands that Devon IT, Inc. ("Devon IT"), Devon AD
> Tech, Inc. ("Devon AD") , and Devon IT (Europe), Ltd. ("Devon
> Europe") (collectively "Devon") have retained Mitts Milavec, LLC
> ("Mitts Milavec") to litigate this matter.    EconLit further
> understands that Mitts Milavec will be responsible for payment of
> fees and costs . . . If EconLit is required to retain counsel in
> connection with collection of unpaid invoices, you agree to be
> responsible for reasonable attorney's fees and associated litigation
> costs incurred in association with such collection efforts.[22]

(Ex. E-1.) Duncan testified that he understood that he was doing the work for the Devon entities,

but there was a third-party funder involved that would provide funds through Devon and/or the

Mitts Firm to pay EconLit. (Duncan, 11/14/12 at 23-24.) On January 5, 2012, EconLit provided

---

[22] The engagement letter does not reference the right of EconLit to collect interest on unpaid
invoices. (Ex. E-1.)

a preliminary budget estimating that its work would cost between $400,000 and $600,000. (Id. at 17.)

On January 20, 2012, an attorney with the Mitts Firm sent an email copying numerous vendors, including Duncan of EconLit, stating: "Our experts should take this email as authorization to work with the Kellogg Huber team, who have entered their appearances and have been admitted pro hac vice in the case as our co-counsel." (Ex. E-7.)  As noted previously, on January 11, 2012, Kellogg had become co-counsel in the IBM litigation with the understanding that Burford would pay Kellogg's fees. (Mitts, 11/15/12 at 194; M-242.)  By the middle of February 2012, Bennett appointed Kellogg as lead counsel in the IBM litigation, and the Mitts Firm became supporting counsel.[23] (Mitts, 11/15/12 at 201.)

On March 10, 2012, Mitts emailed Mulhern to report that Aviva Will, "a fairly senior person at Burford," "wanted me to assure the Econolit [sic] people that they are definitely getting paid, but that she needs numbers to sell the additional funding to the [Burford] board this week." (Duncan, 11/14/12 at 35-37; Ex. M-27 at 1-2.)

On March 15, 2012, Kellogg emailed EconLit stating "you've calculated a preliminary damages number in the range of $40-50 million" and requesting a conference call to "get a deep dive into the analysis underlying the model." (Ex. E-10.)  Under Kellogg's direction, EconLit "develop[ed] many different damage models exploring different damage theories, [and] different present value cap computations." (Duncan, 11/14/12 at 16; See also, Ex. E-24.)  EconLit also assisted in developing topics for Federal Rule of Civil Procedure 30(b)(6) deposition notices and requests for admissions.  (See Exs. E-3, E-4, E-5, E-6.)  Kellogg and EconLit engaged in

---

[23] On February 21 and 27, 2012, the Mitts Firm forwarded EconLit invoices to Mulhern.  (Exs. M-295, M-247.)

numerous phone calls lasting hours, and in correspondence reviewed each line of the damage model and the assumptions upon which they were based. (Duncan, 11/14/12 at 33-34; see also Exs. E-11, E-16, E-17.)

By the middle of March 2012, EconLit had discussions with Kellogg and the Mitts Firm regarding outstanding EconLit invoices, totaling approximately $300,000. (Duncan, 11/14/12 at 35-37.) Duncan testified that "we were being provided assurances to keep working, that the information had been well-received and that they were assuring us that we would be paid by the third-party through Devon for the work that we were doing." (Id. at 36.)

On March 29, 2012, Duncan received an email from an attorney at Kellogg which noted: "[m]y understanding is that Devon is expecting to resolve its funding issues in the next few weeks, and as soon as that is done, [Devon] will be able to resolve the outstanding invoices." (Ex. E-12; see also Duncan, 11/14/12 at 38-40.) This email was of concern to Duncan because it was the first time he became aware of a funding issue with Devon, rather than the third-party funder. (Duncan, 11/14/12 at 38-40.) As a result, on March 30, 2012, Duncan emailed Kellogg and the Mitts Firm stating that since its retention on December 12, 2012, EconLit had accrued outstanding fees totaling $307,000. (Ex. E-13.) Duncan also wrote that prior to the March 29, 2012 email from Kellogg, "all communication regarding payment had indicated that a third party was accepting responsibility for payment and payment was forthcoming." Duncan concluded:

> After looking at our engagement letter yesterday, I observed that the law firm of Mitts Milavec is responsible for payment. I would like to have a call today to discuss the status of our retention and who the responsible party is for payment. If we need to put a new engagement letter in place to properly reflect any changes in the various parties' status, I would like to do so as soon as practical. EconLit has been working vigorously, at your collective direction, to digest the large volumes of information, conduct multiple client interviews, perform industry research, purchase industry data, and participate in multiple conference calls with counsel. We need to

23

> get the payment issue resolved promptly in order to continue at the
> current pace and be able to meet the current disclosure deadline.

(Ex. E-13.)

On March 30, 2012, after Duncan spoke with someone at Kellogg in which he was told he would not be paid for a couple of weeks at the earliest, Duncan emailed an EconLit employee and informed him that "we are pencils down after today." (Ex. E-15.) Duncan testified that this meant EconLit would not do any further work on the IBM litigation after March 30, 2012. (Duncan, 11/14/12 at 52.) Before ceasing its work, EconLit had provided their entire damages model to Kellogg for use in settlement discussions. (Exs. E-16, 17.)

EconLit seeks $385,425.14 for services performed and pre-judgment interest. (Doc. No. 292 at 16.) This amount accounts for a previously paid $10,000 retainer. (Dec. No. 292 at 16.) The net amount sought includes: $372,089.31 in attorney's fees and costs[24] and $23,335.83 in interest.[25] (Id.)

### b.      Work Performed by Intervenor ParenteBeard

ParenteBeard, LLC is a large accounting and consulting firm based in Philadelphia. (Glenn Newman, Hr'g Testimony ["Newman"] 11/14/12 at 116.) Two partners in the forensic and litigation group at ParenteBeard testified during the evidentiary hearing: Glenn Newman and James O'Brien. The forensic and litigation consulting practice of ParenteBeard assists "in looking at disputes, looking at accounting records, making analyses and projections and evaluating it for the purpose of a dispute." (Newman, 11/14/12 at 116.)

---

[24] EconLit's cost of capital to borrow the money to maintain its operation while funding this case was at an annual rate of 4.75%. (Duncan, 11/14/12 at 45.)

[25] Interest is not included as an item to be paid in the retainer letter. Duncan testified that he is entitled to such a charge because a representation "was made to us was [sic] that we would be paid promptly . . . And given that we were now months and months without any payment, the parties understood how I charge interest in the past." (Duncan, 11/14/12 at 48.)

In November 2011, the Mitts Firm contacted ParenteBeard about retaining it as an accounting expert on liability issues in the IBM litigation, resulting in a November 8, 2011 meeting between the Mitts Firm and O'Brien. (Id. at 117; James O'Brien, Hr'g Testimony ["O'Brien"], 11/14/12 at 167-68.) On December 1, 2011, ParenteBeard submitted a proposed standard engagement letter. (Ex. PB-1; see also Newman 11/14/12 at 118-19.) The Mitts Firm requested a modification of the letter so that only the Mitts Firm, and not Devon, was bound by the agreement. (Ex. PB-1; see also Newman 11/14/12 at 118-20.) On December 14, 2011, Newman and Mitts executed the final engagement letter. (Ex. PB-2.) The letter states in relevant part:

> Thank you for this opportunity to provide our services directly to Mitts Milavec, LLC's ("Attorneys").
> . . .
>
> Our invoices for fees and expenses will be presented approximately every 15 days as work progresses and are due upon presentation. The Attorneys agree to pay the invoices via wire (wire instructions attached) within ten (10) business days from the date of presentation of each invoice which will be delivered via email. In accordance with firm policy, we require a $25,000 retainer to initiate our services. The retainer will be applied to our final invoice; any unused amount will be returned. Invoices for which payment is not received within thirty (30) days of invoice date shall accrue a 1.0 percent per month compound late charge. We reserve the right to halt further services until payment is received on past invoices.

(Ex. PB-2.) Newman testified that he believed that Devon was ultimately paying for the services of ParenteBeard. (Newman, 11/14/12 at 120.) Moreover, it was the understanding of Newman that ParenteBeard invoices were being forwarded to Devon by the Mitts Firm. (Id. at 129.) The $25,000 retainer required by the engagement letter and the first invoice submitted by ParenteBeard were paid timely. (O'Brien, 11/14/12 at 170-71.)

ParenteBeard had approximately twelve people assigned to the IBM litigation project. (Id.) O'Brien ran the project, processed the work, and led the team on a daily basis. (Id.) ParenteBeard's role in the IBM litigation, "was on the liability issues, trying to help prove from an accounting standpoint the conduct that was alleged in the matter, that IBM was doing, that – against Devon." (O'Brien, 11/14/12 at 179.) During discovery, ParenteBeard "[a]ssisted on numerous document requests, discovery issues as well as depositions preparation and attendance" and completed "[v]oluminous document identification, review and analysis." (Ex. PB-13.)

On January 6, 2012, O'Brien and another employee of ParenteBeard attended a meeting with several attorneys from the Mitts Firm and with Aviva Will of Burford. (O'Brien, 11/14/12 at 170-71; Doc. No. 292 at 9.) O'Brien provided a status update on the forensic investigation being performed by ParenteBeard and a detailed budget for future work with an estimated burn rate of approximately $50,000 to $85,000 a week. (Id. at 171-72.) That same day, ParenteBeard provided the Mitts Firm with a detailed estimate of the cost to perform additional project requirements, which was shared with Devon and Burford. (Ex. PB-4, M-244.)

On January 20, 2012, O'Brien received the same email sent to EconLit, stating: "Our experts should take this email as authorization to work with the Kellogg Huber team, who have entered their appearances and have been admitted pro hac vice in the case as our co-counsel." (Ex. PB-11.) At this time, according to O'Brien, "[t]here were numerous depositions going. . . . ParenteBeard attended the depositions, assisted with creating deposition questions, and [was] also assisting with the document discovery, so there were documents that [ParenteBeard was] finding that were being used in the depositions." (O'Brien, 11/14/12 at 175-76.)

On February 8, 2012, Newman and O'Brien met with an attorney at the Mitts Firm to discuss the status of unpaid invoices. (Newman 11/14/12 at 122-23; Ex. PB-21; O'Brien 11/14/12 at 179.)  Prior to that meeting, Newman had been told "there was some kind of logjam but it had been approved and we could expect payment any day." (Newman 11/14/12 at 122.) O'Brien describes the meeting as an attempt to get "a negotiated settlement on getting us paid. But also having us complete the work product." (O'Brien, 11/14/12 at 179.) At the meeting, Newman learned "that there were some issues that were starting to arise. In other words, I was asked if I would be willing to revise our estimate on a lump sum basis to complete all of our work and issue our reports." (Newman 11/14/12 at 123.)

On February 9, 2012, Newman emailed an attorney at the Mitts Firm, quoting the engagement letter which states ParenteBeard may terminate engagement for failure to pay.  The email also summarized critical events that occurred during ParenteBeard's engagement, listing the services provided and the invoices and status of payment.  It also included an updated budget with some caps, "laying out some different [payment] options." (Id.; Ex. PB-13.)  The email concluded with a statement that ParenteBeard could no longer continue to work without payment and attached a condensed expert report outline. (Id.; Ex. PB-13.)  Mitts forwarded Newman's email to Mulhern and Bennett, noting: "Burford has confirmed to me that the experts will be paid, but they haven't yet.  This just hit a critical stage where the accountants are stopping work now until this is resolved.  This imperils the entire case and must be resolved now." (Ex. M-244.)

On March 13, 2012, Mulhern arranged a meeting with Newman at Devon's office, to "inquire[] about ParenteBeard's unpaid invoices and address the possibility of ParenteBeard completing work on a reduced flat fee basis." Mulhern personally knew Newman and thought

that a face-to-face meeting might help the situation. (Exs. PB-16, PB-18 at ¶¶8, 9; Mulhern, 1/24/13 at 72.) During the course of the meeting, Mulhern inquired about whether ParenteBeard would accept $250,000 as full payment for its work, including the expert report. (Newman, 11/14/12 at 127-29.) Newman found this offer unacceptable because the original estimate for ParenteBeard's fees in this case was between $900,000 and $3 million. (Id.)

On March 22, 2012, Newman sent Mitts a Demand for Payment letter summarizing outstanding invoices totaling $463,516.76.[26] (Ex. PB-17; see also Ex. PB-18, Newman affidavit supporting request for outstanding invoices). ParenteBeard's total claim is $639,495.32, which includes outstanding invoices plus interest as of April 1, 2013[27] and attorney's fees and costs. (Ex. PB-19; Doc. No. 292 at 2.)

### c.    Work Performed by Intervenor FranklyLegal

Francis P. Welsh, Jr. is the principal of FranklyLegal, LLC, a Philadelphia based "legal staffing company . . . that provides professionals to work on cases and projects and other staffing needs that law firms, businesses and in-house counsel may need." (Francis P. Welsh Jr., Hr'g Testimony ["Welsh"], 1/22/13 at 178.) In September 2011, Mitts contacted FranklyLegal to discuss potential staffing for an electronic document review project. (Id. at 178-80.) Mitts negotiated rates with FranklyLegal. (Id.) Because Mitts was a new client, for business development reasons, FranklyLegal substantially lowered its standard rate from approximately $45-49 an hour to $32 an hour. (Id.)

---

[26] Unpaid invoices were issued on January 6 and 19 as well as February 7 and 24, 2012. (Exs. PB-5, PB-6, PB-7, PB-8.)

[27] ParenteBeard claims that it is owed interest at the rate of 1 percent per month in accordance with the terms of its engagement letter. (Doc. No. 276 at 5.)

On September 23, 2011, FranklyLegal sent an engagement letter to the Mitts Firm listing

the "CLIENT: Mitts Milavec, LLC" and the Matter as "Devon Review Project." (Ex. M-92.)

The engagement letter provides in relevant part:

> . . . your firm or company (the "client") will be billed every week
> at the agreed upon rate, and payment of undisputed amounts will
> be due within thirty (30) days. . . .
> In the event that the client fails to pay the undisputed charges of
> FranklyLegal when due (whether for temporary or permanent
> placement of personnel), the client shall pay interest charges on
> overdue invoices at the less of (a) 1.5% per month or (b) at the
> highest legal rate.

(Id.) FranklyLegal provided the computers necessary to do the review, and the Mitts Firm

provided the workspace for the reviewers. (Welsh, 1/22/13 at 178-80.)

FranklyLegal screened candidates for the project and forwarded their resumes to the

Mitts Firm for a final hiring decision. (Id. at 179, 181.) Reviewers were a mix of recent law

school graduates and seasoned contract attorneys. (Id. at 179.) Reviewers were W-2 employees

of FranklyLegal. (Id. at 181.) Specifically, FranklyLegal paid each employee's wages, trust

fund taxes, federal, state, and local taxes, unemployment compensation, workers' compensation,

malpractice insurance, paid time off, and benefits such as the cost for obtaining Continuing Legal

Education credits. (Id. at 182-83.)

The document review undertaken by FranklyLegal began with approximately sixteen

reviewers and rose to about twenty reviewers. (Id. at 181.) FranklyLegal personnel reviewed

documents produced by Defendants and Plaintiffs in the IBM litigation using the Kroll database

as the platform for reviewing and tagging documents.[28] (Hughes 11/14/12 at 224-26.) In

---

[28] Tagging was explained as follows: "if you're looking at a document on your monitor that's
loaded onto the Kroll software, there usually are issues that are identified in one of the
window panes accompanying the documents. And you can click on certain issues or topics
that might be relevant for purposes of determining what usefulness that document will have

Case 2:10-cv-02899-JHS   Document 305   Filed 11/21/13   Page 30 of 75

addition, FranklyLegal personnel helped prepare the Mitts Firm for depositions, assisted

ParenteBeard in conducting their analysis, identified trends in the documents to develop

litigation strategy, and assisted in answering written discovery requests and requests for

admissions.  (Id. at 224-25.)

FranklyLegal submitted weekly invoices to the Mitts Firm from October 5, 2011 to

March 31, 2012, totaling $464, 408.69. (Exs. FL-1, M-99 through M-121; Hughes, 11/14/12 at

228-29.)  The Mitts Firm paid FranklyLegal $81,204.00 of the accrued fees.  (Exs. FL-1, M-93

through M-98.) The aggregate hours of work performed by FranklyLegal contract attorneys

totaled 16,268 hours.  (Ex. FL-2; Welsh, 1/22/13 at 181-82.)  FranklyLegal has paid each

contract attorney $25 an hour for the number of hours they worked, and also paid the

employment taxes and expenses noted above.  (Welsh, 1/22/13 at 181-82; Doc. No. 292 at 6.)

In March 2012, the FranklyLegal reviewers stopped working because Kroll shut down

the database containing the documents being reviewed.  (Hughes, 11/15/12 at 60.)  In April 2012,

Welsh met with Mitts to discuss the outstanding fees owed to FranklyLegal. (Welsh, 1/22/13 at

186-87.)  Mitts assured Welsh that FranklyLegal would be paid from additional financing or

settlement proceeds.  (Id.)  FranklyLegal now seeks $570,557.93, which includes outstanding

fees, costs,[29] and interest.[30]  (Ex. FL-1; Doc. No. 292 at 2.)

---

later or whether it's responsive to a request, a discovery request." (Hughes, 11/15/12 at 30-
31.)

[29] The costs total $8,931, which includes expenses incurred when FranklyLegal provided a work
space for additional reviewers as the project grew in size. (Welsh, 1/22/13 at 183-85.)

[30] The contract between FranklyLegal and the Mitts Firm provides for payment of interest on
outstanding balances.  The interest shown in Ex. FL-001 is $68,541.75 as of November 29,
2012.  (Welsh, 1/22/13 at 185.)  In the Joint Post-Hearing Memorandum filed by
FranklyLegal, it seeks $570,557.93, including interest due as of April 1, 2013.  (Doc. No. 292)

**D.      Settlement of the IBM Litigation**

On May 11, 2012, IBM and Devon executed a Settlement and Release Agreement which

required IBM to pay Devon ███████████   The Agreement provides:



On May 8, 2012, prior to the date of the settlement agreement, Mitts met with Mulhern

and learned that Devon intended to use the ██████████ settlement proceeds to pay creditors,

rather than pay the Mitts Firm or the vendors.  (Mitts, 11/29/12 at 41-43.)  As a result, on May

10, 2012, Mitts emailed Mulhern identifying a potential conflict of interest and attaching a

Motion to Withdraw as counsel in the IBM litigation.  (Ex. M-75.)

As noted previously, on May 14, 2012, Devon and Burford entered into a separate

Settlement and Release Agreement.  (Ex. M-289.)  The Agreement provided that Devon would

receive ██████████ and Burford would receive ██████████ from the settlement proceeds.  (Id.)

████████████████████████████████████████████████████

██████████████████████████████████ (Ex. M-289.)  As part of the

settlement agreement, Bennett on behalf of Devon, affirmed in Appendix A that:

> He understands that as part of [Burford's] consideration for
> agreeing to accept only ██████████ from the IBM settlement, that
> Devon is responsible for all of the Mitts Milavec outstanding

> invoices and expenses including vendors and experts from the
> settlement.  [Burford] is responsible for all of the Kellogg Huber
> firm invoices and expenses from the settlement. . . .[31]

(Ex. M-290 at 8 ¶16.)  Prior to the execution of the Settlement and Release Agreement between

Burford and Devon, Aviva Will at Burford made an additional request to Mulhern which was "to

ensure that EconLit is paid in full."  (Ex. M-46.)  General Counsel Mulhern agrees that he was

aware of the outstanding invoices and expenses of the vendors and experts in the months prior to

Devon signing the settlement agreement with Burford.  (Mulhern, 1/23/13 at 67.)

### E.    Alleged Modifications to the March 2011 Fee Agreement

The Mitts Firm contends that the following events served as a modification to the March

2011 Fee Agreement:

- In April 2011, the agreement was first modified when the Mitts Firm did not succeed
  in getting a complete denial of the Motion to Dismiss as required by the Burford term
  sheet.  The term sheet states that funding is contingent on the "Court's denial in all
  respects of IBM's Motion to Dismiss."  (Ex. M-1K.)  The Mitts Firm lost on three
  counts.  (Mitts, 11/15/12 at 127-29.)  Burford nonetheless provided litigation funding
  in this case.

- In August 2011, the agreement was modified when Devon used funds allotted to it in
  the second tranche of funding to pay the Mitts Firm $250,000 for purposes of paying
  Kroll.  (Mitts, 11/29/12 at 76-77.)

- In August and September 2011, Devon authorized the Mitts Firm to produce
  documents to IBM without first reviewing the documents, despite that reviewing the
  documents is "standard procedure."

---

[31] This paragraph further states that it is for the benefit of Devon and Driftwood only, and not for
the benefit of the Mitts Firm and/or Kellogg, and Devon also retained the right to dispute any
fees and expenses of vendors and experts hired by the Mitts Firm and Kellogg.  (See Ex. D-
132.)  Before Bennett executed the affidavit on or about May 18, 2012, Devon had engaged in
conduct which caused the Intervenors to continue to work on its behalf.  See Section III(F)(2).
Accordingly, although Devon relies upon this extra language to dispute claims of the
Intervenors, it does not defeat their right to payment from the Settlement Fund, as discussed
infra.

- On December 27, 2011, the agreement was modified when Mulhern approved Mitts approaching Burford to request additional funding to pay expenses of the vendors and fees of the Mitts Firm in the IBM litigation.

- On January 6, 2012, the agreement was modified when the engagement letter with Macht, Shapiro, Arato & Isseries LLP envisioned payment from Burford funding.

- On January 11, 2012, the agreement was modified when Devon hired Kellogg and observed that they will be paid from Burford funding.

- On February 15, 2012, the agreement was modified when Devon appointed Kellogg as lead counsel.

- On March 13, 2012, the agreement was modified when Devon met directly with ParenteBeard in an effort to settle ParenteBeard's outstanding and future fees for $250,000.

- On March 22, 2012, the agreement was modified when Mulhern authorized a partial payment by Devon to Kroll.

- On March 28, 2012, the agreement was modified when Kellogg negotiated directly with Kroll.

- On March 29 and 30, 2012, the agreement was modified when Kellogg made assurances to EconLit that the outstanding invoices would be resolved.

(Doc. No. 293 at 37-38; Mitts, 1/22/13 at 4-7.)

**F.      Funds Sought by the Mitts Firm, Devon, and the Intervenors**

The Mitts Firm contends the firm is entitled to $1,980,305.49 ███████████████████

███████████████████████   The amount sought includes:

- Outstanding fees at a rate of $250 per hour for attorney time and $95 per hour for paralegal time from January 9, 2012 through May 7, 2012, totaling ████████████

- 5% of the ███████████ settlement proceeds, totaling ███████; and

- 5% of the royalty payments made by IBM to Devon during the IBM litigation, totaling ████████[32]

---

[32] In July 2008, Devon entered into certain contracts with IBM and as a result, Devon received royalty payments pursuant to those agreements. (Robert Mulhern, Jr., Hr'g Testimony

(Doc. No. 293 at 14-19.)

   The Intervenors are claiming that their invoices must be paid from the escrow funds.

Devon denies that it owes any money to the Intervenors and argues that the Mitts Firm is the

responsible party to pay their bills.  Devon also contends that it has already paid the Mitts Firm

in full in accordance with the retainer letter of March 4, 2011 and that it should be awarded █

█████████ the escrow account.

**III. ANALYSIS**

  **A. The Fee Agreement Between the Mitts Firm and Devon Created a Binding Contract**

   On March 4, 2011, Mitts and Devon entered into a binding Fee Agreement memorialized

in the form of a letter.  (Ex. M-1A.)  Under Pennsylvania law, a contract is formed when the

parties: (1) reach a mutual understanding; (2) exchange consideration; and (3) delineate the terms

of the bargain with sufficient clarity.  Weavertown Transport Leasing, Inc. v. Moran, 834 A.2d

1169, 1172 (Pa. Super. 2003).  An attorney-client fee agreement is valid unless obtained by fraud,

mistake, undue influence, or suppression of facts on the part of the attorney, or unless such

contract is contrary to public policy.  McKenzie Const., Inc., v. Maynard, 758 F.2d 97 (3d Cir.

1985).

---

["Mulhern"], 1/23/13 at 177.)  Royalty payments were paid by IBM to Devon during the litigation.

Case 2:10-cv-02899-JHS   Document 305   Filed 11/21/13   Page 35 of 75

The Fee Agreement between the Mitts Firm and Devon constitutes a binding contract. The Agreement is on "Mitts Milavec, LLC" letterhead, addressed to "John A. Bennett, M.D., President & CEO Devon International Group," and signed by both parties. The Agreement details the terms of payment of legal fees to the Mitts Firm for representation of Devon in the IBM litigation, indicating a valid offer and acceptance. (Ex. M-1A.)

The "payment of outstanding and future legal fees for the [Mitts] Firm's representation of the Devon Entities" constitutes the bargained for consideration for this contract. Finally, the terms of payment cover: (1) all legal fees presently due to the Mitts Firm; (2) all legal fees that will become due to the Mitts Firm for the continuing representation of the Devon Entities; and (3) all litigation expenses (including expert witness fees) that will be incurred by the Firm in representing the Devon Entities. (Id.) The Fee Agreement states that it is "intended to set forth [the parties'] collective understanding and agreement on the distribution of funds from Burford." (Id.) This Agreement became a binding contract on the parties upon acceptance by Devon on March 4, 2011.

### B.    The Fee Agreement Was Only Modified When Devon Paid the Mitts Firm $250,000 For Purposes of Paying Kroll

The Mitts Firm contends that eleven events occurred between March 4, 2011 and March 29, 2012 that orally modified the Fee Agreement. (Doc. No. 293 at 37-38; Mitts, 1/22/13 at 4-7.) The Firm further contends that it detrimentally relied on these modifications under the belief that additional payment would come from either Burford or the settlement proceeds. (See Hr'g Tr. 204:24-205:8 Nov. 29, 2012.) To the contrary, Devon submits that the Fee Agreement was never modified, aside from the limited request by the Mitts Firm to receive $250,000 from the second $2 million tranche of funding, which Devon forwarded with the understanding that the Fee

Case 2:10-cv-02899-JHS   Document 305   Filed 11/21/13   Page 36 of 75

Agreement would remain in full force and effect.[33]  (Doc. No. 296 at 22.)  According to Devon, the original terms of the Fee Agreement remained constant and binding on the parties during the entirety of the Mitts Firm's representation.

The Court agrees that the original Fee Agreement was only modified by the $250,000 payment to the Mitts Firm, and not by any of the other ten alleged instances.  However, the modification by the $250,000 payment does not affect the outcome of this case because, as discussed below, the Fee Agreement was subsequently breached by the Mitts Firm when it not only failed to pay this money to Kroll, but also failed to pay outstanding invoices submitted to it by the Intervenors.  See Section III(C), infra.

A written contract may be modified by a subsequent oral agreement, provided such agreement includes an offer, acceptance, and consideration.  The burden of proving a contract modification or change rests on the party asserting it.  MDNet, Inc. v. Pharmacia Corp., 147 Fed. Appx. 239 (3d Cir. 2005).  Since "the mere suggestion or possibility of a contract arising from transactions between the parties is not enough," the party asserting modification must show that both parties mutually consented to modify the agreement, either expressly or impliedly by their words or conduct.  Gloeckner v. School Dist. of Baldwin Tp., 405 Pa. 197, 200 (1961).  Further, an oral modification must be so specific and direct that it leaves no doubt that the parties intended to change what they had previously solemnized by formal document.  Sabatini v. ITS Amore Corp., No. 3:CV-05-2586, 2010 U.S. Dist. LEXIS 52959, at *22-25 (M.D. Pa. May 28, 2010), aff'd, 2011 U.S. App LEXIS 25138 (3d Cir. 2011).  As the Pennsylvania Supreme Court noted:

---

[33] As noted already, the Mitts Firm did not give this $250,000 to Kroll as represented to Devon, but instead retained it.  This conduct is discussed further in Section III(C).

> The oral evidence must be of such a persuasive character that it
> moves like an ink eradicator across the written page, leaving it
> blank so that the parties in effect start fresh in their . . . mutual
> commitments.

Gloeckner, 405 Pa. at 200; See, e.g., Iron Worker's Sav. And Loan Ass'n v. IWS, Inc., 424 Pa.

Super. 255 (1993) (finding that discussions regarding possible extensions to contract deadline

was not clear evidence of oral modification.)  An implied modification must be "based on

conduct consisting of acts and declarations of the parties inconsistent with the existence of the

original contract, regardless of whether the agreement to modify is express or implied." Centrix

HR, LLC v. On-Site Staff Management, Inc., 2008 WL 783558, at *11 (E.D. Pa., March 25,

2008).

 The Mitts Firm has the burden of proving that each of the eleven events modified the Fee

Agreement.  To meet this burden, the Mitts Firm must establish that each event was so specific

and direct as to leave no doubt that both the Firm and Devon intended to modify the written

terms of the Fee Agreement.  Again, except for the $250,000 payment from Devon to the Mitts

Firm for purposes of paying Kroll, the Mitts Firm has failed to meet this burden with respect to

each of the alleged modifications.

> **1.    Devon's Use of a Portion of the Second Tranche Funding to Pay the
>        Mitts Firm $250,000 Modified the Fee Agreement**

 The only event that served to modify the Fee Agreement was Devon's decision to pay

$250,000 from the second tranche of funding to the Mitts Firm in order to pay Kroll.  The

original Fee Agreement provided that $250,000 from the second tranche would go to Devon.

(Ex. M-1A.)  In August 2011, Devon decided that rather than keep the $250,000 from the second

tranche, it would give this money to the Mitts Firm to pay Kroll for services rendered.  This was

in response to the Mitts Firm's request that Devon advance it this money so that the Mitts Firm could cover outstanding Kroll invoices.  (Ex. M-222 at 4; Mitts, 11/29/12 at 76-77.)[34]

The Mitts Firm asserts that Devon's payment of the $250,000 modified the Fee Agreement between Devon and the Firm.  (Doc. No. 293 at 37.)  Devon, on the other hand, submits that the limited decision to pay Kroll $250,000 was made with the understanding that the terms of the Fee Agreement would remain binding.  (Doc. No. 296 at 22.)

The payment of the $250,000 did modify the Fee Agreement.  There was an offer and acceptance, and the transfer of the $250,000 constituted the required consideration.  The modification, however, did not void the entire contract because it was specific and direct in changing only one term of the Agreement.  The payment only modified in part the provision that the Mitts Firm would be responsible for payment of all litigation expenses.  It did not change the obligation of the Mitts Firm to pay these expenses from the flat fee it received in the funding tranches.

### 2.   The Other Ten Events Cited by the Mitts Firm Did Not Modify the Fee Agreement

#### a.   Funding by Burford After the Motion to Dismiss Was Granted in Part Did Not Modify the Fee Agreement

Mitts asserts that the Fee Agreement was first modified in April 2011, when the Firm failed to secure a complete denial of the Motion to Dismiss as required by the Burford term sheet.  (Doc. No. 293 at 37.)  The term sheet states that funding is contingent on the "Court's denial in all respects of IBM's Motion to Dismiss."  (Ex. M-1K.)  Although Devon lost on three claims, Burford still provided funding.  (Mitts, 11/15/12 at 127-29.)  The Mitts Firm argues that

---

[34] As stated, Mitts did not pay the $250,000 to Kroll from the second tranche of funding as Devon had instructed, and instead kept the money to use as it deemed fit.  (Mulhern, 1/24/13 at 22-23.)

Burford's decision to provide funding despite the loss modified the Fee Agreement. (Doc. No.

293 at 37.) The Court disagrees.

Burford's decision to provide funding to Devon did not affect the Fee Agreement between

Devon and the Mitts Firm. While the Fee Agreement references the Burford term sheet, Burford

is not a party to the Fee Agreement. Burford's decision to provide funding to Devon despite the

failure to win a complete victory on the condition precedent did not affect nor modify the Fee

Agreement between Devon and the Mitts Firm.

> **b.  Devon's Authorization to the Mitts Firm to Produce
> Documents to IBM Without Prior Review Did Not Modify the
> Fee Agreement**

In August and September 2011, Devon authorized the Mitts Firm to produce documents

to IBM without a prior review. Standard practice in litigation is for a party to review documents

before producing them to the opposing party. Devon authorized the Mitts Firm, however, to

forgo the review in order to streamline document production and to save on costs. (Mulhern,

1/23/12 at 6-7.) The Mitts Firm contends that this modified the Fee Agreement.

The Fee Agreement does not specify the terms of document production between the

parties. Additionally, the Mitts Firm has not presented evidence of a mutual agreement between

the Firm and Devon on the method of document production. Since the authorization to send

documents without initial review does not run contrary to any term in the Fee Agreement, it is no

stretch for this Court to conclude that there was no modification of the Agreement.

> **c.  Devon's Authorization to the Mitts Firm to Approach Burford
> for Additional Funding Did Not Modify the Fee Agreement**

On December 22, 2011, Maurice Mitts sent Robert Mulhern, Devon's General Counsel,

an email summarizing the status of the IBM case and requesting permission to approach Burford

for additional funds. Attached to the email was a "Litigation Cost Summary from April 6, 2011

39

through November 30, 2011," listing various expenses. (Mitts, 11/29/12 at 110-14, 149.) Devon responded to the email by giving the Firm approval to approach Burford to request an additional $2 million. (Ex. M-11.) According to Mitts, this modified the Fee Agreement. (Id.) Specifically, the Mitts Firm argues that Mulhern's response email "reaffirmed the continuing viability of Devon's five percent contingent fee obligation to the Mitts Firm while simultaneously signaling Devon's approval of a new funding structure that modified and abandoned the old structure for purposes of providing millions of dollars of additional financing." (Doc No. 293 at 15.) The Court disagrees.

Despite the authorization given by Devon, the request for additional funding did not modify the Fee Agreement. Notably, Burford never advanced additional funds. Burford's practice was to provide a written term sheet as a means of finalizing their agreement to fund a case, as they did when the original funding agreement was negotiated. No term sheet was created for additional funding above the $4 million already advanced. The Mitts Firm therefore fails to provide evidence that this email exchange modified the Fee Agreement.

#### d.   Retention of Macht, Shapiro, Arato & Isseries LLP Did Not Modify the Fee Agreement

On January 6, 2012, Devon hired Macht, Shapiro, Arato & Isseries LLP ("Macht") as outside counsel. The engagement letter with Macht stated that the firm would be paid from the Burford funding. Although the engagement was later terminated, the Mitts Firm contends that the engagement letter modified the Fee Agreement between Devon and the Mitts Firm.

There is no evidence that the Macht engagement letter represented any mutual agreement between the Mitts Firm and Devon to modify the Fee Agreement. In fact, the Macht engagement letter does not reference the Fee Agreement at all. It is not unusual for co-counsel to be retained

during the course of litigation.  Retaining Macht was not inconsistent with the terms of the Fee

Agreement between Devon and the Mitts Firm, and it did not constitute a modification.

### e.    Retention of Kellogg Did Not Modify the Fee Agreement

On January 11, 2012, Devon hired Kellogg to serve as outside counsel in order to advise

Devon on the merits of the case and the amount of additional funding to request from Burford.

(Mitts, 11/15/12 at 194.)  The Mitts Firm argues that because the hiring of Kellogg as co-counsel

was not within the original terms of the Fee Agreement with Devon, this retention modified the

Agreement.  (Mitts, 11/15/12 at 197-98.)

Similar to the effect of the retention of the Macht Firm on the Fee Agreement, Devon's

decision to retain outside counsel did not modify the Fee Agreement between Devon and the

Mitts Firm.  The emails discussing Kellogg's role as co-counsel do not reference the Fee

Agreement, nor is there any evidence that Devon or the Mitts Firm intended that the retention of

Kellogg modify the Fee Agreement.  Without more, a decision to retain co-counsel does not

automatically modify a fee agreement with another attorney.

### f.    Appointment of Kellogg as Lead Counsel Did Not Modify the Fee Agreement

On February 15, 2012, Devon appointed Kellogg as lead counsel in the IBM litigation.

(Mitts, 11/15/12 at 201.)  As a result, Kellogg took responsibility for the work performed by the

experts, and the Mitts Firm continued to work on paper discovery, including document

production, interrogatories, requests for admission, and certain depositions.  (Id.)  Mitts then

emailed Mulhern proposing new terms for a fee agreement to reflect the Firm's "new transitional

and supporting role."  (M-23 at 2.)  This agreement was never adopted.  (Mitts, 1/22/12 at 58.)

Nevertheless, Mitts asserts that Kellogg's appointment as lead counsel modified the Fee

Agreement.

Devon refrained from accepting the terms proposed by the Mitts Firm for its new supporting role. (Mitts 1/22/12 at 58.) Again, the Mitts Firm fails to present evidence of any mutual agreement to modify the original Fee Agreement by assigning a new role to Kellogg. Merely appointing new lead counsel in litigation, without more, does not modify a fee agreement already executed between a client and different counsel.

### g. Devon's Negotiations with ParenteBeard Did Not Modify the Fee Agreement

On March 13, 2012, Mulhern met directly with ParenteBeard in an effort to settle ParenteBeard's outstanding and future fees for $250,000. The Mitts Firm had retained ParenteBeard as an accounting expert on liability issues in the IBM litigation. (O'Brien, 11/14/12 at 170-71.) Originally, ParenteBeard estimated that its fees would range between $900,000 and $3 million. However, in March 2012, Mulhern decided to personally negotiate with ParenteBeard and offered ParenteBeard $250,000 as full payment for its work. (Newman, 11/14/12 at 127-29.) The Mitts Firm argues that the negotiations between Devon and ParenteBeard modified the Fee Agreement between Devon and the Mitts Firm. The Court disagrees.

The engagement letter between ParenteBeard and the Mitts Firm was modified to "remove[] the secondary signor [Devon]" in order "to keep third parties off of the agreement because there [were] some strategies involved in the litigation." (11/14/12 at 119-20; see also PB-1; PB-2.) The final engagement letter stated that the Mitts Firm would be responsible for all payments to ParenteBeard. This assumption of responsibility is similar to the terms of the Fee Agreement, in which the Mitts Firm agreed that it would be liable for all vendor expenses. While ParenteBeard believed that Devon would ultimately pay for its services, any negotiations

between ParenteBeard and Devon over fees did not modify the Fee Agreement between the Mitts Firm and Devon.

### h.   Communications Between Devon and the Mitts Firm Regarding a Small Partial Payment to Kroll Did Not Modify the Fee Agreement

By March 19, 2012, the Mitts Firm informed Mulhern that Kroll had demanded $250,000 or it would cease working. (Ex. D-92.) On March 22, 2012, Mulhern emailed Mitts stating that he would look into paying Kroll "a few thousand dollars," but would be unable to pay "any substantial amount." (Ex. D-93.) Kroll did not receive payment and thereafter stopped reviewing documents. (Hughes, 11/15/12 at 60.) The Mitts Firm contends that Mulhern's statement regarding potential payment of a few thousand dollars to Kroll modified the Fee Agreement. Again, the Court disagrees.

The Fee Agreement states that Mitts will be responsible to pay all litigation expenses incurred during its representation of Devon. (Ex. M01A.) The "few thousand dollars" that Mulhern mentioned was never advanced to Kroll. No consideration supports the claim of the Mitts Firm that this potential payment modified the Fee Agreement.

### i.   Negotiations Between Kellogg and Kroll Did Not Modify the Fee Agreement

On March 19, 2012, Mitts reported to Mulhern that negotiations with Kroll had become heated and Kroll had threatened to stop working. Mulhern then asked Kellogg to try negotiating with Kroll in an effort to resolve the outstanding Kroll invoices. The Mitts Firm contends that delegating responsibility to Kellogg for these negotiations and Kellogg's subsequent assurances to Kroll modified the Fee Agreement. (Doc. No. 293 at 37.) Again, the Court disagrees.

As stated above, the Fee Agreement made the Mitts Firm responsible for payment of all litigation expenses. When Mulhern asked Kellogg to negotiate with Kroll, there was no mention

of changing any terms of the Fee Agreement. In fact, the emails between Mulhern and Kellogg state that the Mitts Firm was still liable for the Kroll payments. (M-250.) There is no evidence that Devon intended to modify the Fee Agreement by asking Kellogg to negotiate with Kroll.

> ### j.  Kellogg's Assurances to EconLit Did Not Modify the Fee Agreement

By March 2012, outstanding EconLit invoices totaled approximately $300,000. (Duncan, 11/14/12 at 35-37.) On March 29, 2012, Kellogg sent an email to EconLit stating that "Devon is expecting to resolve its funding issues in the next few weeks, and as soon as that is done, [Devon] will be able to resolve the outstanding invoices." (Ex. E-12; see also, Duncan, 11/14/12 at 38-40.) EconLit then emailed both Devon and the Mitts Firm noting that its engagement letter made the Firm responsible for payment. (Ex. E-13.) The Mitts Firm argues that Kellogg's assurances to EconLit modified the Fee Agreement between the Mitts Firm and Devon.

When Devon hired Kellogg as lead counsel there was no indication that Devon intended to modify the Fee Agreement. Moreover, EconLit was informed by the Mitts Firm to cooperate with Kellogg. The email sent to EconLit by Kellogg stating Kellogg's expectation that Devon would resolve its funding issues and pay EconLit's outstanding invoices did not change the terms of the Fee Agreement.

> ### C.  The Mitts Firm Breached the Fee Agreement By Failing to Pay Outstanding Invoices to Intervenors and Kroll

Under the Fee Agreement, the Mitts Firm was responsible to pay "from the date of this [March 4, 2011] agreement going forward, all litigation expenses (including expert witness fees) that will be incurred by the Firm to represent the Devon Entities. . ."[35] (Ex. M-1A.) The

---

[35] Kroll signed an engagement letter with Devon, rather than with the Mitts Firm. (Ex. M-3.) However, this does not undermine the fact that the Mitts Firm breached the Fee Agreement

evidence establishes beyond peradventure, however, that the Mitts Firm did not pay all outstanding invoices of the Intervenors as required, and even received $250,000 from Devon in order to pay Kroll and did not make that payment. The obligation of the Mitts Firm under the Fee Agreement to pay all litigation expenses was a material term of the contract. The palpable breach of this material term by the Mitts Firm has evident consequences as discussed below in Section D.[36]

To sustain a claim for breach of contract, a plaintiff must prove: "(1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages." CoreStates Bank, Nat'l Ass'n v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999). A party breaches a contract when it fails to perform any contractual duty of immediate performance, or when it violates an obligation, engagement, or duty under the contract. Johnson v. Fenestra, Inc., 305 F.2d 179, 181 (3d Cir. 1962) (a party breaches a bilateral contract when he fails to do something which he has expressly or impliedly undertaken to do to facilitate performance by the other party). When a breach is material, the non-breaching party is discharged of liability under the contract. See, e.g., Sabatini v. Its Amore Corp., 455 Fed.App'x. 251, 256 (3d. Cir. 2011). Whether a breach is so substantial to justify the injured party regarding the whole transaction as at an end, "is a question of degree; and must be answered by weighing the consequences in the actual custom of men in the performance of contracts similar to the one

---

with Devon by failing to pay the Intervenors and to pay Kroll the $250,000.

[36] The Mitts Firm contends that the Court should apply a charging lien to the Settlement Fund for its benefit. In making this argument, the Mitts Firm puts its own conduct in issue because the Court has to decide whether conduct of the Mitts Firm was inequitable. Such analysis is necessary because a charging lien arises in equity, and equitable considerations are an element of a charging lien. Thus, the Court must decide if the Mitts Firm breached the Fee Agreement because a breach can rise to the level of inequitable conduct.

that is involved in the specific case." <u>International Diamond v. Singularity Clark</u>, 40 A.3d 1261,

1271 (Pa. Super. 2012) (quoting <u>2401 Penna. Ave. Corp. v. Federation of Jewish Agencies of</u>

<u>Greater Phila.</u>, 466 A.2d 132, 139 (1983)).

      Devon contends that the Mitts Firm breached the Fee Agreement and therefore is not

entitled to a charging lien for outstanding legal fees. The Court agrees. An attorney's agreement

to pay all litigation expenses is a material term customarily covered in an attorney's engagement

letter. The Mitts Firm assumed responsibility to pay the litigation expenses and did not fulfill

this obligation. The outstanding invoices of the Intervenors were not paid. The $250,000

earmarked for Kroll was not paid. At the November 29, 2012 hearing, Maurice Mitts admitted

that the Mitts Firm retained the entire $250,000 rather than pay it to Kroll as agreed. Maurice

Mitts testified as follows:

> Q:  . . . since [Devon] actually forfeited that [$250,000] to you to
> pay Kroll, was Kroll paid from that [$250,000]?
>
> A: No. No.
>
> Q: You kept the [$250,000] in your account?
>
> A: We kept the [$250,000] in our account, yes.

(11/29/12 at 76:14-77:2, Exhibit A.)

      Moreover, after December 22, 2011, the date Mitts expressly stated to Devon that the $4

million was exhausted, a total of $720,000 was retained by Mitts as fees earned, including

$300,000 on January 11, 2012, $150,000 on February 14, 2012, and $270,000 on February 22,

2012. (Ex. D77.) During this time frame, ParenteBeard, Econlit and FranklyLegal were seeking

payments from the Mitts Firm. (Ex D67; D68, D138.) Maurice Mitts also testified that the Mitts

Firm "paid [it's] own invoices" with this money, despite telling Devon that the funding had been

exhausted and failing to pay the vendors and experts. (11/29/12 at 168:22-169:17, 177:21-

178:16, Exhibit A.)  The failure to pay the outstanding invoices of the Intervenors and the

$250,000 to Kroll amounts to a clear breach of the Fee Agreement.  The Mitts Firm agreed in the

Fee Agreement to accept a flat fee and to pay all litigation expenses from that fee.  Its failure to

do so discharges Devon from making any further payments to the Mitts Firm, as noted below.

### D.   Breach of the Fee Agreement by the Mitts Firm Bars It From Recovering Any Additional Fees

The Mitts Firm claims that under the Fee Agreement it is entitled to five percent of the

████████████ settlement proceeds, ██████████████   The Mitts Firm also asserts that under the

Fee Agreement it is entitled to five percent of the royalty payments made by IBM to Devon

during the IBM litigation, totaling ████████ .  Finally, the Mitts Firm contends that it is entitled to

be paid outstanding fees accrued from January 9, 2012 through May 7, 2012, at a rate of $250

per hour for attorney time and $95 per hour for paralegal time, totaling ██████████ .  All of

these claims fail because of the breach of the Fee Agreement by the Mitts Firm.

Since the Mitts Firm breached the Fee Agreement, it is void and no further fees are owed

to the Mitts Firm by Devon.  A material breach of a contract by one party discharges the other

party of any liability under the contract.  See, e.g., Sabatini, 455 Fed.Appx. at 256.

**E.    The Mitts Firm Has Failed To Establish that a Charging Lien Should Be
        Applied to the ▇▇▇▇▇ Escrow[37]**

On October 5, 2012, the Court ordered that ▇▇▇▇▇ the Settlement Proceeds be

placed in an escrow account with the Clerk of Court. The funds were segregated by Court Order

pending a decision on a charging lien that the Mitts Firm claimed it had on the funds. In order to

establish the right to a charging lien, the Court looks to well settled law in this area. "The right

of an attorney to secure an equitable charging lien upon a fund has been frequently recognized by

the appellate courts of the Commonwealth [of Pennsylvania]." Recht v. Urban Redevelopment

Auth., 168 A.2d 134, 136 (Pa. 1961.); see also Novinger, 809 F.2d at 218 ("The equitable

charging lien gives an attorney the right to be paid out of a fund in court which resulted from his

skill and labor, thereby extending only to services rendered in the particular case"). "The

rationale behind the charging lien was that a successful plaintiff should not be permitted the

whole of any judgment secured by the services of his attorney without paying for those services."

Zack v. City of Minneapolis, 601 F. Supp. 117, 119 (D. Minn. 1985) (internal quotation and

citation omitted). Courts have long recognized that judges, not juries, have responsibility for

attorney's fee liens. See Exact Software No. Am., Inc. v. DeMoisey, No. 12-3538, 2013 WL

2248978 (6th Cir. May 23, 2013). The parties agree that Recht and its five-part test set forth the

elements of a charging lien.

---

[37] A court has ancillary jurisdiction regarding fees and expenses of counsel for a party in a case
before the Court. See Novinger v. E.I. DuPont De Nemours & Co., 809 F.2d 212 (3d Cir.
1987); see also, Zack v. City of Minneapolis, 601 F.Supp. 117, 119 (D. Minn. 1985), aff'd,
1997 U.S. App. LEXIS 41193 (8th Cir. Aug. 11, 1997). As the Third Circuit has noted,
"Ancillary jurisdiction exists because without it the federal court neither could dispose of the
principal case effectively nor do complete justice in the dispute that is before the tribunal."
Novinger, 809 F.2d at 217 (quoting 13 C. Wright, A. Miller & E. Cooper, Federal Practice and
Procedure, § 3523, at 85 (1984) (footnote omitted)).

As noted, in <u>Recht v. Urban Redevelopment Auth.</u>, 168 A.2d 134, 138-39 (Pa. 1961), the Pennsylvania Supreme Court held that five factors ("<u>Recht</u> factors") must be satisfied in determining whether a charging lien should be recognized and applied:

> (1) that there is a fund in court or otherwise applicable for distribution on equitable principles, (2) that the services of the attorney operated substantially or primarily to secure the fund out of which he seeks to be paid, (3) that it was agreed that counsel look to the fund rather than the client for his compensation, (4) that the lien claimed is limited to costs, fees or other disbursements incurred in the litigation by which the fund was raised and (5) that there are equitable considerations which necessitate the recognition and application of the charging lien.

<u>Recht</u>, 168 A.2d at 138-39.[38]   The Mitts Firm has failed to meet prongs three and five of the <u>Recht</u> factors and therefore is not entitled to a charging lien on the settlement funds.

### 1.   The Mitts Firm Has Failed to Establish the Third and Fifth <u>Recht</u> Factors

Under <u>Recht,</u> all five factors must be satisfied in order for a court to apply a charging lien.  The most evident <u>Recht</u> factor that the Mitts Firm fails to establish is the fifth one.  The Mitts Firm is unable to establish this factor because of the Firm's unclean hands stemming from its breach of the Fee Agreement.  Under the fifth <u>Recht</u> factor, the Mitts Firm must show that equitable considerations necessitate the recognition and application of a charging lien.  Pennsylvania "courts will look at whether an attorney properly handled a case or whether the attorney breached some obligation to the client in determining the equitable considerations applied to establish a charging lien."  <u>See</u> <u>Fee Agreements in Pennsylvania, Pennsylvania Bar</u>

---

[38] Charging liens exist to protect the rights of litigation support vendors retained by attorneys for the benefit of a client.  <u>See</u> <u>Monarch Life Ins. Co. V. Elam,</u> 918 F.2d 201, 203 (D.C. Cir. 1990) ("Charging liens in favor of attorneys rest on the judgment that as the recovery would not come into being without the lawyer's skill and effort, the lien is not only in the interest of claimants but in that of their creditors as well.")

Institute § 1-3 (2d ed. 2006) (citing Brandywine Sav. & Loan v. Redevelopment Auth., 514 A.2d

673 (Pa. Cmwlth. 1986), app. denied, 527 A.2d 545 (Pa. 1987)).  Likewise, "[a]ny lien an

attorney may have may be lost by reason of his own misconduct and infidelity to his client's

interests." 2 Robert L. Rossi, Attorneys Fees § 12:25 (3d ed.) (citing Poltronieri v. Talasco, 204

N.Y.S.2d 613 (N.Y. App. Div. 1960) and Robinson v. Rogers, 257 N.Y.S. 737 (N.Y. App. Div.

1932)).  "The [charging] lien can be used only to collect a valid and enforceable fee claim.  If,

for example, the lawyer's fee claim has been forfeited . . . the lien becomes unenforceable."

Restatement of the Law Governing Lawyers A 43, cmt. e (2000); see also Restatement Second,

Agency § 469 (agent not entitled to compensation for conduct which is disobedient or breach of

duty of loyalty to principal).  Since the Mitts Firm breached the Fee Agreement, relieving Devon

from any further obligation to pay the Mitts Firm, equitable considerations bar the recognition

and application of a charging lien for purposes of paying the Firm additional funds.

Further, "[h]e who comes into equity must come with clean hands."  Brandywine

Savings and Loan Ass'n., 514 A.2d at 676 (declining to impose a charging lien where there was

an inference that a lawyer was seeking to profit from his wrongdoing by failing to inform his

client of important facts).  The bar of unclean hands applies in Pennsylvania where the

wrongdoing of a party directly affects the equitable relationship subsisting between the parties

and is directly connected with the matter in controversy.  See Stauffer v. Stauffer, 465 Pa. 558,

575, 351 A.2d 236, 244 (1976); see also Estate Partners, Ltd. v. Leckey, 2005 U.S. Dist. LEXIS

47790 (W.D. Pa. Aug. 25, 2005).

The Mitts Firm engaged in inappropriate conduct when it did not remit to Kroll the

$250,000 that was earmarked for Kroll.  This conduct in conjunction with the failure to pay

outstanding Intervenor invoices breached the Fee Agreement and rendered the five percent bonus

payment to the Mitts Firm nugatory.  The Mitts Firm had already collected its entire $4 million

dollar flat fee.  It would be inequitable for the Court to allow the Mitts Firm to collect additional

funds from the Settlement Fund.  In In re Howard, the Third Circuit noted that an attorney's

failure to disclose the fact that the attorney would retain certain money runs contrary to the

considerations underlying the attorney's equitable theory of recovery for a charging lien.  2012

U.S. App. LEXIS 3750, at *11.

     The Mitts Firm also fails to satisfy the third Recht factor, which requires a showing that it

was agreed that counsel would look to the fund rather than client for compensation.  It was never

agreed that the Mitts Firm would look to the fund rather than Devon for compensation beyond

the $4 million flat fee.  The Mitts Firm admits to receiving the full flat fee of $4 million as

contemplated by the Fee Agreement.  (11/15/12 at 86-87.)  There was never any agreement

between the Mitts Firm and Devon that payment of the additional five percent bonus would be

specifically paid from a fund of money generated at settlement.

### 2.      Constructive Trust

     The Mitts Firm argues in the alternative that if the Court does not apply a charging lien,

then equitable principals require the imposition of a constructive trust.  This argument also fails.

A constructive trust holds property that is subject to an equitable duty to be conveyed to another

party on the ground that the recipient would be unjustly enriched if they were permitted to retain

it.  Balazick v. Ireton, 541 A.2d 1130, 1133 (Pa. 1988).  Under Pennsylvania law, courts

recognize that a constructive trust "is not really a trust at all but rather an equitable remedy."

Gee v. Eberle, 420 A.2d 1050, 1056 (Pa. Super. 1980) (quoting Buchanan v. Brentwood Fed. Sav.

& Loan Ass'n, 320 A.2d 117, 126 (1974)).  The theory underlying the constructive trust doctrine

is that "when property has been acquired in such circumstances that the holder of the legal title

may not in good conscience remain the beneficial interest, equity converts him into a trustee."
Id. Courts will impose a constructive trust only where the defendant has acquired the property at
issue as a result of fraud, duress, undue influence, mistake, abuse of a confidential relationship,
or other such circumstances suggesting unjust enrichment. See Yohe v. Yohe, 353 A.2d 417, 421
(Pa. 1976); Santoro v. Morse, 781 A.2d 1220, 1231 (Pa. Super. 2001). As the Third Circuit
recently noted, a movant seeking to impose a constructive trust bears a heavy burden of proof.
Mass. Mut. Life Ins. Co. v. Curley, 2012 U.S. App. LEXIS 1556, at *18 (3d Cir. Jan. 25, 2012).

Devon did not acquire the money in the Settlement Fund as a result of fraud, duress,
undue influence, mistake, abuse of a confidential relationship, or under any other circumstances
suggesting unjust enrichment. It was acquired through arm's length negotiation that resulted in a
settlement of the IBM litigation. In determining whether there has been unjust enrichment,
courts do not focus on the intention of the parties as manifested in a contract, but simply upon
whether there has been a retention of benefits under circumstances where it would be inequitable
for them to be retained. See Northeast Fence & Iron Works, Inc. v. Murphy Quigley Co., 933
A.2d 644, 668-69 (Pa. Cmwlth. 2007), app. denied, 596 Pa. 755, 947 A.2d 737 (2008); Gee v.
Eberle, 279 Pa. Super. 101, 420 A.2d 1050 (1980). There is nothing inequitable about Devon
recovering settlement proceeds it is entitled to under its settlement agreement with IBM.

The Mitts Firm also argues that without its "zealous advocacy and the professional
services provided by the vendors, there would have been no settlement fund and no stream of
royalty payments to Devon," and for these reasons the settlement funds would be wrongfully
retained by Devon. (Doc. No. 293 at 32-33.) In making this argument, the Mitts Firm overlooks
the fact that it breached the Fee Agreement by not paying outstanding invoices to vendors and,
accordingly, is not entitled to receive any additional fees. Because of the breach, Devon may be

exposed to vendor lawsuits and considerable litigation expenses in other cases covered by the Fee Agreement.  Receipt of these funds by Devon would not constitute unjust enrichment. Imposition of a constructive trust is not warranted under the facts here.

### 3.    Recoupment Defense

Devon argues that if the Court finds that the Mitts Firm is entitled to recover a portion of the settlement proceeds, then such recovery should be reduced by any fees and costs Devon may incur in the future in the IBM litigation or in other cases in which the Mitts Firm represented Devon.  In support of this claim, Devon relies on the equitable defense of recoupment.  (Doc. No. 296 at 51.)  Since the Court finds that the Mitts Firm is not entitled to any additional fees, the Court need not address the merits of the recoupment defense raised by Devon.

### F.    Intervenors' Requests for Relief

Intervenors EconLit, ParenteBeard, and FranklyLegal advance several theories in support of their claim that they are entitled to be paid for their services in the IBM litigation, along with counsel fees and interest.  They are:  1) the right to be paid through the charging lien of the Mitts Firm or under their own charging lien; 2) the right to be paid by the application of equitable estoppel; 3) the right to be paid under express, implied, and apparent authority of the law firms; and 4) the right to be paid attorney's fees and interest.  These claims will be discussed seriatim.

### 1.    Intervenors Are Not Entitled to be Paid by Applying a Charging Lien

Under the third <u>Recht</u> factor, the Intervenors must show that it was agreed that they would look to a fund rather than the client for compensation.  The agreements that the Intervenors executed with the Mitts Firm provided that their invoices would be paid by the Firm. There was no provision that they would be paid from a fund created by settlement of the IBM

litigation.  For this reason, the third <u>Recht</u> factor is not satisfied.  Given the failure to satisfy this factor, there is no need to discuss the others.

> **2.    Equitable Estoppel Provides a Remedy for the Intervenors to Be Paid a Portion of Their Outstanding Invoices**
>
> **a.    Controlling Law**

The Intervenors also assert that Devon should be equitably estopped by its conduct from challenging whether the Intervenors should be paid from the Settlement Fund.  (Doc. No. 292 at 22.)  Equitable estoppel is an equitable remedy that functions defensively to bar a party from raising a defense or objection it otherwise would have been able to assert.  <u>See, Reese v. Ford Motor Co.</u>, 499 Fed.App'x. 163, 168 (3d Cir. 2012).  Pennsylvania courts have held:

> The doctrine of estoppel is founded on considerations of sound public policy . . . "The rule of law is clear that where one by his words or conduct willfully causes another to believe in the existence of a certain state of things and induces him to act on that belief, so as to alter his own previous position, the former is concluded from averring against the latter a different state of things as existing at the same time."

<u>Albright v. City of Shamokin</u>, 419 A.2d 1176, 1178 (Pa. Super. 1980) (citations omitted).  The elements of estoppel have been summarized as follows:

> (1) Misleading words, conduct or silence by the party against whom the estoppel is asserted; (2) unambiguous proof of reasonable reliance on the misrepresentation by the party seeking to assert the estoppel; and (3) no duty of inquiry on the party seeking to assert estoppel.

<u>A.G. Edwards & Sons, Inc. v. Petrucci</u>, No. 91-6133, 1992 WL 185581, at *4 (E.D. Pa. July 23, 1992).

While it is a defense, equitable estoppel is also an equitable remedy.  <u>Haskins v. First American Title Ins. Co.</u>, 866 F.Supp.2d 343 (NJ 2012).  Because of its "unique nature as a special tool to do justice in individual cases, equitable estoppel differs from rules of law in that,

like other equitable remedies, it is not subject to fixed and settled rules of universal application."

Robinson v. Pan American World Airways, Inc., 650 F.Supp. 125 (SDNY 1986). "Equitable

estoppel rests largely on the acts and circumstances of the particular case . . . ." Id. A trial court

has the power to apply equitable estoppel as an equitable remedy as necessary to meet the needs

of a particular case.  Northern Crossarm, Inc. v. Chemical Specialties, Inc., 332 F.Supp.2d 1181,

1192 (W.D. Wisc. 2004).  As noted above, like other equitable remedies, equitable estoppel

"springs from the need to give relief where the strict enforcement of the rules of law would be

inadequate."  Greenwich Firm Productions, S.A. v. DRG Records, Inc., 1995 WL 312477, at *1

(SDNY May 22, 1995); see, e.g., Derry Township School District v. Suburban Roofing Co., 517

A.2d 225 (Pa. Cmwlth. 1986) (finding a school district equitably estopped from denying

payment to a contractor for supplies not specifically included in the contract, because the school

district had made representations that induced the contractor to purchase supplies for the project

with the understanding that he would be reimbursed for them); Cameron Manor, Inc. v.

Department of Public Welfare, 681 A.2d 836 (Pa. Cmwlth. 1996) (finding the Department of

Public Welfare equitably estopped from denying payment to a plaintiff after the plaintiff was

decertified under the contract, because the Department and its agents had made representations to

plaintiff that it would be paid).

        Thus, equitable estoppel has been applied in contract disputes to compel payment to a

party who was led to believe it would be paid for services rendered.  Like the situation at hand,

equitable estoppel applies when a combination of one party's misleading words, conduct, or

silence induces the other party to reasonably rely on those misrepresentations and provide

services with the understanding that they will be paid for them.

b.    **Devon's Conduct Requires the Application of Equitable Estoppel[39]**

In view of the applicable law, the next step in the analysis is to determine whether Devon's conduct, as manifested by the actions of its Chief Executive Officer John Bennett or its Chief Counsel Robert Mulhern, either through misleading words, conduct, or silence, unambiguously permitted reasonable reliance by the Intervenors. In other words, the Court must determine in applying this test whether the conduct of Devon caused the Intervenors to render services under their contract with Devon's agent, the Mitts Firm, with the understanding that they would be paid for those services. In addition, the Court must decide whether the Intervenors had a duty of inquiry to determine whether they were being misled into believing that they would be paid.

By December 22, 2011, Devon believed that the Mitts Firm had depleted the $4 million dollars of funding. Despite this knowledge, Devon authorized Mitts to seek more money from Burford, knowing that the Mitts Firm and the Kellogg firm, which became lead counsel in February 2012, would have the Intervenors continue to work on Devon's behalf. By December 22, 2011, Devon, through Mulhern, had the right to hold the Mitts Firm completely accountable under the Fee Agreement to pay all litigation expenses, which included the Intervenors' outstanding invoices. Rather than rely on the clause of the Fee Agreement requiring these payments by the Mitts Firm, Devon instead set in motion the understanding that additional

---

[39] The Mitts Firm is not entitled to relief under equitable estoppel because the Firm breached the Fee Agreement. "He who comes into equity must come with 'clean hands . . . .'" Lewis v. Attorney General of the United States, 878 F.2d 714, 723 (3d Cir. 1989). As stated above, the Mitts Firm breached the Fee Agreement by failing to pay the Intervenors and Kroll as required under the Fee Agreement and the one modification. Thus, equitable estoppel is not available to the Mitts Firm as a remedy.

funding could be obtained from Burford in order to pay the Intervenors.  The Intervenors

continued to work based on this conduct, which turned out to be entirely misleading.

The critical date from which equitable estoppel attaches is December 27, 2011.

Previously, on December 22, 2011, Mitts sent an email to Bennett and Mulhern, in which he

explained that he had exhausted the $4 million.  In the December 22, 2011 email, Mitts stated:

> We have exhausted the Burford money and we forecast it will take
> at least $2 million to take this case to trial.  I have attached a
> spreadsheet which details where we have used the Burford funding
> that you will find helpful.  From the "big picture" perspective,
> please consider the following: of the $4 million we received from
> Burford, ($925,000 was paid back to Devon, $1,086,928 paid
> outstanding fees owed for McKesson, Itochu, Gaspar and the IBM
> cases) which left approximately $2 million for the IBM case since
> last April.
>
> ***
>
> From our recent discussions, I understand that Devon is currently
> too cash strapped to provide this additional funding to take this
> case to trial.  If my understanding of Devon's current financial
> situation is correct, then we need to approach Burford for more
> money now.

(Ex. M-10 at 1-2.)  Attached to the email was a "Litigation Cost Summary from April 6, 2011

through November 30, 2011" listing various expenses, including amounts owed to the

Intervenors.  (Ex. M-10.)  In response to the email, Bennett and Mulhern told Mitts to go back to

Burford for up to an additional $4 million in funding.  On December 27, 2011, Mulhern wrote to

Mitts:

> I spoke with John [Bennett], and he approves approaching Burford
> and requesting an additional $2 million on the best terms possible
> for us.  Hopefully they will agree to accept $4 million for that
> additional investment.  On the bonus issue [Bennett] wants to hold
> that open until we see what Burford comes back with."

(Ex. M-11.)

As a result of this December 27, 2011 response authorizing him to approach Burford, Mitts emailed Aviva Will, the managing director of Burford.  (Mitts, 11/15/12 at 139, 146-47; Ex. M-12.)  Mitts provided Will with a litigation update and requested additional funding.  His email reads as follows:

> We truly appreciate the $4 million of funding that we have received from Burford and we have put all of that money to good use.  We now forecast that it will take at least $2 million more to get this case to trial.  We have exhausted all of the funds that we received and we are deep in the heart of the discovery.  Our burn rate has soared since October in part because of the massive document production and the need to prevent Jones Day from benefiting from its strategic late document productions.  I have discussed this with the client and we are authorized to request this additional funding from Burford.  Obviously we now know so much that is helpful to our case, but we need additional funding to complete discovery and to drive this case to trial.  Without the additional funding, we simply cannot do either.

(Ex. M-12.)  On January 6, 2012, Will attended a meeting at the Mitts Firm, which she would not have done without Bennett and Mulhern's authorization for Mitts to approach Burford for additional funding.  At that meeting, Will saw a presentation on the status of the IBM litigation, the discovery process, the use of the vendors, the work of experts drafting reports and running damage models, and the burn rate of fees and expenses.  (Mitts, 11/15/12 at 185-86.)  Also stemming from Bennett and Mulhern's approval, ParenteBeard and EconLit made presentations to Will on their work on the case.  While at the Mitts' offices, Will even observed FranklyLegal reviewers conducting document review on a Kroll database.  (Id. at 186.)

Following this meeting, Will recommended that Kellogg serve as outside counsel to advise on the merits of the case and the amount of additional funding.  (Mitts, 11/15/12 at 194.)  On January 11, 2012, Kellogg was hired as co-counsel in the IBM litigation with the understanding that Burford would pay Kellogg's fees.  (Id.; M-242.)  In the middle of February 2012, Bennett appointed Kellogg lead counsel in the IBM Litigation, and the Mitts Firm became

supporting counsel. (Mitts, 11/15/12 at 201.) As a result, Kellogg took responsibility for the work performed by the experts and asked the Mitts Firm to be responsible for paper discovery, including document production, interrogatories, request for admissions, and, to some extent, depositions. (Id. at 213.) By March 2012, Burford had a board meeting where Will made a presentation for approval of almost $6 million in additional funding, including over $2 million for Kellogg's fees. (Mitts, 11/29/12 at 21-22.) By April 2012, Burford had approved additional funding, although it was never advanced because Devon and IBM had decided to try to settle the case. (Id. at 37.) As a result, Devon never received any additional funding terms from Burford.

Meanwhile, by authorizing Mitts to approach Burford for more funding, by hiring Kellogg as co-counsel with overall responsibility for the case, and by refraining from telling the Mitts Firm or the Intervenors to cease working on its behalf, Devon knew that the Intervenors would continue to work on its behalf and incur fees. Devon also believed that the Mitts Firm did not have additional money with which to pay the Intervenors for any new fees incurred. Further, Devon hired Kellogg knowing that Kellogg would encourage the Intervenors to continue working. Both the Mitts Firm and Kellogg assured the Intervenors that they would be paid for their work.

For example, on March 10, 2012, Mitts emailed Mulhern to report that Will "wanted me to assure the Econolit [sic] people that they are definitely getting paid, but that she needs numbers to sell the additional funding to the [Burford] board this week." (Duncan, 11/14/12 at 35-37; Ex. M-27 at 1-2.) On March 29, 2012, Duncan, the president of EconLit, received an email from an attorney at Kellogg which noted: "[m]y understanding is that Devon is expecting to resolve its funding issues in the next few weeks, and as soon as that is done, [Devon] will be able to resolve the outstanding invoices." (Ex. E-12; see also Duncan, 11/14/12 at 38-40.)

Further, as partially noted above, on January 6, 2012, O'Brien, a ParenteBeard partner, and another employee of ParenteBeard attended a meeting with several attorneys from the Mitts Firm and Aviva Will. (O'Brien, 11/14/12 at 170-71; Doc. No. 292 at 9.) O'Brien provided a status update of the forensic investigation being performed by ParenteBeard and a detailed budget for future work with an estimated burn rate of approximately $50,000 to $85,000 a week. (Id. at 171-72.) That same day, ParenteBeard provided the Mitts Firm with a detailed estimate of the cost to perform additional project requirements, which was shared with Devon and Burford. (Ex. PB-4, M-244.) Again, this meeting with Aviva Will of Burford would not have taken place but for Devon's approval and encouragement that Mitts approach Burford for additional money.

After failing to be paid, Newman, another partner at ParenteBeard, emailed an attorney at the Mitts Firm on February 9, 2012, stating that ParenteBeard could no longer continue to work without payment. (Id.; Ex. PB-13.) Mitts forwarded Newman's email to Mulhern and Bennett, noting: "Burford has confirmed to me that the experts will be paid, but they haven't yet. This just hit a critical stage where the accountants are stopping work now until this is resolved. This imperils the entire case and must be resolved now." (Ex. M-244.)

Through March 2012, based upon the events that Bennett and Mulhern had put into motion with Burford, the two men knew that the Intervenors had continued to do a considerable amount of work on Devon's behalf and were now threatening to stop if they were not paid. On March 23, 2012, Kroll shut down the database because of lack of payment, thus ending the document review. (Hughes, 11/15/12 at 83-85.) Also on March 23, 2012, the FranklyLegal reviewers stopped reviewing documents because of the database shutdown. (Hughes, 11/15/12 at 60.) On March 30, 2012, Duncan of EconLit spoke with someone at Kellogg and was told that he would not be paid for a couple of weeks at the earliest. (Ex. E-15.) EconLit then ceased

working on that same day. (Duncan, 11/14/12 at 52.)  On March 13, 2012, Mulhern arranged a

meeting with Newman of ParenteBeard at Devon's office, to "inquire[] about ParenteBeard's

unpaid invoices and address the possibility of ParenteBeard completing work on a reduced flat

fee basis." (Exs. PB-16, PB-18 at ¶¶8, 9; Mulhern, 1/24/13 at 72.)  This meeting produced no

result at all.  By March 22, 2012, the Mitts Firm ceased all work on behalf of Devon and it

appears that by the end of March 2012, the Intervenors had stopped working too.

    Additionally, during settlement discussions, Devon assumed responsibility for paying the

outstanding vendor invoices using the settlement funds.  Devon and Burford entered into a

separate settlement agreement which noted Burford's agreement ████████████████████

████████████████████  In that agreement, on May 18, 2012, Bennet affirmed, albeit with

qualifying language, that as part of Burford's consideration for agreeing ████████████████

████████████████  "Devon is responsible for all of the Mitts Milavec outstanding invoices and

expenses including vendors and experts from the settlement."[40]  (MM-289, Appendix A at 8.)

Further, during settlement negotiations, Devon was aware of the outstanding amounts of the

Intervenors' invoices.  Mulhern testified:

> Q: Now, in the months leading up to this agreement with Burford,
> you personally knew the amounts of these outstanding invoices
> and expenses to the vendors and the experts, correct?
>
> A: Yes.

---

[40] The Mitts Firm does not argue in its Post-Hearing Memorandum of Law that Bennett's
statement in his affidavit, which is attached as Exhibit A to the settlement agreement with
Burford, that Devon would be responsible for the outstanding invoices of the Mitts
Firm modified the Fee Agreement with Devon.  Even if the Mitts Firm had made such an
argument, the Court would have rejected it.  There is no evidence that the Burford/Devon
settlement agreement was incorporated into the Fee Agreement and, as such, would constitute
a modification.

(1/23/13 at 67-68.)  On April 23, 2012, Mulhern wrote to Burford: "I am authorized to accept a total ███████████ on [be]half of the plaintiffs with ███████ being paid to Devon and ███ ████ being paid to Burford. Devon is responsible for any payments for the Mitts invoices and expenses including vendors and experts . . . ."  (MM-283; see also 1/23/13 at 35.)  In a May 18, 2012 email from Mulhern to Bennet, Mulhern wrote:  "Our agreement with Burford is that Devon is responsible to any Mitts fees and expenses and Burford is responsible for Kellogg fees and expenses."  (MM-291.)  Despite the agreement with Burford that Devon would be responsible to pay the Intervenors' outstanding invoices from the settlement funds, Devon's position has been in the litigation over distributions from that Fund that the Mitts Firm is responsible to pay the Intervenors, not Devon, and that Devon should be awarded the entire amount.

All of the above exchanges were the result of Bennett and Mulhern putting into place the purported mechanism of seeking additional funds from Burford, which led the Intervenors to believe they would be paid.  The Intervenors knew that the same funding source had already advanced money, which made it more likely that Burford would advance additional funds.  By this point, even Mitts believed that the Intervenors would be paid.  The Intervenors learned about the additional funding from the Mitts Firm, Kellogg, and Aviva Will of Burford as a result of Devon's instructions that the litigation move forward by approaching Burford for more money.  In fact, Burford had approved the funding and would have prepared the paperwork had Devon not decided to settle the case and put a stop to that process.  As Mitts testified:  "Burford had approved additional funding[, but] Devon and Burford had decided that they would try to settle the case, and if that were possible they wouldn't have to draw additional funding to litigate

the case, and so they put [the Mitt's Firm] into a go slowly mode . . . ." (Mitts, 11/29/12 at 21-22.)

It is inequitable for Devon to now say that the Intervenors are not entitled to payment, when Bennett and Mulhern had set the funding process in motion and knew that the Intervenors were working under the assumption that additional funding from Burford would be forthcoming. Based on the evidence in this record, the Court finds credible Maurice Mitts' testimony that Burford did approve such funding. Devon interfered with this process by seeking a settlement with IBM and not completing the transaction with Burford. Devon now takes the untenable position that the Intervenors should not be paid from the Settlement Fund and instead should look to the Mitts Firm for payment, despite agreeing to assume responsibility for paying the Intervenors in the settlement agreement with Burford. Such lamentable conduct is inequitable and cannot be countenanced.

Finally, the Intervenors made inquiries from December 27, 2011 to the end of March 2012 about receiving payment on their invoices. They reasonably relied, however, on Devon's representations and conduct, which caused the litigation to continue with the understanding that additional funds would be obtained. The Intervenors have fulfilled their duty of inquiry and have set forth unambiguous proof of reasonable reliance on the misrepresentation that additional funds would be available. For all these reasons, equitable estoppel applies here, and the Intervenors are entitled to be paid for their work from December 27, 2011 to the date in March when they ceased working on the case.

c.     **Devon's Arguments to Overcome the Application of Equitable Estoppel are Unavailing**

Devon makes three arguments why equitable estoppel should not be applied here. First, Devon contends that equitable estoppel should not apply because Devon was never in contractual

privity with the Intervenors, and therefore their claims properly lie against the Mitts Firm rather than Devon. (Doc. No. 293 at 3.) Equitable estoppel, however, does not require privity of the parties because it is an equitable concept to prevent patent unfairness. Moreover, under equitable estoppel, it is the actions of the principal, not the actions of an attorney as its agent, that directly creates the environment on which third parties rely to their detriment. Here, Devon caused the Intervenors to perform services after December 27, 2011. Regardless of whether Devon or the Mitts Firm had the contract with the Intervenors, Devon took advantage of the existing contractual relationship between the Mitts Firm and the Intervenors and misled the Intervenors into continuing to work on Devon's behalf. For this conduct by Devon, as described in more detail above, equitable estoppel applies here.

Second, Devon contends that it never made representations to the Mitts Firm, the Intervenors, or Kellogg that additional payments would be forthcoming beyond the $4 million flat fee noted in the Fee Agreement. As explained above, equitable estoppel bars Devon from asserting this defense. Similar to the cases cited above in which equitable estoppel applies, Devon's conduct here led the Intervenors to believe that Devon would obtain the money with which to pay them. See Derry Township School District, 517 A.2d 225; Cameron Manor, Inc. v. Department of Public Welfare, 681 A.2d 836. Like the plaintiffs in these cases, the Intervenors are entitled to be paid for work because Devon made various representations that induced the Intervenors to continue working on the litigation.

Third, Devon contends that because equitable estoppel was not pled as a cause of action in any of the Intervenor's Complaints, it cannot be asserted here. However, under Federal Rule of Civil Procedure 8(a)(2), a claimant is not required to set forth any legal theory or argument in a pleading. Skinner v. Switzer, 131 S. Ct. 1289 (2011) ("under the Federal Rules of Civil

Procedure, a complaint need not pin plaintiff's claim for relief to a precise legal theory. Rule 8(a)(2) of the Federal Rules of Civil Procedure generally requires only a plausible 'short and plain' statement of the plaintiff's claim, not an exposition of his legal arguments."). Rather, pleadings are only required to contain sufficient factual averments to show a plausible claim for relief. Id.

Pursuant to Rules 24(b) and (c) of the Federal Rules of Civil Procedure, the Intervenors have filed separate Complaints alleging sufficient facts to support equitable estoppel. (Doc. Nos. 271, 273, and 276.) ParenteBeard's Complaint states in part:

> 15. From the outset the Mitts Firm advised ParenteBeard that funding for the litigation in the Underlying Case was being provided by Devon's funding source, Burford Capital ("Burford"), a third party lender.
>
> ***
>
> 17. Devon was fully aware of the scope and payment arrangement for ParenteBeard's services and regularly communicated with the Mitts Firm regarding the costs for such services.
>
> 18. At the time ParenteBeard was engaged, Devon knew that the only funding for ParenteBeard's services was the Burford financing. Devon directed the Mitts Firm to retain ParenteBeard knowing that payment for ParenteBeard's services could only come from Burford and deducted from the proceeds of any Settlement.
>
> ***
>
> 23. Devon was aware of the accelerated work and associated cost and accepted the benefit of ParenteBeard's services.
>
> ***
>
> 25. Unfortunately, payments to ParenteBeard ceased. Relying upon assurances that payment would be forthcoming, ParenteBeard continued to work on Plaintiff's behalf.

\*\*\*

> 27.  During settlement negotiations of the Underlying Case, Devon expressly agreed with Burford that Devon would be responsible for ParenteBeard's invoices.   Subsequently,  it appears that Devon changed  its  position  and  wrongfully  claimed  that  it  had  no responsibility for ParenteBeard's invoices.

(Doc. No. 276 at 1-5.)

The Complaint filed by FranklyLegal states in part:

> 7.   Mitts Milavec was acting as an agent of the Defendants [Devon] in retaining Plaintiff in the Underlying Action.

\*\*\*

> 11.  A database that contained the detailed work product of this coding and analysis was established and used by Mitts Milavec and other  attorneys  and  experts  providing  services  in  support  of Defendants [Devon] prosecution of its claims in the Underlying Action.  This database and the work of the FranklyLegal Personnel were  critical  for  the  continued  prosecution  of  the  Underlying Action.

\*\*\*

> 14.  Mitts Milavec significantly utilized FranklyLegal Personnel in identifying the most relevant pool of documents for expert analysis and review, and for developing detailed witness files and outlines built upon by Mitts Milavec attorneys in taking and defending over twenty (20) depositions in late 2011 and the first quarter of 2012.

\*\*\*

> 16.   In sum, among other things, the database created by the FranklyLegal Personnel was used in the Underlying Action for:

> > (i)    deposition preparation, including identification of "hot documents" used to prepare witness files to  assist  in  both  taking  and  defending depositions;

> > (ii)    responding  to  more  than  1,400  Requests  for Admissions  and  other  extensive  written discovery;

66

    (iii)    preparing third party discovery;

    (iv)    complying with the Court's Scheduling Orders;

    (v)    privilege reviews;

    (vi)    providing information to experts;

    (vii)    drafting motions and briefs;

    (viii)    preparing for oral argument;

    (ix)    settlement negotiations; and

    (x)    case and discovery strategizing.

17. FranklyLegal regularly billed Mitts Milavec for the services it provided in accordance with the terms of their agreement. Mitts Milavec reviewed every FranklyLegal bill at the time it was received. At no time did Mitts Milavec or Defendants [Devon] contest any of FranklyLegal charges. The total billed by FranklyLegal was $554,543.63.

18. Mitts Milavec has paid $81,204.00 of that amount, leaving an outstanding balance of $473,339.63, not including interest and other costs which Plaintiff is entitled to under the Agreement and otherwise.

19.   This information was provided by Mitts Milavec to Defendants in advance of the settlement of the case and the apportionment of the settlement proceeds between Defendants.

               ***

21. Because Mitts Milavec's position is that Defendants [Devon] or a third party should pay the balance of the amount owed to FranklyLegal, it has refused and is, upon information and belief, presently unable to pay the amount due to FranklyLegal

(Doc. No. 271 at 3-5.)

Finally, EconLit's Complaint states in part:

2. On or about December 12, 2011, the law firm of Mitts Milavec, LLC, on behalf of and as agent of Devon, authorized EconLit to

commence work as an expert/consultant related to the instant litigation . . . .

\*\*\*

7. Before Mitts Milavec authorized EconLit to proceed, Devon's general counsel was aware of EconLit's engagement, scope work, and rates.

\*\*\*

10. A substantial portion of EconLit's work was performed at the direction of Devon's agent, the law firm of Kellogg Huber.

\*\*\*

12. During the course of EconLit's performance of expert/consultant services, Devon's general counsel received copies of EconLit's invoices.

13. Devon's receipt of EconLit's invoices included receipt of invoices on or about February 21, 2012.

14. Devon's receipt of EconLit's invoices included receipt of invoices on or about March 12, 2012.

\*\*\*

18. Devon never instructed EconLit to cease rendering expert/consultant services.

\*\*\*

22. EconLit was given assurances by Devon's agents, including Kellogg Huber, that EconLit's invoices would be paid.

23. In reliance on these assurances, EconLit continued to render services for Devon.

(Doc. No. 273 at 1-3.) To adequately plead the element of reasonable reliance for a claim of

equitable estoppel, a plaintiff need do no more than generally plead that the inducing party knew

of should have known that the other party would rely on the representations to his detriment.

A.G. Edwards & Sons, Inc. v. Petrucci, 1992 WL 185581 (citing Fed. R. Civ. P. 9(b).)  The Court

is satisfied that the Intervenors have sufficiently pled in their respective Complaints the necessary facts to support a claim of equitable estoppel.

In sum, equitable estoppel attached on December 27, 2011, when Mulhern gave Mitts the authorization to approach Burford for additional funding. Equitable estoppel applies from that date to the end of March when the Intervenors ceased working. During that time period, Devon engaged in a combination of misleading words, conduct, and silence to induce the Intervenors to continue working with the expectation that they would be paid. The Intervenors reasonably relied on these words, conduct, and silence and fulfilled their duty of inquiry. As such, Devon is equitably estopped from avoiding liability for those payments and is responsible for paying the outstanding Intervenor invoices from December 27, 2011 to March 2012.

### 3. A Jury Must Decide Whether the Mitts Firm Acted with Express, Implied, or Apparent Authority on Behalf of Devon

The Intervenors also contend that they should be paid because the Mitts Firm was acting with the express, implied, and apparent authority of Devon when it hired the Intervenors and in accord with this authority Devon is responsible for paying for their services. (Doc. No. 292 at 28.) As noted previously, Courts recognize three types of attorney authority – express, implied, and apparent – and the acts an attorney makes within the scope of his employment and authority are binding on his client. Tiernan v. Devoe, 923 F.2d 1024, 1037 (3d Cir. 1991); Walck v. Com. Dept. of Transp. Bureau of Driver Licensing, 625 A.2d 1276, 1279 (Pa. Cmwlth. 1993). Express authority will be found when a client gives his attorney explicit instructions regarding an action and thus binds himself by the attorney's compliance. Id. at 1033. However, merely retaining an attorney will not suffice to give the attorney express authority to act for the client; there must be some affirmative action taken by the client to confer that authority. Id. at 1034.

Next, implied authority will be found when there are written or spoken words, or other conduct by the client, that justify an inference that the attorney may act on the client's behalf. Tiernan, 923 F.2d at 1034. In matters concerning the management of litigation, implied authority is initially presumed for the sake of judicial efficiency. In re Paige, 476 B.R. at 871 (citations omitted). "Implied authority arises out of express authority; it is the authority to do those acts of the agent that are necessary, proper and usual in the exercise of the agent's express authority. Thus there can be no implied authority without a base of express authority." Ortiz v. Duff-Norton Co., Inc., 975 F. Supp. 713, 718 n.2 (E.D. Pa. 1997) (internal quotations omitted) "[I]mplied authority will be found when there are written or spoken words or other conduct by the client that justify an inference that an attorney may act on his client's behalf." In re Paige, 476 B.R. at 870 (citing Tiernan, 923 F.2d at 1034; Tucker v. Tucker, 87 A.2d 650, 656 (Pa. 1952)).

Finally, "apparent authority is demonstrated through a client's manifestations to a third party that the client's attorney has the authority to act on the client's behalf." Id. at 871 (citing Tiernan, 923 F.2d at 1034) (other citations omitted). Apparent authority exists to the extent that it is reasonable for the third party dealing with the agent to believe the agent is authorized. In re Mushroom Transp. Co. Inc., 382 F.3d 325, 345 (3d Cir. 2004). The test for determining whether an agent has apparent authority is "whether a man of ordinary prudence, diligence and discretion would have a right to believe and would actually believe that the agent possessed the authority he purported to exercise." Id. (citing Universal Computer Sys. Inc. v. Med. Svcs. Ass'n of Pa., 628 F.2d 820, 823 (3d Cir. 1980)).

Importantly, the nature and extent of an agent's authority is a question of fact for the jury and is not proper for this Court to decide. Turner Hydraulics, Inc. v. Susequehanna Constr.

70

Corp., 606 A.2d 532 (Pa. Super. 1992). The question for the jury becomes whether a person of

ordinary prudence, diligence, and discretion would have believed that the agent had the authority

that he alleges he had. Joyner v. Harleysville Ins. Co., 393 Pa.Super. 386 (1990).  For example,

in Gizzi v. Texaco, Inc., the Third Circuit held that the District Court had erred in granting a

motion for directed verdict on the question of apparent authority, and remanded the case.  The

Third Circuit stated:

> Questions of apparent authority are questions of fact and are
> therefore for the jury to determine . . . While the evidence on
> behalf of appellants by no means amounted to an overwhelming
> case of liability, we are of the opinion that reasonable men could
> differ regarding it and that the issue should have been determined
> by the jury, after proper instructions from the court.

Gizzi v. Texaco, Inc., 437 F.2d 308, 310 (3d Cir. 1970). The jury must then evaluate the conduct

of the parties in light of all of the circumstances in determining the existence of apparent

authority. Turner Hydraulics, 606 A.2d at 535.  Questions of express and implied authority are

also questions of fact for a jury to decide.  Id.

Here, there is a factual question as to whether the Mitts Firm or Kellogg acted with the

express, implied, or apparent authority of Devon to pay the Intervenors.[41]  The Intervenors allege

that the Mitts Firm and Kellogg had the authority to act on behalf of Devon as their client.  (Doc.

292 at 18.)  Devon alleges that there was no express or implied authority, and that any apparent

authority should not extend to such "unauthorized acts as Mitts Milavec and Kellogg Huber

reassuring the Intervenors that Devon would pay the Intervenors." (Doc. No. 293 at 17.)  While

---

[41] Although a jury must decide whether the Mitts Firm acted with express, implied, or apparent
authority, at least with respect to express and implied authority, it appears tenuous that the
Mitts Firm acted with such authority because the Fee Agreement explicitly stated that the
Mitts Firm would pay all litigation expenses.  In view of the fact that a jury trial would be
necessary on the issue of authority, there is no need for the Court to further address this issue.

the Mitts Firm did have agreements with the Intervenors which stated that the Firm would be responsible for paying the Intervenors, the Mitts Firm had a Fee Agreement with Devon as its attorney and agreed in the Fee Agreement to be responsible for the payment of all litigation expenses from its flat fee.  Because of this restriction, Devon would be entitled to a jury trial in order to prove that the Mitts Firm was not authorized as its agent to make representations to the Intervenors that would bind Devon to pay them.  Accordingly, this Court must defer to Devon's right to a trial by jury on the issue of express, implied, or apparent authority and cannot make findings on this claim as a matter of law.[42]

### 4.    Intervenors Are Not Entitled to Be Paid Attorney's Fees or Interest

The Intervenors also seek attorney's fees incurred in litigating this action and interest on the money they are entitled to receive for services rendered.  While EconLit's contract with the Mitts Firm contains a provision for the recovery of attorney's fees, the contracts of ParenteBeard and FranklyLegal do not have a similar clause.  The contracts of ParenteBeard and FranklyLegal do contain a provision that interest will be charged on unpaid invoices.

The Court, however, is not making an award to the Intervenors here based on the contracts between the Intervenors and the Mitts Firm.  The award is based on equitable estoppel.  Therefore, the Intervenors are not entitled to any attorney's fees under those contracts.  For the same reason, the Intervenors are not entitled to be paid interest on outstanding invoices under their contracts with the Mitts Firm.

---

[42]Apparent authority differs from equitable estoppel.  The former is a legal theory while the latter is an equitable one.  Equitable estoppel arises from misleading words, conduct, or silence by the party against whom estoppel is asserted.  The test for apparent authority does not involve misleading conduct, but only whether it is reasonable for the third party dealing with the agent to believe the agent is authorized to act for his client.

## IV.   CONCLUSION

For reasons stated above, the Court denies the claim of the Mitts Firm to additional fees from the Settlement Fund.  Specifically, the Mitts Firm is not entitled to be paid for hourly work, to receive five percent of the settlement proceeds or five percent of royalty payments because the Firm breached the Fee Agreement when it failed to pay the litigation expenses as evidenced by the Intervenors' outstanding invoices and the $250,000 to Kroll as promised to Devon.  As such, no charging lien will be imposed by the Court in favor of the Mitts Firm or even in favor of the Intervenors for the reasons noted above.  Moreover, no constructive trust will be imposed on the settlement funds in favor of the Mitts Firm.  The Court does find, however, that in applying the law of equitable estoppel, the Intervenors are entitled to be paid for services rendered from December 27, 2011 to March 2012.  The Intervenors, however, will not be awarded attorney's fees or interest.  Devon will receive the balance of the ▮▮▮▮▮▮ settlement proceeds after payment to the Intervenors from the Settlement Fund in the custody of the Clerk of Court. Accordingly, the Court will enter an appropriate Order in accordance with the Opinion of the Court.

ENTERED

DEC 3 1 2013

CLERK OF COURT